# EXHIBIT 2

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

-----------------------------------------------------------------x

DISRUPTIONAL LTD. and &VEST BEAUTY
LABS LP,                                                                    :   Index No. 650928/2023

        Plaintiffs,                :

   - against -                                                :

AMYRIS, INC.,                                                              :

        Defendant.                   :

-----------------------------------------------------------------x

## COMPLAINT

Plaintiffs Disruptional Ltd. ("Disruptional") and &Vest Beauty Labs LP ("&Vest")

(collectively with Disruptional, "Sellers") bring this breach of contract action against Amyris,

Inc. ("Amyris" or "Purchaser"), showing as follows:

## NATURE AND SUMMARY OF THE ACTION

1.      Plaintiffs bring this lawsuit to recover in excess of $31,250,000 which is owed to

them but for Defendant Amyris's bad faith breach of a Share Purchase Agreement dated August

31, 2021("SPA" or "Agreement"), through which Sellers sold Beauty Labs International Ltd.

("Beauty Labs"), a technology development company focused on the beauty and wellness

industries, to Amyris, a biotechnology company operating in the beauty and wellness industry

and publicly traded on the NASDAQ.

2.      The SPA was structured to provide Sellers additional consideration in the form of

earnout payments in the event that Beauty Labs hit certain revenue milestones in the years after

the deal closed.  Although Sellers are informed and believe that Beauty Labs exceeded those

milestones under a variety of calculation methodologies, Amyris now refuses to make the

earnout payments owed to Sellers in clear breach of the SPA.

3.      In further breach of the SPA, when Plaintiff Disruptional, the Seller's designated

Representative under the SPA, and the other sellers sought to learn more about Amyris's position

under their information rights delineated in the SPA, Amyris resorted to pre-textual excuses,

failing to provide contractually required information, in further breach of the SPA.  Amyris's

refusal to timely provide the requested information mandated by the SPA nullifies Plaintiffs

ability to dispute Amyris's calculations under the mechanism provided in the SPA.

4.      Finally, in further breach of the SPA, over the last year Amyris's Chief Executive

Officer John Melo has diverted the Beauty Labs' team into numerous projects for Amyris and its

2

Case 1:23-cv-02245-RA   Document 1-2   Filed 03/15/23   Page 4 of 185

portfolio companies which fall outside of the projects the parties agreed Beauty Labs would work on in the SPA. On multiple occasions, Mr. Melo gave assurances that Amyris would count the revenue from these projects towards the earnout payments Amyris owes to Sellers under the SPA. Yet now that these earnout payments have become due, Amyris wishes to pretend that the diversion, its assurances and the successful contribution of Beauty Labs to its business never occurred.

5.      Amyris's actions leave Plaintiffs with no choice but to initiate this lawsuit to recover in excess of $31,250,000 owed to them under the SPA.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction pursuant to N.Y. Jud. Law §140-b and the SPA § 9.10.

7.      Amyris, Inc. has consented to the personal jurisdiction of this Court. *See* SPA § 9.10(a)(i). The SPA is a commercial contract governed by New York law that involves a transaction worth more than $1 million. See N.Y. GOL §§ 5-1401, 5-1402.

8.      Venue is proper pursuant to the SPA entered into between the parties, which contains a choice-of-forum clause specifying that:

> This Agreement shall be governed by, and construed in accordance with, the Laws of the State of New York, without regard to the conflicts of Law rules of such state. The Parties agree that any Action seeking to enforce any provision of, or based on any matter arising out of or in connection with this Agreement shall be brought and determined exclusively in any New York federal court sitting in the Borough of Manhattan of The City of New York (or any appellate court thereof); provided, however, that if such federal court does not have jurisdiction over such Action, such Action shall be heard and determined exclusively in any New York state court sitting in the Borough of Manhattan of The City of New York.

Art. IX, Sec. 9.10(a).

3

## PARTIES

9.      Plaintiff Disruptional Ltd. is a United Kingdom registered company with its principal place of business at St. Johns Innovation Park, Cowley Road, Cambridge CB4 0WS, United Kingdom.

10.     Plaintiff &Vest Beauty Labs LP is a Delaware limited partnership with its principal place of business at 109 Old Branchville Rd, Ridgefield, Connecticut 06877.

11.     Defendant Amyris, Inc. is a Delaware corporation, with its principal place of business at 5885 Hollis Street, Suite 100, Emeryville, California 94608-2405.

## SUBSTANTIVE ALLEGATIONS

I.      **The Share Purchase Agreement**

12.     On August 31, 2021, Amyris and Beauty Labs entered into the SPA, whereby Amyris acquired Sellers' equity in Beauty Labs, becoming the sole owner of the Company.  A copy of the SPA is attached as **Exhibit A**.  In addition to the up-front purchase price, the SPA provides for a number of subsequent payments in shares or cash to the Sellers, based on milestones specified in the SPA (the "Earnout Payments").

13.     Because the deal was structured to include these Earnout Payments, although Amyris acquired Beauty Labs and took "control over . . . [Beauty Labs] and the operation of the [Beauty Lab's] business . . . .", Amyris was restricted from diverting the efforts of the Beauty Labs' team away from the earnout targets.  The SPA thus provides that Amyris "***shall not take any action for the purpose of, or with the primary intention of, reducing the Earnout Payments***" and must "comply with the business plan set forth on Schedule 2.08(e)(i)(A)." *See* Art. II, Sec. 2.08(e)(i)-(ii).

4

FILED: NEW YORK COUNTY CLERK 03/09/2023 01:48 PM
NYSCEF DOC. NO. 19
Case 1:23-cv-02245-RA   Document 1-2   Filed 03/15/23   Page 6 of 185

INDEX NO. 650928/2023
RECEIVED NYSCEF: 03/09/2023

14.     The agreed-to business plan projected annual revenues in categories tied to the

Earnout Payments under the SPA:



Art. II, Sec. 2.08(e)(i)(A).

**A.     The First Earnout**

15.     Pursuant to Section 2.08 of the SPA, "as additional consideration for the Seller

Shares and cancellation of the Other Seller Securities," the parties agreed that "Purchaser shall

make, or cause to be made, to Sellers and Optionholders, in accordance with the terms of this

Section 2.08 . . . Earnout Payments[,]" including the "**First Earnout.**"

16.     As part of the First Earnout, Sellers and Optionholders become entitled to the

"**First Beauty Labs Revenue Payment**" if the "**Beauty Labs Revenue**" for the period between

January 1, 2022 and December 31, 2022 ("**First Beauty Labs Revenue**") is equal to or exceeds

> If the First Earnout Beauty Labs Revenue is equal to or greater than ███████
> then . . . Purchaser will issue to each Seller and each Optionholder a number of
> Purchaser Shares equal to (A) its Pro Rata Portion of, subject to any reduction
> required under the retention provisions set forth in <u>Schedule 2.08</u>, that number of

5

validly issued, fully paid and nonassessable Purchaser Shares (rounded down to the nearest whole share) equal to the quotient determined by dividing (1) an amount equal to (a) $31,250,000, less (but not below zero) solely in respect of any Seller (but not any Optionholder) (b) any amounts set off pursuant to Article VIII that are not reflected in the calculation of any other Earnout Payment, by (2) the Issuance Price determined as of the date of such issuance (the "First Earnout Beauty Labs Revenue Payment"); provided that all such payments shall be made in cash to the extent required pursuant to Section 2.10.

Art. II, Sec. 2.08(a)(ii).

17.     The SPA defines Beauty Labs Revenue to include (1) **Third Party Beauty Labs Revenue**, made up of sales, licenses, subscription, or transaction fees paid by third-party purchasers or end users of **Company Products**, and (2) **Synthetic Beauty Labs Revenue**, made up of SaaS revenue per user from sales charged to Amyris or any of its portfolio companies equaling a specified amount:

> (a) the revenue of the Company recognized from the sale to, or license, subscription or transaction fees paid by, any third-party purchaser or end user (other than Purchaser or any of its Affiliates) of Company Products (the amount determined pursuant to this clause (a) being the "Third Party Beauty Labs Revenue") and (b) an implied software as a service (SaaS) revenue per user from sales charged to Purchaser or any of its Affiliates by the Company equal to the lesser of (i ███ per user and (ii) the lowest price per user charged by the Company to any third party (the amount determined pursuant to this clause (b) being the "Synthetic Beauty Labs Revenue"), in the case of clause (a), determined in accordance with U.S. GAAP consistently applied by Purchaser, and in each case of clauses (a) and (b), based upon the books and records of the Company and Purchaser.

Art. I, Sec. 1.01.

18.     The SPA defines "**Company Products**" as "all service offerings or products (including IT Assets) made or currently intended to be made commercially available or otherwise distributed, or currently under development, by or on behalf of the Company." Art. I, Sec. 1.01.

INDEX NO. 650928/2023
Case 1:23-cv-02245-RA   Document 1-2   Filed 03/15/23   Page 8 of 185
RECEIVED NYSCEF: 03/09/2023

19.     As a further part of the First Earnout, and in addition to the First Beauty Labs

Revenue Payment, if the First Earnout Beauty Labs Revenue exceeds ▇▇▇▇▇ Sellers

become entitled to a second Earnout Payment, the "**First Overperformance Earnout**

**Payment**":

> If the First Earnout Beauty Labs Revenue exceeds ▇▇▇▇▇▇ (the
> "Overperformance Earnout Threshold"), then . . . Purchaser will pay or cause to be
> paid in cash to each Seller and each Optionholder its Pro Rata Portion of, subject
> to any reduction required under the retention provisions set forth in Schedule 2.08,
> an amount equal to (A) either (1) (a) the lesser of (x) the amount by which the First
> Earnout Beauty Labs Revenue exceeds the Overperformance Earnout Threshold
> and (y) the portion the First Earnout Beauty Labs Revenue that is Third Party
> Beauty Labs Revenue, multiplied by (b) ▇▇▇▇▇▇ or (2) the applicable
> Accelerated Overperformance Payment, if applicable, less (but not below zero)
> solely in respect of any Seller (but not any Optionholder) (B) any amounts set off
> pursuant to Article VIII that are not reflected in the calculation of any other Earnout
> Payment, in immediately available funds by wire transfer to the account of such
> Seller and such Optionholder set forth in the Preliminary Closing Statement (the
> "First Overperformance Earnout Payment"); provided that all such payments shall
> be made in cash to the extent required pursuant to Section 2.10.

Art. II, Sec. 2.08(a)(iii).

**B.     Process For Determining Earnout Payments**

20.     The SPA lays out a process for determining these First Earnout payments amongst

the parties.

21.     The first step requires Amyris to send Disruptional, as "Representative" under the

SPA, a "**First Earnout Beauty Labs Revenue Statement**" which sets out the First Earnout

Beauty Labs Revenue for January 1, 2022 through December 31, 2022 ("Relevant Period"):

> [w]ithin twenty (20) Business Days after December 31, 2022, Purchaser will deliver
> to the Representative a written statement (the "First Earnout Beauty Labs Revenue
> Statement") setting forth Purchaser's calculation of the Beauty Labs Revenue,
> Third Party Beauty Labs Revenue and Synthetic Beauty Labs Revenue recognized
> during the twelve (12) month period between January 1, 2022 and December 31,
> 2022 (the "First Earnout Beauty Labs Revenue").

Art. II, Sec. 2.08(a)(i)

22.     The second step requires Amyris and Beauty Labs to provide Disruptional

reasonable access to the books and records used in preparing the Earnout Statement so that

Disruptional may adequately review the Statement, and determine whether to dispute the

statement:

> In connection with the Representative's review of any Earnout Statement, the
> Company and Purchaser shall provide the Representative and its representatives and
> accountants all books, records, work papers and other information used in preparing
> the Earnout Statement reasonably requested by the Representative, and provide
> reasonable access, during normal business hours, to members of the Company's
> accounting and financial staff in connection with the Representative's review thereof.

Art. II, Sec. 2.08(c).

23.     Disruptional's access to the books and records used to prepare the Earnout

Statement is key to its rights under the SPA, because if Disruptional does not provide Amyris

with a Dispute Notice by the 20th business day after it receives the Earnout Statement, the

Earnout Statement becomes final:

> An Earnout Statement shall be final, conclusive and binding on the Parties and on
> all Optionholders unless the Representative provides a Dispute Notice to Purchaser
> no later than the twentieth (20th) Business Day after the delivery to the
> Representative of such Earnout Statement[.]

Art. II, Sec. 2.08(c).

## II.     Beauty Labs Achieves The Milestones For The First Beauty Labs Earnout Payments

24.     Sellers are informed and believe that Beauty Labs at all times complied with its

obligations under the SPA and achieved over ███████ in Beauty Labs Revenue for 2022,

entitling Sellers to both the First Beauty Labs Revenue Payment and First Overperformance

Earnout Payment.

25.     Sellers are informed and believe that, by the end of 2022, Beauty Labs had

achieved almost double the revenue required for these First Earnout Payments in the relevant

8

categories combined under the plain language of Beauty Labs Revenue as defined in SPA and business plan set out in the SPA.

26.     Indeed, Sellers are informed and believe that the SaaS revenue for 2022 alone entitled Sellers to both the First Beauty Labs Revenue Payment and First Overperformance Earnout Payment.

27.     Notably, Beauty Labs achieved these revenue milestones under the SPA despite Amyris's diversion of Beauty Labs resources from the beginning in an attempt to reduce the Earnout Payments.

## III.     Amyris Diverts Beauty Labs Resources In Breach Of The SPA

28.     In or around March 2022, the Sellers are informed and believe that Mr. Melo began directing Beauty Labs co-founders Mark Gerhard and Riaan Hodgson to divert Beauty Labs resources to pursue initiatives outside the business plan including those related to: (1) nano and micro-influencers, (2) Amyris portfolio companies struggling commercially, including ONDA Beauty, Costa Brazil, EcoFabulous, and Terasana, and (3) live-selling technology (based on which the company filed numerous patent claims).

29.     The Sellers are informed and believe that, before diverting its resources away from the agreed upon business plan, the Beauty Labs team sought assurances from Mr. Melo that the revenue from Amyris's proposed new business plan for the Company would count towards the Earnout Payments under the SPA.  This was important, especially for the First Overperformance Earnout Payment, which is calculated in part based on the amount of Beauty Labs Revenue for the Relevant Period over the ██████ nitial threshold.  Mr. Melo continually provided these assurances in meetings and other correspondence with Beauty Labs, including as follows:

9

Case 1:23-cv-02245-RA   Document 1-2   Filed 03/15/23   Page 11 of 185

a. <u>July 2022</u>: Beauty Labs had a meeting with Mr. Melo at the Companies office in Cambridge, England during which the Company presented its second quarter earnings. Those earnings included revenue streams for live-selling tech. The Company also set out its third quarter Earnout plan and goals during this meeting, which included ONDA Beauty, nano- and micro-influencers, and revenue targets for each. Mr. Melo approved the prior earnings from the second quarter as counting towards the total Earnout, as well as the third quarter Earnout plan.

b. <u>September 2022</u>: Mr. Gerhard confirmed to Mr. Melo via e-mail Beauty Labs' commitment to the revised business plan set out by Mr. Melo for the Company, including Beauty Labs' understanding that Amyris would ultimately credit these revised revenue streams against the First Earnout Payment thresholds.

c. <u>October 4, 2022</u>: Beauty Labs provided Mr. Melo with its calculation of the revenue attributable to its Earnout Payment under the SPA to-date, as well as expected revenue through the end of the year ahead of a meeting between Mr. Gerhard and Mr. Melo later that day. The calculations showed that Beauty Labs had already reached the threshold to unlock the First Beauty Labs Revenue Payment. Mr. Melo confirmed these calculations in his meeting with Beauty Labs that day.

d. <u>October 6, 2022</u>: Mr. Gerhard asked Mr. Melo to confirm Beauty Labs should continue to pursue the revenue streams outside of the business plan in the

10

SPA. Mr. Gerhard also laid out for Mr. Melo how Beauty Labs had achieved the threshold for the First Beauty Labs Revenue Payment under the SPA.

e.  <u>October 28, 2022</u>: After meeting in London the week prior, Mr. Gerhard e-mailed Mr. Melo to confirm their agreement that the revenue from the work Beauty Labs was now doing outside of the business plan in the SPA would count towards the Earnouts under the SPA.

f.  <u>December 7, 2022</u>: Mr. Melo and Mr. Gerhard had a meeting where Mr. Melo confirmed that Beauty Labs achieved the SPA Earnout targets for 2022 and that Amyris would pay Beauty Labs the First Earnout payments.

g.  <u>January 24, 2023</u>: Mr. Gerhard sent Mr. Melo the Beauty Labs business plan for the upcoming year. The business plan laid out the Beauty Labs Revenue applicable to its First Earnout payment for 2022 as totaling ███████.

30.     Despite Mr. Gerhard's ongoing requests that Mr. Melo confirm the revenue streams from the work outside of the business plan counted towards the Earnout Payments, and despite Mr. Melo's confirmations, on January 27, 2023, Amyris sent to Disruptional and &Vest the Earnout Statement required under the SPA for 2022, which claimed that Beauty Labs did not achieve the ███████ milestone for the First Beauty Labs Revenue Payment or the ███████ milestone for the First Overperformance Earnout Payment. Instead, the Statement claimed that the total applicable Revenue for the Relevant Period was ███████ comprised of ███████ in Beauty Labs Revenue and Third Party Beauty Labs Revenue, and ███████ in Synthetic Beauty Labs Revenue:

The outcome of the fiscal 2022 earnout achievement is as follows:
Fiscal 2022 Revenue Milestone (per Purchase Agreement): ███████
Fiscal 2022 Revenue Achieved (actual): ███████ comprised of the following:

11

- Beauty Labs Revenue & Third Party Beauty Labs Revenue: ███
  ███
- Synthetic Beauty Labs Revenue: ████████

Milestone achieved: No
As Beauty Labs did not achieve the revenue milestone per the Purchase Agreement
in fiscal 2022, no earnout payment is awarded for 2022 performance.

A true and correct copy of the Earnout Statement is attached hereto as **Exhibit B**.

**IV.    Amyris Refuses To Comply With The Earnout Statement Investigation And Dispute Process Agreed To In The SPA**

31.    Sellers were shocked to see the numbers in the Earnout Statement given Beauty Labs had continuously confirmed with Mr. Melo that Beauty Labs had far exceeded the ███ baseline revenue target and ████████ bonus revenue target for the 2022 Earnout Payment.  Consequently, on January 31, 2023, Plaintiffs' counsel sent a letter to Amyris and requested that Amyris provide "all books, records, work papers and other information used in preparing the Earnout Statement" by Friday, February 3, 2023. *See* Art. II, Sec. 2.08(c).  Sellers' Representative was entitled to this information pursuant to the SPA, and Amyris had an contractual obligation to reasonably and in good faith cooperate with this request.

32.    Mr. Melo responded minutes later falsely claiming to have documented communications with Mr. Hodgson and Mr. Gerhard in which the Beauty Labs co-founders agreed the revenue from the work outside of the business plan set out in the SPA would *not* count towards the Earnout targets.

33.    On February 6, 2023, Plaintiffs' counsel received a letter from Amyris's counsel, which claimed that Disruptional and its advisors were not authorized to communicate with or request information from Amyris or Beauty Labs.  This baseless claim directly contradicted the plain language of the SPA in a pretextual attempt to delay Disruptional's review of the books and

12

records. *See* Art. II, Sec. 2.08(c) ("In connection with the Representative's review of any Earnout Statement, ***the Company and Purchaser shall provide the Representative and its representatives and accountants all books, records, work papers and other information used in preparing the Earnout Statement.***").

34.     This same day, in an attempt to jump through whatever pre-textual hoops Amyris was seeking to impose, Plaintiffs' counsel sent an updated letter again requesting that Disruptional be provided the books and records underlying the calculations in the Earnout Statement, and requesting the materials referenced in Mr. Melo's January 31 e-mail. Sellers' counsel requested all materials by Wednesday, February 8, 2023.

35.     Wednesday, February 8 came and went, and no formal response was received from Amyris or its attorneys. Without access to this contractually required information, Disruptional cannot reasonably engage in the dispute process contemplated by the SPA.

36.     The import of these events is clear, Amyris has used Beauty Labs for its own purposes and, despite the success of Beauty Labs, it refuses to honor its obligation and seeks in bad faith to circumvent its obligations under the SPA.

## FIRST CLAIM FOR RELIEF

### Breach of the Share Purchase Agreement Section 2.08

37.     Plaintiffs incorporate by reference as if fully set forth herein all facts and allegations set forth above.

38.     The SPA is a valid and enforceable agreement between the parties.

39.     Plaintiffs performed all of their obligations under the SPA.

40.     Amyris has refused to abide by its obligations and has unilaterally committed willful breach of the SPA as described above, including, but not limited to:

13

    a.   Section 2.08(a) by its refusal to pay Sellers the First Earnout payments;

    b.   Section 2.08(c) by refusing to provide Disruptional all books, records, work papers and other information used in preparing the Earnout Statement; and

    c.   Section 2.08(e) by directing Beauty Labs to divert its resources away from the revenue streams agreed to in the business plan set out in Schedule 2.08(e)(i)(A) for the purpose of, or with the primary intention of, reducing the Earnout Payments.

41.    As a result of these material breaches, Sellers have suffered damages in an amount to be determined at trial.

## SECOND CLAIM FOR RELIEF

### Breach of the Implied Covenant of Good Faith and Fair Dealing

42.    Plaintiffs incorporate by reference as if fully set forth herein all facts and allegations set forth above.

43.    The SPA is a valid and enforceable agreement which contains the implied covenant of good faith and fair dealing.

44.    Plaintiffs performed all of their obligations under the SPA.

45.    Amyris failed to act in good faith as described above, including by intentionally diverting Beauty Labs resources away from revenue streams which would allow Sellers to obtain the Earnout Payments.

46.    As a result of Amyris's breach of the implied covenant of good faith and fair dealing, Plaintiffs have suffered damages under the SPA in an amount to be proven at trial.

## THIRD CLAIM FOR RELIEF

### Unjust Enrichment

14

Case 1:23-cv-02245-RA   Document 1-2   Filed 03/15/23   Page 16 of 185

1. Plaintiffs incorporate by reference as if fully set forth herein all facts and allegations set forth above.

2. Amyris acted willfully, wantonly, and with conscious disregard of the rights of Plaintiffs.

3. As an expected and intended result of their conscious wrongdoing as set forth in this Complaint, Defendants have profited and benefited from Beauty Labs' compliance with the SPA and superior work.

4. During the Relevant Period, and in exchange for Beauty Labs compliance with the SPA's requirement that Amyris control Beauty Labs operations and Amyris's diversions of Beauty Labs resources to revenue streams outside the business plan set out in the SPA while promising such revenue counted towards the Earnout, Plaintiffs expected that Amyris would pay them the Earnout Payment they are entitled to.

5. Defendants, through the wrongful conduct described above, have been unjustly enriched at the expense of Plaintiffs.

6. In equity and good conscience, it would be unjust and inequitable to permit Amyris to enrich themselves at the expense of the Plaintiffs.

7. By reason of the foregoing, Amyris must disgorge its unjustly acquired profits and other monetary benefits resulting from its unlawful conduct and provide restitution to Plaintiffs.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully requests that the Court enter an order of judgment granting all relief requested in this Complaint, and/or allowed at law or in equity, including:

(a)   Assume jurisdiction over this matter;

15

(b)     Award damages in an amount to be determined at trial;

(c)     Award Plaintiffs' attorneys' fees through trial and all appeals, and all costs and expenses with the prosecution of these claims at the trial level and through all appeals;

(d)     Award pre-judgment and post-judgment interest to Plaintiffs as may be allowed by law; and

(e)     Award all other relief, legal and equitable, that the Court may deem just and proper.


Dated: New York, New York
       February 22, 2023

Respectfully submitted,

SIMPSON THACHER & BARTLETT LLP


By:     _____
        Jonathan K. Youngwood
        Stephen P. Blake
        Hilary A. Soloff (*pro hac vice* forthcoming)

        425 Lexington Avenue
        New York, NY 10017-3954
        Telephone: 212-455-2000
        Facsimile: 212-455-2502
        jyoungwood@stblaw.com
        sblake@stblaw.com
        hilary.soloff@stblaw.com

        *Attorneys for Plaintiffs*


16

Case 1:23-cv-02245-RA   Document 1-2   Filed 03/15/23   Page 18 of 185

# EXHIBIT A

CONFIDENTIAL

EXECUTION VERSION

---

SHARE PURCHASE AGREEMENT

---

among

BEAUTY LABS INTERNATIONAL LIMITED,

SELLERS PARTY HERETO,

and

AMYRIS, INC.

dated as of August 31, 2021

# TABLE OF CONTENTS

**Page**

## ARTICLE I

## DEFINITIONS

SECTION 1.01  Certain Defined Terms .......................................................................... 1
SECTION 1.02  Definitions ............................................................................................ 19
SECTION 1.03  Interpretation and Rules of Construction ........................................... 21

## ARTICLE II

## PURCHASE AND SALE

SECTION 2.01  Purchase and Sale of the Seller Shares; Cancellation of the Other Seller Securities ............................................................................................ 23
SECTION 2.02  Purchase Price ...................................................................................... 23
SECTION 2.03  Closing ................................................................................................. 24
SECTION 2.04  Closing Deliveries by Sellers ............................................................... 24
SECTION 2.05  Closing Deliveries by Purchaser .......................................................... 25
SECTION 2.06  Determination of the Adjustment Amount and Net Adjustment Amount. ...... 26
SECTION 2.07  Payment of Deferred Consideration ..................................................... 29
SECTION 2.08  Earnout ................................................................................................. 30
SECTION 2.09  Treatment of Options and Warrants ...................................................... 40
SECTION 2.10  Nasdaq Limitation ............................................................................... 40
SECTION 2.11  Withholding ......................................................................................... 41

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF THE COMPANY

SECTION 3.01  Organization and Qualification; Subsidiaries ................................... 41
SECTION 3.02  Governing Documents .......................................................................... 42
SECTION 3.03  Capitalization ....................................................................................... 42
SECTION 3.04  Authority ............................................................................................... 43
SECTION 3.05  Corporate Books and Records .............................................................. 43
SECTION 3.06  No Conflict; Required Filings and Consents ....................................... 43
SECTION 3.07  Compliance with Laws; Permits ........................................................... 44
SECTION 3.08  Financial Statements; Books and Records ........................................... 44
SECTION 3.09  Absence of Certain Changes or Events ................................................ 45
SECTION 3.10  Absence of Undisclosed Liabilities ...................................................... 47
SECTION 3.11  Absence of Litigation ........................................................................... 47
SECTION 3.12  Employee Benefit Plans ....................................................................... 48
SECTION 3.13  Labor Matters ........................................................................................ 49
SECTION 3.14  Real Property ......................................................................................... 52

SECTION 3.15    Assets ........................................................................................................ 53
SECTION 3.16    Intellectual Property and IT Assets; Data and Privacy Laws ..................... 53
SECTION 3.17    Taxes ......................................................................................................... 58
SECTION 3.18    Environmental Matters ............................................................................... 61
SECTION 3.19    Material Contracts ...................................................................................... 61
SECTION 3.20    Insurance .................................................................................................... 64
SECTION 3.21    Accounts Receivable .................................................................................. 64
SECTION 3.22    Certain Business Practices .......................................................................... 64
SECTION 3.23    Interested Party Transactions ..................................................................... 65
SECTION 3.24    Brokers ....................................................................................................... 65

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF SELLERS

SECTION 4.01    Organization ............................................................................................... 66
SECTION 4.02    Authority .................................................................................................... 66
SECTION 4.03    Title to the Seller Securities ....................................................................... 66
SECTION 4.04    No Claims ................................................................................................... 67
SECTION 4.05    No Conflict; Required Filings and Consents .............................................. 67
SECTION 4.06    Absence of Litigation ................................................................................. 67
SECTION 4.07    U.S. Investment Representations ................................................................ 68
SECTION 4.08    Disruptional Representation ........................................................................ 68
SECTION 4.09    Brokers ....................................................................................................... 68

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF PURCHASER

SECTION 5.01    Organization ............................................................................................... 68
SECTION 5.02    Authority .................................................................................................... 69
SECTION 5.03    No Conflict; Required Filings and Consents .............................................. 69
SECTION 5.04    Sufficient Funds ......................................................................................... 70
SECTION 5.05    SEC Reports and Financial Statements ...................................................... 70
SECTION 5.06    Stock Consideration .................................................................................... 70
SECTION 5.07    No Material Adverse Effect ........................................................................ 70
SECTION 5.08    Brokers ....................................................................................................... 71
SECTION 5.09    Purchaser's Investigation and Reliance ...................................................... 71

## ARTICLE VI

## ADDITIONAL AGREEMENTS

SECTION 6.01    Access to Information .................................................................................. 71
SECTION 6.02    Confidentiality ............................................................................................ 72
SECTION 6.03    Public Announcements ................................................................................ 73
SECTION 6.04    Related Party Accounts and Agreements .................................................... 73

ii

SECTION 6.05   Release and Waiver.................................................................... 73
SECTION 6.06   Representative........................................................................ 74
SECTION 6.07   Purchaser Shares; Resale Registration Statement............................. 75
SECTION 6.08   Directors' Indemnification......................................................... 77
SECTION 6.09   Non-Solicitation...................................................................... 78

ARTICLE VII

TAX MATTERS

SECTION 7.01   Contests.............................................................................. 79
SECTION 7.02   Preparation of Tax Returns........................................................ 80
SECTION 7.03   Tax Cooperation and Exchange of Information................................. 81
SECTION 7.04   Conveyance Taxes.................................................................. 82
SECTION 7.05   Tax Refunds........................................................................ 82
SECTION 7.06   Straddle Period..................................................................... 82
SECTION 7.07   Tax Sharing Agreements........................................................... 83
SECTION 7.08   Tax Disputes........................................................................ 83
SECTION 7.09   Miscellaneous...................................................................... 83

ARTICLE VIII

INDEMNIFICATION

SECTION 8.01   Survival of Representations, Warranties, Covenants and Agreements.......... 83
SECTION 8.02   Indemnification by Sellers......................................................... 84
SECTION 8.03   Procedures........................................................................... 85
SECTION 8.04   Limits on Indemnification.......................................................... 87
SECTION 8.05   Exclusive Remedy.................................................................. 88
SECTION 8.06   Order of Recovery by the Purchaser Indemnified Parties...................... 89
SECTION 8.07   Holdback Consideration........................................................... 89
SECTION 8.08   No Right of Contribution........................................................... 90
SECTION 8.09   Claims Unaffected by Investigation.............................................. 90

ARTICLE IX

GENERAL PROVISIONS

SECTION 9.01   Expenses............................................................................. 90
SECTION 9.02   Notices.............................................................................. 90
SECTION 9.03   Severability......................................................................... 92
SECTION 9.04   Entire Agreement.................................................................... 92
SECTION 9.05   Assignment.......................................................................... 92
SECTION 9.06   Amendment......................................................................... 92
SECTION 9.07   Waiver.............................................................................. 92
SECTION 9.08   No Third Party Beneficiaries...................................................... 93
SECTION 9.09   Currency............................................................................ 93

iii

Case 1:23-cv-02245-RA   Document 1-2   Filed 03/15/23   Page 23 of 185

SECTION 9.10    Governing Law; Venue ...................................................................... 93
SECTION 9.11    Waiver of Jury Trial ......................................................................... 94
SECTION 9.12    Specific Performance ......................................................................... 94
SECTION 9.13    Further Assurances ........................................................................... 94
SECTION 9.14    Non-Recourse .................................................................................... 94
SECTION 9.15    Disclosure Schedule ......................................................................... 95
SECTION 9.16    Mutual Drafting ............................................................................... 95
SECTION 9.17    Attorney-Client Privilege and Waiver of Conflicts ........................ 95
SECTION 9.18    Counterparts ..................................................................................... 97

## EXHIBITS

██████████      ██████████████

██████████      ████████████████████████████████

██████████      ████████████████████

██████████      ████████████████████████████████████████████████

██████████      ████████████████████████████

## SCHEDULES

██████████          ██████████████████████

██████████████      ██████████████████████

SHARE PURCHASE AGREEMENT (together with the Disclosure Schedule, this "Agreement"), dated as of August 31, 2021, by and among Beauty Labs International Limited, a private company limited by shares organized under the laws of England and Wales (company no. 12373935) (the "Company"), each of the equityholders of the Company listed on the signature pages hereto (each, a "Seller", and collectively, "Sellers") and Amyris, Inc., a Delaware corporation ("Purchaser").

WHEREAS, Sellers and Optionholders own those Seller Securities as indicated on Exhibit A, which, immediately prior to the Option Cancellation and the Warrant Cancellation, constitute one-hundred percent (100%) of the issued and outstanding Equity Securities of the Company (the "Seller Securities");

WHEREAS, (i) Sellers wish to sell to Purchaser, and Purchaser wishes to purchase from Sellers, the Seller Shares (as defined herein), free and clear of any and all Liens, and (ii) applicable Sellers and Optionholders wish to cancel the Other Seller Securities (as defined herein) in exchange for the consideration set forth herein, in each case, upon the terms and subject to the conditions set forth herein;

WHEREAS, effective as of immediately prior to the Closing, the board of directors of the Company approved a resolution accelerating the vesting of all Options that are not vested as of immediately prior to the Closing; and

WHEREAS, concurrently with the execution of this Agreement, and as a condition and material inducement to Purchaser's execution and delivery of this Agreement, Purchaser is entering into a guarantee, release and restrictive covenant agreement with each Key Employee, in the form attached hereto as Exhibit D (the "Restrictive Covenant Agreements").

NOW, THEREFORE, in consideration of the foregoing and the respective representations, warranties, covenants and agreements contained in this Agreement, and intending to be legally bound hereby, the Parties hereby agree as follows:

## ARTICLE I

## DEFINITIONS

SECTION 1.01    Certain Defined Terms.  For purposes of this Agreement:

"Accelerated Overperformance Payment" means, (i) as of the occurrence of a Control Acceleration Event on or prior to December 31, 2022, the amount that would be payable pursuant to Sections 2.08(a)(iii) and (b)(iii) if the daily average rate of Beauty Labs Revenue and Third Party Beauty Labs Revenue of the Company from January 1, 2022 (or, for any Control Acceleration Event occurring prior to January 1, 2022, from the Closing Date) through the date of the Control Acceleration Event were deemed to be the daily Beauty Labs Revenue and Third Party Beauty Labs Revenue of the Company for the entire twenty four (24)-month period between January 1, 2022 and December 31, 2023, (ii) as of the occurrence of a Control Acceleration Event between January 1, 2023 and December 31, 2023, the amount that would be payable pursuant to Section 2.08(b)(iii) if the daily average rate of Beauty Labs Revenue and Third Party Beauty Labs Revenue of the Company from January 1, 2023 through the date the Control Acceleration Event

were deemed to be the daily Beauty Labs Revenue and Third Party Beauty Labs Revenue of the Company for the entire twelve (12)-month period between January 1, 2023 and December 31, 2023, (iii) as of the occurrence of a Covenant Acceleration Event on or prior to December 31, 2022, the amount that would be payable if (x) the First Earnout Beauty Labs Revenue was calculated for the period from January 1, 2022 (or, for any Covenant Acceleration Event occurring prior to January 1, 2022, from the Closing Date) through the date of such Covenant Acceleration Event and (y) the Overperformance Earnout Threshold was deemed to be an amount equal to █████████ multiplied by a fraction the numerator of which is the number of days from January 1, 2022 (or, for any Covenant Acceleration Event occurring prior to January 1, 2022, the number of days from the Closing Date) through the date of such Covenant Acceleration Event, and the denominator of which is three hundred sixty-five (365) and (iv) as of the occurrence of a Covenant Acceleration Event between January 1, 2023 and December 31, 2023, the amount that would be payable if (x) the Second Earnout Beauty Labs Revenue was calculated for the period from January 1, 2023 through the date of such Covenant Acceleration Event and (y) the Overperformance Earnout Threshold were deemed to be an amount equal to █████████ multiplied by a fraction the numerator of which is the number of days from January 1, 2023 through the date of such Covenant Acceleration Event, and the denominator of which is three hundred sixty-five (365).

"Accounting Principles" means U.K. GAAP applied on a basis consistent with the Company's past practices and, to the extent not inconsistent therewith, the methodology, principles and assumptions used in the preparation of the calculation of the Example Closing Statement and subject to any explicit departures from U.K. GAAP contained in the accounting principles, policies and practices set forth on Exhibit B.

"Action" means any civil, criminal or administrative litigation, claim, action, suit, arbitration, hearing, inquiry, opposition, investigation or other similar proceeding by or before any Governmental Authority.

"Adjustment Amount" means an amount equal to (A) $0.00, plus (B) the Net Working Capital Adjustment Amount (or minus the absolute value of the Net Working Capital Adjustment Amount if the Net Working Capital Adjustment Amount is a negative number), plus (C) the amount of Cash and Cash Equivalents, minus (D) the amount of Closing Date Indebtedness, minus (E) the amount of Transaction Expenses plus (F) the Aggregate Exercise Price Amount.

"Affiliate" means, with respect to any specified Person, such Person's directors, managers and officers, any other Person that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such specified Person and, with respect to any Seller, Optionholder, any director, manager or officer or other individual, shall include any family members or related Persons of such specified Person as well as trusts for the benefit of any such specified Person or such specified Person's family members or other related Persons.

"Aggregate Exercise Price Amount" means the aggregate cash exercise prices that would be payable upon the exercise in full of all Options and Warrants, in each case, immediately prior to the Closing.

Case 1:23-cv-02245-RA   Document 1-2   Filed 03/15/23   Page 26 of 185

"Amyris Brands Products" means the products of Purchaser and its Subsidiaries sold from time to time under (i) the brand names Biossance, Pipette, Rose Inc, JVN, Terasana, Costa Brazil, Olika and EcoFabulous, and any successors to such brand names, and (ii) any other products and brand names of Purchaser and its Subsidiaries proposed to be included as Amyris Brands Products by Purchaser and accepted by Mark Gerhard (or, if Mark Gerhard is not then employed by Purchaser or any of its Subsidiaries, the Representative); provided, that for purposes of this Agreement, all Amyris Brands Products under a single brand name shall be considered a single Amyris Brands Product.

"Amyris Brands Revenue" means the total revenue recognized by Purchaser and its Subsidiaries from the sale of Amyris Brands Products to third-party purchasers (other than Purchaser or any of its Affiliates) determined in accordance with U.S. GAAP consistently applied by Purchaser based upon the books and records of Purchaser.

"Ancillary Documents" means the Option Cancellation Agreements and the Restrictive Covenant Agreements.

"Average Monthly Revenue Per User" means, for each Amyris Brands Product, the total revenue recognized by Purchaser and its Subsidiaries from the sale of such Amyris Brands Product during any calendar month to third-party purchasers who purchase such Amyris Brands Products through Purchaser's website, iOS application, Android application or comparable digital platform, divided by the total number of unique third-parties who engage with such Amyris Brands Product through Purchaser's website, iOS application, Android application or comparable digital platform by taking any action at least once during such calendar month.

"Baseline Monthly DAU/MAU" means, for each Amyris Brands Product, the average ratio of Daily Active Users to Monthly Active Users for such Amyris Brands Product for the most recent three (3) full calendar months ended prior to the Launch of such Amyris Brands Product.

"Baseline Monthly LTV" means, for each Amyris Brands Product, the average ratio of Average Monthly Revenue Per User to User Churn for such Amyris Brands Product for the most recent three (3) full calendar months ended prior to the Launch of such Amyris Brands Product.

"Beauty Labs Revenue" means (a) the revenue of the Company recognized from the sale to, or license, subscription or transaction fees paid by, any third-party purchaser or end user (other than Purchaser or any of its Affiliates) of Company Products (the amount determined pursuant to this clause (a) being the "Third Party Beauty Labs Revenue") and (b) an implied software as a service (SaaS) revenue per user from sales charged to Purchaser or any of its Affiliates by the Company equal to the lesser of (i) ███ per user and (ii) the lowest price per user charged by the Company to any third party (the amount determined pursuant to this clause (b) being the "Synthetic Beauty Labs Revenue"), in the case of clause (a), determined in accordance with U.S. GAAP consistently applied by Purchaser, and in each case of clauses (a) and (b), based upon the books and records of the Company and Purchaser.

"Business" means the business of the Company as currently conducted.

3

"Business Day" means any day that is not a Saturday, a Sunday or other day on which banks are required or authorized by Law to be closed in New York, New York, Emeryville, California or London, England; provided that banks shall not be deemed to be required or authorized to be closed due to a "shelter in place," "non-essential employee" or similar closure of physical branch locations at the direction of any Governmental Authority if such banks' electronic funds transfer systems (including wire transfers) are open for use by customers on such day.

"Cash and Cash Equivalents" means the sum of the fair market value (expressed in United States dollars) as of the Reference Time of all cash and cash equivalents of the Company calculated in accordance with the Accounting Principles, (i) including checks and wire transfers that have been deposited or initiated for the account of the Company, and (ii) excluding (A) outbound checks and wire transfers that have been sent by the Company and (B) Restricted Cash.

"Change of Control" means (i) Purchaser (together with its Affiliates) ceases to own or control, directly or indirectly, a majority of the outstanding Equity Securities of the Company, (ii) consummation of the sale or lease of all or substantially all of the property and assets of the Company to any Person (other than to an Affiliate of Purchaser), (iii) any Person or group of persons within the meaning of Section 13(d)(3) of the Exchange Act becomes the beneficial owner, directly or indirectly, of a majority of the voting power of Purchaser or (iv) a merger, consolidation, or other form of business combination of Purchaser with another Person that results in the holders of voting securities of such Person immediately prior to such business combination holding, directly or indirectly, in the aggregate, voting securities carrying a majority of the voting power of the surviving entity resulting from the business combination (or the ultimate parent of such surviving entity).

"Closing Date" means the date on which the Closing occurs.

"Closing Date Indebtedness" means the total amount of outstanding Indebtedness of the Company as of the Reference Time.

"Code" means the U.S. Internal Revenue Code of 1986.

"Company Fundamental Representations" means those representations and warranties made in Sections 3.01(a) and (b), 3.02, 3.03, 3.04, 3.06(a)(i) and 3.24.

"Company Insurance Policies" means all insurance, reinsurance or captive insurance policies (including fire and casualty, general liability, professional liability, business interruption and workers' compensation insurance policies) under which the Company has been an insured, a named insured or otherwise the principal beneficiary of coverage at any time since the formation of the Company.

"Company Intellectual Property" means all Owned Intellectual Property and all Licensed Intellectual Property.

"Company IP Agreements" means all (a) (i) licenses of Owned Intellectual Property by the Company to any Person, (ii) licenses of Intellectual Property by any Person to the Company and (iii) Contracts between any Person and the Company relating to the transfer, development or maintenance of material Intellectual Property; and (b) consents, settlements, decrees, orders,

4

injunctions, judgments or rulings governing the use, validity or enforceability of any Owned Intellectual Property, or by which any of the Owned Intellectual Property is bound.

"Company IT Assets" means all IT Assets used or held for use in the operation of the Business, including the Company Software and Company Websites.

"Company Permits" means franchises, grants, authorizations, licenses, permits, easements, variances, exceptions, consents, concessions, registrations, clearances, exemptions, certificates, approvals and orders of any Governmental Authority necessary for the Company to own, lease and operate its properties and assets or to carry on the Business.

"Company Products" means all service offerings or products (including IT Assets) made or currently intended to be made commercially available or otherwise distributed, or currently under development, by or on behalf of the Company.

"Company Software" means all Owned Software and all other Software that is used or held for use in the operation of the Business, including all (i) Software used in the Company's provision of Company Products to customers or end users, including any Software incorporated in, or integrated or bundled with, any Company Product, (ii) Software intended for license to customers or end users and (iii) Software, libraries, modules and other materials used by the Company in the development, design, construction or testing of any of the Software described in clause (i) or (ii) above.

"Company Websites" means all Internet or intranet websites owned or operated by the Company.

"Company's Knowledge," "Knowledge of the Company" or similar terms used in this Agreement mean the actual knowledge of the Key Employees, after reasonable inquiry.

"Continuing Business" means the business of the Company from and after the Closing Date.

"Contract" means any contract, agreement, understanding, instrument, arrangement, lease, sublease, license, sublicense, statement of work, work order, mortgage, note, bond, indenture, deed of trust, loan agreement, plan, insurance policy or other legally enforceable promise, commitment or undertaking, in each case, whether written or oral, express or implied.

"control" (including the terms "controlled by" and "under common control with"), with respect to the relationship between or among two or more Persons, means the possession, directly or indirectly or as trustee, personal representative or executor, of the power to direct or cause the direction of the affairs or management of a Person, whether through the ownership of voting securities, as trustee, personal representative or executor, by Contract, credit arrangement or otherwise.

"Conveyance Taxes" means any sales, use, value added, transfer, real estate transfer, stamp (including any UK stamp duty or stamp duty reserve tax), stock transfer, documentary, registration, real property transfer, recording and similar Taxes.

"Daily Active Users" means, for each Amyris Brands Product, the total number of unique third-parties who engage with such Amyris Brands Product through Purchaser's website, iOS application, Android application or comparable digital platform by taking any action at least once on a given day.

"Disclosure Schedule" means the Disclosure Schedule, dated as of the date hereof, delivered by the Company and Sellers to Purchaser in connection with this Agreement.

"Earnout Payments" means the First Earnout Beauty Labs Revenue Payment, if any, the First Overperformance Earnout Payment, if any, the First Earnout Amyris Brands Revenue Payment, if any, any First Earnout Brand Metrics Payment, the Second Earnout Beauty Labs Revenue Payment, if any, the Second Overperformance Earnout Payment, if any, the Second Earnout Amyris Brands Revenue Payment, if any, and any Second Earnout Brand Metrics Payment, as applicable.

"Earnout Statements" means the First Earnout Beauty Labs Revenue Statement, the First Earnout Amyris Brands Revenue Statement, each First Earnout Brand Metrics Statement, the Second Earnout Beauty Labs Revenue Statement, the Second Earnout Amyris Brands Revenue Statement, each Second Earnout Brand Metrics Statement and the Overperformance Earnout Statement, as applicable.

"EMI Optionholder" means an Employee or other service provider of the Company who holds EMI Options.

"EMI Options" means options to purchase shares of Disruptional that were granted in the UK to an Employee or other service provider of the Company pursuant to the Disruptional Enterprise Management Incentive Share Option Plan.

"Employee" means each individual who is an employee or former employee of the Company.

"Employee Benefit Plan" means any pension, profit sharing, retirement, deferred compensation, stock purchase, stock option, restricted stock or other equity based or equity-related compensation plans, incentive, bonus, vacation, employment, independent contractor, severance, disability, hospitalization, sickness, death, medical insurance, dental insurance, retiree medical or life insurance, supplemental retirement or any other employee benefit plan (whether provided on a funded or unfunded basis, or through insurance or otherwise), agreement, program, policy, trust, fund, Contract or arrangement, whether written or oral, and all employment, change in control, severance, retention, termination, non-competition, non-solicitation and any other similar agreements, arrangements or policies, whether written or oral.

"Environmental Claim" means any and all Actions, demands, demand letters, liens, notices of noncompliance or violation, notices of Liability or potential Liability, consent orders, consent decrees, or consent agreements relating to any Environmental Law, Environmental Permit or Hazardous Substance.

"Environmental Law" means any Law relating to: (a) Releases or threatened Releases of Hazardous Substances or materials containing Hazardous Substances; (b) the

6

manufacture, handling, transport, use, treatment, storage or disposal of, or exposure to, Hazardous Substances or materials containing Hazardous Substances; or (c) pollution, protection of the environment, health, safety, natural resources or natural resource damages.

"Equity Securities" means, with respect to a Person, (a) any equity interests in such Person, including ordinary shares, preferred shares, common stock, preferred stock, membership interests, limited liability company interests, profit sharing interests, partnership interests, units of participation or other similar interest (however designated); (b) any securities convertible into or exchangeable or exercisable for any such equity interests described in clause (a); (c) any option, warrant, purchase right, conversion right, exchange right or other right which would entitle any other Person to acquire any interests described in clause (a) or (b); and (d) any "equity security" within the meaning of the Exchange Act.

"Estimated Adjustment Amount" means negative $940,170.89.

"Example Closing Statement" means the illustrative calculation, attached as Exhibit B hereto, as of the close of business on July 31, 2021, of (i) the amount of outstanding Indebtedness of the Company, (ii) the amount of Cash and Cash Equivalents, (iii) the amount of Net Working Capital, (iv) the amount of Transactions Expenses and (v) the Aggregate Exercise Price Amount.

"Exchange Act" means the Securities Exchange Act of 1934.

"Excluded Taxes" means, in each case, except to the extent actually taken into account in the final calculation of Indebtedness and regardless of the disclosure of any matter set forth in the Disclosure Schedule, (a) Taxes imposed on or payable by the Company for a Pre-Closing Tax Period; (b) with respect to any Straddle Period, Taxes imposed on or payable by the Company that are allocable to a Pre-Closing Straddle Period, as determined under the method employed in Section 7.06; (c) Taxes imposed on or payable by the Company, or for which the Company may be liable, as a result of having been or ceasing to be a member of any Tax Group of any Seller on or prior to the Closing Date; (d) Taxes of any other Person (other than Purchaser or any of its Affiliates) for which the Company is liable by operation of Law, as a transferee or successor, by reason of anything done by the Company on or before the Closing Date, or pursuant to any Tax allocation agreement, Tax sharing agreement, or Tax indemnity agreement relating to any Tax (other than a contractual agreement entered into the ordinary course of business the principal subject matter of which is not Taxes) entered into on or before the Closing Date; (e) Conveyance Taxes that are the responsibility of Sellers under Section 7.04; (f) Taxes imposed on or payable by the Company arising from a breach of any representation or warranty made by the Company in Section 3.17; (g) any Taxes of a Seller or Optionholder (or an Affiliate of such Seller or Optionholder, as applicable) imposed on or payable by Purchaser or the Company (including any amounts payable by Purchaser or the Company arising from the failure to withhold the correct amount of Taxes from any payment due to a Seller or Optionholder (or an Affiliate of either of them) under this Agreement); and (h) Taxes imposed on Purchaser or the Company (or any of their Affiliates) arising from the exercise, amendment, cancellation, or transfer of (or any other act or thing done in relation to (including, but not limited to, the provision of a loan (or similar arrangement) to an EMI Optionholder in order to facilitate the exercise of the EMI Options)) the EMI Options.

"First Earnout Amyris Brands Revenue Target" means ▮▮▮▮▮▮▮; provided, that if additional products and brand names are added to the definition of Amyris Brands Products, the First Earnout Amyris Brands Revenue Target shall be increased by an amount equal to one hundred ten percent (110%) of revenue for such additional products and brand names for the twelve (12) month period between January 1, 2022 and December 31, 2022 pursuant to Purchaser's long range plan as provided to Mark Gerhard (or, if Mark Gerhard is not then employed by Purchaser or any of its Subsidiaries, the Representative) prior to any agreement to add such products and brand names to the definition of Amyris Brands Products.

"Fraud" means a statement that was actually false made by a party (which, in the case of the Company, shall be any of the individuals included in the definition of "Company's Knowledge," "Knowledge of the Company") that either knew such statement was false or knowingly made such statement with reckless disregard as to whether it was true or false, in either case with the intent that the recipient rely on such statement.  For the avoidance of doubt, the definition of "Fraud" in this Agreement does not include, and no claim may be made by any Person in relation to this Agreement or the transactions contemplated hereby for:  (a) constructive fraud or other claims based on constructive knowledge, gross negligence, negligence, or similar theories, or (b) equitable fraud or any other fraud-based claim or theory.

"Fully Diluted Shares" means the sum of (i) the aggregate number of Ordinary Shares that are issued and outstanding as of immediately prior to the Closing, plus (ii) the aggregate number of Ordinary Shares issuable upon the exercise in full of all Options, whether vested or unvested, outstanding as of immediately prior to the Option Cancellation, plus (iii) the aggregate number of Ordinary Shares issuable upon the exercise in full of all Warrants outstanding as of immediately prior to the Warrant Cancellation, plus (iv) the aggregate number of Ordinary Shares issuable upon the conversion in full of all preferred shares of the Company into Ordinary Shares at the conversion rate applicable at the Closing.

"Governing Documents" means the Memorandum of Association of the Company, the Articles of Association of the Company and that certain Subscription and Shareholders' Agreement, dated as of July 13, 2020, between AndVest Beauty Labs LP, Disruptional and the Company, in each case, in effect as of the date hereof.

"Governmental Authority" means any U.S. or non-U.S. federal, national, supranational, state, provincial, local or other government, governmental, regulatory, self-regulatory or administrative authority, agency or commission or any court, tribunal, or judicial or arbitral body.

"Governmental Order" means any order, writ, judgment, injunction, Company Permit, decree, stipulation, ruling, subpoena, verdict, permit, license, exemption, certification, decision, determination or award made, issued or entered by or with any Governmental Authority (including any judicial or administrative interpretations, guidance, directives, policy statements or opinions).

"Hazardous Substances" means (a) those pollutants, contaminants, substances, materials and wastes defined in or regulated under any United Kingdom or European Union Environmental Laws, including the Environmental Permitting (England and Wales) Regulations

and Part 2A of the Environmental Protection Act 1990; (b) petroleum and petroleum products, including crude oil and any fractions thereof; (c) natural gas, synthetic gas, and any mixtures thereof; (d) polychlorinated biphenyls, urea formaldehyde, asbestos, presumed asbestos-containing material or asbestos-containing material, toxic mold and radon; and (e) any other pollutant, contaminant, substance, material or waste regulated by any Governmental Authority pursuant to any Environmental Law.

"Indebtedness" means, with respect to any Person, without duplication, any and all (a) Liabilities of such Person:  (i) for borrowed money, including all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments (including in respect of principle, accrued interest, penalties, fees and premiums); (ii) for the deferred purchase of securities, other property or services; (iii) for deferred revenue when there is not an offsetting receivable in accounts receivable; (iv) created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even if the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property); (v) as lessee under leases that have been or should be, in accordance with U.K. GAAP, recorded as capital leases; (vi) under acceptance, letter of credit or similar facilities; (vii) under any interest rate, currency or other hedging agreements, to the extent payable if terminated; (viii) to purchase, redeem, retire, defease or otherwise acquire for value any Equity Securities of such Person, valued, in the case of redeemable preferred stock, at the greater of its voluntary or involuntary liquidation preference, plus accrued and unpaid dividends; (ix) for payments of compensation, including bonuses, benefits and associated employer Taxes (including (A) the employer portion of any employment or payroll Taxes and employer national insurance contributions and (B) any irrecoverable services, value-added, goods and services, sales, or use Taxes) that are accrued for services rendered prior to the Closing pursuant to pre-existing arrangements by such Person, including with respect to such payments of compensation, bonuses and benefits; or (x) in the case of the Company, payable to Disruptional; (b) all Indebtedness of others referred to in clause (a) above guaranteed directly or indirectly in any manner by such Person; (c) all unpaid Taxes of the Company for Pre-Closing Tax Periods or Pre-Closing Straddle Periods; and (d) all Indebtedness of others referred to in clauses (a) - (c) above secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property or assets (including accounts and Contract rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such Indebtedness; provided that, for the avoidance of doubt, Indebtedness with respect to the Company shall include all declared but unpaid dividends of the Company.  The current portion of any Indebtedness referred to in clauses (a) through (d) above shall be included in the computation of Indebtedness and shall not be included in the calculation of Net Working Capital.  Indebtedness shall not include recoverable value added Taxes (or similar Taxes) due from the Company.  Indebtedness shall be calculated net of any actual saving, refund or repayment to the Company of Taxes expected to be recognized by the Company in connection with the payment of any item included in the computation of Indebtedness, in the taxable year in which that item of Indebtedness is expected to be paid.  For the avoidance of doubt, Indebtedness shall not include any employee payroll Taxes if and to the extent that such Taxes have been or are to be deducted or withheld from any payments under an Option Cancellation Agreement, or any Taxes in respect of which Purchaser or the Company has otherwise already been reimbursed pursuant to this Agreement or the Ancillary Documents.

"Information Privacy and Security Laws" means all applicable Laws concerning the privacy or security of Personally Identifiable Information (including any Laws of jurisdictions where such data or information was collected), and all regulations promulgated by Governmental Authorities, including, the Data Protection Act 2018 and the UK General Data Protection Regulation, the Federal Trade Commission Act, the Privacy Act of 1974, the CAN-SPAM Act, the Telephone Consumer Protection Act, the Telemarketing and Consumer Fraud and Abuse Prevention Act, Children's Online Privacy Protection Act, the Computer Fraud and Abuse Act, the Gramm-Leach-Bliley Act, the Fair Credit Reporting Act, the Fair and Accurate Credit Transaction Act, state data security Laws, state social security number protection Laws, state data breach notification Laws (including the California Consumer Privacy Act of 2018, as amended, and 23 NYCRR 500 as promulgated by the New York State Department of Financial Services), the European Union Directive 95/46/EC and General Data Protection Regulation 2016/679, and Canada's Personal Information Protection and Electronic Documents Act, and any applicable Laws concerning requirements for website and mobile application privacy policies and practices, data- or web-scraping, call or electronic monitoring or recording or any outbound communications (including outbound calling and text messaging, telemarketing, and e-mail marketing).

"Intellectual Property" means, in any and all jurisdictions worldwide (whether or not capable of registration, registered or not registered), all (i) patents, utility models, inventions and discoveries, statutory invention registrations, mask works, invention disclosures, chip topography rights, industrial designs, community designs and other designs; (ii) trademarks, service marks, Internet domain names, corporate names, uniform resource locators, trade dress, assumed, fictional business and trade names, geographical indications and other identifiers of source or goodwill, including the goodwill symbolized thereby or associated therewith; (iii) works of authorship (including Software) and copyrights, and moral rights, design rights and database rights therein and thereto; (iv) confidential and proprietary information, including trade secrets, know-how and invention rights; (v) rights of privacy and publicity; (vi) registrations, applications, renewals, continuations, continuations-in-part, reissues and extensions for any of the foregoing in clauses (i) - (v), and (vii) any and all other proprietary rights.

"Issuance Price" means, as of a specified date, the volume weighted average closing sale price of one Purchaser Share on the NASDAQ Global Select Market (the "Nasdaq") for the twenty (20) consecutive trading days ending on (and including) the day that is two (2) trading days immediately prior to such specified date (as adjusted as appropriate to reflect any stock splits, stock dividends, combinations, reorganizations, reclassifications or similar events).

"IT Assets" means Software, systems, servers, computers, hardware, firmware, middleware, networks, data communications lines, routers, hubs, switches and all other information technology equipment and associated documentation.

"Key Employees" means Mark Gerhard and Riaan Hodgson.

"Launch" or "Launched" means, with respect to any Amyris Brands Product, the first application of any Company Products in any offering of such Amyris Brands Product to consumers.

"Law" means any U.S. or non-U.S. federal, national, supranational, state, provincial, local or similar statute, law (including all Tax Laws and Information Privacy and Security Laws), ordinance, regulation, rule, code, order, requirement or rule of law (including common law) enacted, promulgated, adopted, applied or imposed by any Governmental Authority and includes any Governmental Order.

"Lease" means any and all real property leases, subleases, licenses or other occupancy agreements, sale/leaseback arrangements or similar arrangements.

"Leased Real Property" means the real property leased, subleased, licensed or otherwise occupied by the Company as tenant, subtenant, licensee or occupant together with, to the extent leased, subleased, licensed or otherwise occupied by the Company, all buildings and other structures, facilities or improvements currently or hereafter located thereon, all fixtures, systems, equipment and items of personal property of the Company affixed or appurtenant thereto and all easements, licenses, rights, hereditaments and appurtenances relating to the foregoing.

"Leased Real Property Options" means, collectively, options, rights of first offer or rights of first refusal contained in any Lease pertaining to the Leased Real Property, including any such options or rights pertaining to purchase, expansion, renewal, extension or relocation.

"Liabilities" means any and all debts, liabilities, guarantees, claims, losses, damages, deficiencies, costs, expenses and obligations of any nature, whether direct or indirect, accrued or fixed, absolute or contingent, liquidated or unliquidated, matured or unmatured, asserted or unasserted or determined or determinable, including those arising under any Law, Action or Contract, whether or not required under U.K. GAAP or U.S. GAAP to be accrued on any applicable financial statement.

"Licensed Intellectual Property" means all Intellectual Property licensed to the Company by any other Person, or that the Company is otherwise permitted by other Persons to use, including pursuant to the Company IP Agreements.

"Lien" means any and all pledges, liens (including environmental and Tax liens), charges, licenses, claims, conditions, equitable interests, mortgages, encumbrances, security interests, hypothecations, infringements, conditional and installment sale agreements or other claims of third parties or restrictions of any kind whatsoever, including any easement, encroachment, servitude, restrictive covenant, reversion interest, deed of trust, right of way or other encumbrance to title, limitations on voting rights, or any option, right of first refusal, right of first offer, buy/sell agreement or other similar restriction or covenant.

"Material Adverse Effect" means any event, state of facts, circumstance, development, change, occurrence or effect that, individually or in the aggregate with all other events, state of facts, circumstances, developments, changes, occurrences or effects, is, or would reasonably likely be, materially adverse to the Business, assets, Liabilities, condition (financial or otherwise) or results of operations of the Company, taken as a whole, other than any event, change, occurrence or effect occurring after the date of this Agreement to the extent arising out of, attributable to or resulting from, alone or in combination, (i) general changes or developments in any of the industries in which the Company operates, (ii) changes in regional, national or

11

Case 1:23-cv-02245-RA   Document 1-2   Filed 03/15/23   Page 35 of 185

international political conditions (including any outbreak or escalation of hostilities or any acts of war or terrorism) or in general economic, business, regulatory, political or market conditions or in national or international financial markets, (iii) pandemics (including the COVID-19 pandemic), earthquakes, hurricanes, floods or other natural disasters or calamities and (iv) changes in any applicable Laws or applicable accounting regulations or principles or interpretations thereof; provided, however, that with respect to the foregoing clauses (i), (ii), (iii) and (iv), any such event, change, occurrence, circumstance, effect condition or state of facts may be taken into account in determining whether there has been or is a Material Adverse Effect if it adversely and disproportionately impacts the Company, taken as a whole, in comparison to other participants of similar size in the industry in which the Company operates.

"Monthly Active Users" means, for each Amyris Brands Product, the total number of unique third-parties who engage with such Amyris Brands Product through Purchaser's website, iOS application, Android application or comparable digital platform by taking any action at least once during any given calendar month.

"Net Adjustment Amount" means (i) the amount by which the Adjustment Amount is greater than the Estimated Adjustment Amount or (ii) the amount by which the Adjustment Amount is less than the Estimated Adjustment Amount; provided that any amount that is calculated pursuant to the preceding clause (ii) shall be deemed to be a negative number.

"Net Working Capital" means, as of the Reference Time, the positive or negative amount equal to the difference between (a) the current assets of the Company (consisting only of the asset account line items specified as "Current Assets" on the Example Closing Statement, including by establishing levels of reserves in the same manner as such reserves were established in preparing the Example Closing Statement), minus (b) the current liabilities of the Company (consisting only of the liability account line items specified as "Current Liabilities" on the Example Closing Statement, including by establishing levels of reserves in the same manner as such reserves were established in preparing the Example Closing Statement), in each case, determined in accordance with the Accounting Principles. For purposes herein, (i) Net Working Capital shall be calculated exclusive of any amounts included in the calculation of Cash and Cash Equivalents, Closing Date Indebtedness and Transaction Expenses, (ii) Tax assets are not "Current Assets" and (iii) Tax liabilities are not "Current Liabilities."

"Net Working Capital Adjustment Amount" means, as of the Reference Time, (i) the amount by which Net Working Capital is greater than Target Net Working Capital or (ii) the amount by which Net Working Capital is less than Target Net Working Capital; provided that any amount that is calculated pursuant to the preceding clause (ii) shall be deemed to be a negative number.

"Neutral Accountant" means a nationally recognized accounting firm with expertise in accounting matters that is independent of Purchaser, the Company and the Representative and is mutually acceptable to Purchaser and the Representative at the time of such firm's engagement.

"<u>Non-Disclosure Agreement</u>" means the confidentiality provisions of the Amyris and Beauty Labs Term Sheet, dated as of March 26, 2021, by and between the Company and Purchaser.

"<u>Off-the-Shelf Software</u>" means all Software, other than Public Software, that is (a) commercially available off-the-shelf, click-through or shrink-wrap software, (b) has not been modified or customized for the Company and (c) is licensed to the Company for a one-time or annual fee of $10,000 or less.

"<u>Option Cancellation</u>" means the cancellation of all outstanding Options at the Closing in accordance with <u>Section 2.09(a)</u> and the applicable Option Cancellation Agreements.

"<u>Optionholder</u>" means a holder of an Option.

"<u>Options</u>" means options to subscribe for or purchase shares in the Company (but excluding any Warrant).

"<u>Ordinary Shares</u>" means the ordinary shares of £0.0000001 each in the capital of the Company.

"<u>Organizational Document</u>" means (a) with respect to a Person that is a corporation or similar entity, its articles, its charter, its by-laws and any other organizational documents and all shareholder agreements, voting trusts and similar arrangements applicable to any of its Equity Securities, (b) with respect to a Person that is a partnership, its agreement and certificate of partnership or formation (or similar document), any agreements among partners related to interests in the partnership, and any management and similar agreements between the partnership and any partners and (c) with respect to a Person that is a limited liability company or similar entity, its certificate of formation (or similar document), its limited liability company agreement or operating agreement (or similar document), any register of members (or similar document), any agreements among members of such Person, on the one hand, and such Person, on the other hand, related to the interests in such limited liability company and similar agreements.

"<u>Overperformance Earnout Payments</u>" means the First Overperformance Earnout Payment, if any, and the Second Overperformance Earnout Payment, if any, as applicable.

"<u>Owned Intellectual Property</u>" means all Intellectual Property owned or purported to be owned by the Company.

"<u>Owned Software</u>" means all Software owned by or purported to be owned by the Company.

"<u>Party</u>" or "<u>Parties</u>" means any one or each of the parties to this Agreement.

"<u>Permitted Liens</u>" means such of the following as to which no enforcement, collection, execution, levy or foreclosure proceeding shall have been commenced and as to which the Company is not otherwise subject to civil or criminal liability due to its existence: (a) Liens for Taxes not yet due and payable that are being contested in good faith and for which adequate reserves have been maintained on the books of the Company in accordance with U.K. GAAP; (b)

Case 1:23-cv-02245-RA   Document 1-2   Filed 03/15/23   Page 37 of 185

materialmen's, mechanics', carriers', workmen's and repairmen's Liens and other similar Liens arising in the ordinary course of business securing obligations (i) as to which there is no default on the part of the Company or the validity or amount of which is being contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves are maintained on the books of the Company in accordance with U.K. GAAP, (ii) which are not overdue for a period of more than thirty (30) days and (iii) are not in excess of $5,000 in the case of a single property or $50,000 in the aggregate at any time; (c) pledges or deposits to secure obligations under workers' compensation Laws or similar legislation or to secure public or statutory obligations; (d) minor survey exceptions, customary utility easements and other minor customary encumbrances on title to Leased Real Property which, individually or in the aggregate, do not materially detract from the value of, or impair the use of, the applicable property by the Company; (e) as to any Leased Real Property, any Lien affecting the interest of the lessor thereof that would not, individually or in the aggregate, adversely affect the ability of the Company to continue to conduct the Business in the ordinary course; and (f) non-exclusive licenses of Intellectual Property granted in the ordinary course of business.

"<u>Person</u>" means any individual, partnership, firm, corporation, limited liability company, association, trust, unincorporated organization or other entity, as well as any syndicate or group that would be deemed to be a person under Section 13(d)(3) of the Exchange Act.

"<u>Personally Identifiable Information</u>" means any personally identifiable information (including name, address, telephone number, electronic mail address, social security number, bank account number or credit card number), sensitive personal information, personal health information and any special categories of personal information regulated under Information Privacy and Security Laws or covered thereby, including any information that can be used to distinguish or trace an individual's identity, either alone or when combined with other personal or identifying information that is linked or linkable to a specific individual.

"<u>Post-Closing Straddle Period</u>" means the portion of any Straddle Period beginning after the Closing Date.

"<u>Post-Closing Tax Period</u>" means any taxable period beginning after the Closing Date.

"<u>Pre-Closing Straddle Period</u>" means the portion of any Straddle Period ending on the Closing Date.

"<u>Pre-Closing Tax Period</u>" means any taxable period ending on or prior to the Closing Date.

"<u>Pro Rata Indemnification Portion</u>" means, with respect to any Seller, the ratio (expressed as a percentage) equal to (i) the number of Ordinary Shares held (assuming the exercise in full of all Warrants held by such Seller immediately prior to the Warrant Cancellation and the conversion of all preferred shares held by such Seller at the exercise or conversion rate applicable at the Closing but excluding for purposes of this definition the number of Ordinary Shares issuable upon the exercise of any Options) by such Seller as of immediately prior to the Closing <u>divided by</u> (ii) the total number of Ordinary Shares held by all Sellers as of immediately prior to the Closing

14

(assuming the exercise in full of all Warrants held by all Sellers immediately prior to the Warrant Cancellation and the conversion of all preferred shares held by all Sellers at the exercise or conversion rate applicable at the Closing but excluding for purposes of this definition the number of Ordinary Shares issuable upon the exercise of any Options), in each case, equal to the percentage set forth opposite such Seller's name under the column titled "<u>Pro Rata Indemnification Portion</u>" in the Preliminary Closing Statement.

"<u>Pro Rata Portion</u>" means (without double counting): (a) with respect to any Seller, the ratio (expressed as a percentage) equal to (i) the number of Ordinary Shares held (assuming the exercise in full of all Warrants held by such Seller immediately prior to the Warrant Cancellation and the conversion of all preferred shares held by such Seller at the exercise or conversion rate applicable at the Closing but excluding for purposes of this definition the number of Ordinary Shares issuable upon the exercise of any Options held by such Seller) by such Seller as of immediately prior to the Closing <u>divided by</u> (ii) the total number of Fully Diluted Shares; and (b) with respect to any Optionholder, the ratio (expressed as a percentage) equal to (i) the number of Ordinary Shares issuable upon the exercise in full of all Options held by such Optionholder as of immediately prior to the Option Cancellation <u>divided by</u> (ii) the total number of Fully Diluted Shares, in each case, equal to the percentage set forth opposite such Seller's or Optionholder's name under the column titled "<u>Pro Rata Portion</u>" in the Preliminary Closing Statement.

"<u>Public Software</u>" means any Software that is distributed as open source Software, freeware or similar licensing or distribution models that (i) require the licensing or distribution of source code to any other Person; (ii) prohibit or limit the receipt of consideration in connection with sublicensing or distributing any Software; (iii) except as specifically permitted by applicable Law, allow any Person to decompile, disassemble or otherwise reverse-engineer any Software; or (iv) require the licensing of any Software to any other Person for the purpose of making derivative works.

"<u>Purchaser Fundamental Representations</u>" means those representations and warranties made in Sections <u>5.01</u>, <u>5.02</u>, <u>5.03(a)(i)</u>; and <u>5.06</u>.

"<u>Reference Time</u>" means as of immediately prior to the Closing.

"<u>Registered</u>" means issued by, registered, recorded or filed with, renewed by or the subject of a pending application before any Governmental Authority or Internet domain name registrar.

"<u>Registrable Securities</u>" means the Purchaser Shares issued in connection with this Agreement, and any Purchaser Shares issued as (or issuable upon the conversion or exercise of any warrant, right, or other security that is issued as) a dividend or other distribution with respect to, or in exchange for or in replacement of, such Purchaser Shares; <u>provided</u>, <u>however</u>, that Purchaser Shares shall cease to be Registrable Securities hereunder if and when (i) such Registrable Securities have been sold, transferred or otherwise disposed of pursuant to an effective registration statement registering such Registrable Securities (or the resale thereof) under the Securities Act, (ii) such Registrable Securities have been sold, transferred or otherwise disposed of pursuant to Rule 144 of the Securities Act ("<u>Rule 144</u>") or (iii) with respect to the Registrable Securities held by a particular Seller or Optionholder, such Seller or Optionholder has held such

Registrable Securities for at least six (6) months and holds a number of Registrable Securities less than the number of Purchaser Shares that can be sold by such Seller or Optionholder in a single ninety (90)-day period pursuant to Rule 144 (including Rule 144(e)).

"Release" means releasing, disposing, discharging, injecting, spilling, leaking, leaching, migrating, dumping, emitting, escaping, emptying, seeping, placing and the like into or upon any land or water or air or otherwise entering into the environment.

"Remedial Action" means any action to investigate, remove, remediate, clean up or monitor any release or threatened release of Hazardous Substances.

"Restricted Cash" means any cash and cash equivalents that are not freely usable, distributable or transferable by the Company or are otherwise subject to restrictions or limitations on the use or distribution thereof by Law, Contract or otherwise, including any restrictions or limitations on the repatriation or transfer thereof.

"Retention Bonus Agreement" means those certain Retention Bonus Agreements, dated as of August 31, 2021, by and between the Company and each Employee that is a party thereto.

"SEC" the Securities and Exchange Commission.

"Second Earnout Amyris Brands Revenue Target" means ███████████; provided, that if additional products and brand names are added to the definition of Amyris Brands Products, the Second Earnout Amyris Brands Revenue Target shall be increased by an amount equal to one hundred ten percent (110%) of revenue for such additional products and brand names for the twelve (12) month period between January 1, 2023 and December 31, 2023 pursuant to Purchaser's long range plan as provided to Mark Gerhard (or, if Mark Gerhard is not then employed by Purchaser or any of its Subsidiaries, the Representative) prior to any agreement to add such products and brand names to the definition of Amyris Brands Products.

"Securities Act" means the Securities Act of 1933.

"Seller Fundamental Representations" means those representations and warranties made in Sections 4.01, 4.02, 4.03, 4.04, 4.05(a)(i), 4.07 and 4.09.

"Seller Shares" means the Ordinary Shares, the Series A-1 Shares of £0.0000001 each in the capital of the Company and the Series A-2 Shares of £0.0000001 each in the capital of the Company.

"Software" means all (i) computer programs, applications, systems and code, including software implementations of algorithms, models and methodologies, program interfaces, and source code and object code; (ii) code for Internet and intranet websites, databases and compilations, including data and collections of data, whether machine-readable or otherwise, (iii) development and design tools, library functions and compilers; (iv) code for technology supporting websites, and the contents and audiovisual displays of websites, whether machine-readable or otherwise; and (v) media, documentation and other works of authorship, including user

manuals and training materials, relating to or embodying any of the foregoing or on which any of the foregoing is recorded.

"Straddle Period" means any taxable period beginning on or before the Closing Date and ending after the Closing Date.

"Subsidiary" of any Person means any corporation, limited liability company, partnership, limited partnership, association, trust, unincorporated organization or other legal entity of which such Person (either alone or through or together with any other Subsidiary) owns, directly or indirectly, a majority of the Equity Securities, the holders of which are generally entitled to vote for the election of the board of directors or other governing body of such corporation or other legal entity, or any Person that would otherwise be deemed a "subsidiary" under Rule 12b-2 promulgated under the Exchange Act.

"Target Monthly DAU/MAU" means, for each Amyris Brands Product, (i) for the first (1st) full calendar month following Launch of such Amyris Brands Product, the Baseline Monthly DAU/MAU plus the Baseline Monthly DAU/MAU multiplied by 0.016667, (ii) for each of the second (2nd) through twelfth (12th) full calendar months following Launch of such Amyris Brands Product, the Target Monthly DAU/MAU for the prior calendar month plus the Baseline Monthly DAU/MAU multiplied by 0.016667, (iii) for the thirteenth (13th) full calendar month following Launch of such Amyris Brands Product, the Baseline Monthly DAU/MAU plus the Baseline Monthly DAU/MAU multiplied by 0.15, and (iv) for each of the fourteenth (14th) through twenty-fourth (24th) full calendar months following Launch of such Amyris Brands Product, the Target Monthly DAU/MAU for the prior calendar month plus the Baseline Monthly DAU/MAU multiplied by 0.0125.

"Target Monthly LTV" means, for each Amyris Brands Product, (i) for the first (1st) full calendar month following Launch of such Amyris Brands Product, the Baseline Monthly LTV plus the Baseline Monthly LTV multiplied by 0.016667, (ii) for each of the second (2nd) through twelfth (12th) full calendar months following Launch of such Amyris Brands Product, the Target Monthly LTV for the prior calendar month plus the Baseline Monthly LTV multiplied by 0.016667, (iii) for the thirteenth (13th) full calendar month following Launch of such Amyris Brands Product, the Baseline Monthly LTV plus the Baseline Monthly LTV multiplied by 0.15, and (iv) for each of the fourteenth (14th) through twenty-fourth (24th) full calendar months following Launch of such Amyris Brands Product, the Target Monthly LTV for the prior calendar month plus the Baseline Monthly LTV multiplied by 0.0125.

"Target Net Working Capital" means negative £119,626.

"Tax" or "Taxes" means any and all taxes, duties, levies, customs, assessments or other charges of any kind in the nature of taxation (together with any and all interest, penalties, additions to tax and additional amounts imposed with respect thereto) imposed by any Governmental Authority, including (a) on or with respect to income, franchise, windfall or other profits, gross receipts, property, sales, use, capital stock, payroll, employment, social security (or equivalent, including UK National Insurance contributions), workers' compensation, unemployment compensation, escheat and net worth and (b) in the nature of excise, withholding (including by way of the UK Pay-As-You-Earn scheme), ad valorem, stamp, stamp duty reserve,

transfer, value-added, services, goods and services, or gains taxes, in each case, together with any and all interest, penalties, additions to tax and additional amounts imposed with respect thereto.

"Tax Group" means (i) a group of companies for UK corporation tax purposes or (ii) any other consolidated, combined, affiliated, unitary or similar Tax group.

"Tax Returns" means any and all returns, reports and forms (including elections, declarations, amendments, schedules, information returns or attachments thereto and any amendments thereto) filed or required to be filed with a Governmental Authority with respect to Taxes.

"Transaction Expenses" means, without duplication, all costs, fees and expenses incurred or payable by the Company (on behalf of itself or any holder of its Equity Securities or Affiliates) or any Seller in connection with the negotiation, execution and delivery of this Agreement and the Ancillary Documents or the consummation of the transactions contemplated hereby or thereby, including (a) all brokerage fees, commissions, finders' fees or financial advisory fees; (b) the fees and expenses of legal counsel, accountants, consultants and other experts and advisors so incurred; (c) any payment or consideration to obtain any consents, modifications, waivers or approvals of any party under any Contract or arrangement as are required in connection with the transactions contemplated hereby for any such Contract to remain in full force and effect following the Closing or resulting from agreed upon modifications or early termination of such Contract and (d) obligations of the Company in respect of severance, change of control payments, discretionary bonuses, stay bonuses, retention bonuses (including all amounts payable pursuant to the Retention Bonus Agreements), transaction bonuses and any other compensatory payments or similar arrangements due or arising (either alone or in combination with any other event) as a result of the transactions contemplated hereby or by any Ancillary Document, in each case, solely to the extent such amounts remain unpaid as of the Reference Time (including the employer portion of any employment, payroll or other irrecoverable Taxes and employer national insurance contributions arising as a result of the payment of any such amounts).

"U.K. GAAP" means United Kingdom generally accepted accounting principles and practices in effect from time to time applied consistently throughout the periods involved.

"U.S. GAAP" means United States generally accepted accounting principles and practices in effect from time to time applied consistently throughout the periods involved.

"User Churn" means, for each Amyris Brands Product, the total number of unique third-parties who engage with such Amyris Brands Product through Purchaser's website, iOS application, Android application or comparable digital platform by taking any action at least once during the prior calendar month ("Prior Month Users") who do not engage with such Amyris Brands Product through Purchaser's website, iOS application, Android application or comparable digital platform by taking any action at least once during the current calendar month, divided by the number of Prior Month Users.

"Virus" means any virus, malware, spyware, trojan horse, worm, back door, time bomb, drop dead device or other routine, contaminant, device, code or effect designed or intended to (a) disable, disrupt, erase, harm or otherwise impair the normal and authorized operation of, or

18

Case 1:23-cv-02245-RA   Document 1-2   Filed 03/15/23   Page 42 of 185

provide or enable any unauthorized access to, any IT Asset, including any computer system, hardware, firmware, network, or device on which any Company Product or Company Software is installed, stored or used; or (b) damage, destroy or prevent the access to or use of any data or file without the user's consent (except, for the avoidance of doubt, license keys and other code intended to limit access to or use of such Company Product or Company Software to an authorized user).

"Warrant Cancellation" means the cancellation of all outstanding Warrants at the Closing in accordance with Section 2.09(b).

"Warrant Instrument" means that certain Warrant Instrument, dated July 13, 2020, executed as a deed and delivered by the Company.

"Warrantholder" means a holder of Warrants.

"Warrants" means all outstanding Warrants to purchase Ordinary Shares pursuant to the Warrant Instrument.

SECTION 1.02   Definitions. The following terms have the meanings set forth in the Sections set forth below:

<table>
<tr><td>Definition</td><td>Location</td></tr>
<tr><td>"Acceleration Event"</td><td>2.08(f)(ii)</td></tr>
<tr><td>"Agreement"</td><td>Preamble</td></tr>
<tr><td>"Anti-Corruption Laws"</td><td>3.22(a)(i)</td></tr>
<tr><td>"Assets"</td><td>3.15(a)</td></tr>
<tr><td>"Audited Financial Statements"</td><td>3.08(a)(i)</td></tr>
<tr><td>"Balance Sheet"</td><td>3.10(a)</td></tr>
<tr><td>"Business Plan"</td><td>2.08(e)(i)(A)</td></tr>
<tr><td>"Cap"</td><td>8.04(b)(ii)</td></tr>
<tr><td>"Cash Consideration"</td><td>2.02(a)(i)</td></tr>
<tr><td>"CFA 2017"</td><td>3.17(t)</td></tr>
<tr><td>"Claim Notice"</td><td>8.03(a)</td></tr>
<tr><td>"Closing"</td><td>2.03(a)</td></tr>
<tr><td>"Closing Stock Consideration"</td><td>2.02(a)(ii)(ii)</td></tr>
<tr><td>"Collection Costs"</td><td>8.04(d)(iii)</td></tr>
<tr><td>"Company"</td><td>Preamble</td></tr>
<tr><td>"Company Benefit Plan"</td><td>3.12(a)</td></tr>
<tr><td>"Company Persons"</td><td>3.22(a)</td></tr>
<tr><td>"Confidential Information"</td><td>6.02(b)</td></tr>
<tr><td>"Contest"</td><td>7.01(b)</td></tr>
<tr><td>"Control Acceleration Event"</td><td>2.08(f)(i)</td></tr>
<tr><td>"Covenant Acceleration Event"</td><td>2.08(f)(ii)</td></tr>
<tr><td>"CTA 2009"</td><td>3.17(q)(ii)</td></tr>
<tr><td>"CTA 2010"</td><td>3.17(m)</td></tr>
<tr><td>"Deferred Consideration"</td><td>2.02(a)(iii)(i)</td></tr>
<tr><td>"Deferred Stock Consideration"</td><td>2.02(a)(iii)(ii)</td></tr>
</table>

19

| Definition | Location |
|---|---|
| "Direct Claim" | 8.03(c) |
| "Dispute Notice" | 2.06(c) |
| "Disputed Item" | 2.06(c)(x) |
| "Disruptional" | 3.15(b) |
| "Environmental Permits" | 3.18 |
| "Estimated Aggregate Exercise Price Amount" | 2.06(a)(A)(v) |
| "Estimated Cash and Cash Equivalents" | 2.06(a)(A)(ii) |
| "Estimated Closing Date Indebtedness" | 2.06(a)(A)(iii) |
| "Estimated Net Working Capital" | 2.06(a)(A)(i) |
| "Estimated Net Working Capital Adjustment Amount" | 2.06(a)(A)(i) |
| "Estimated Transaction Expenses" | 2.06(a)(A)(iv) |
| "Final Closing Statement" | 2.06(b) |
| "Final Closing Statement Due Date" | 2.06(b) |
| "Financial Statements" | 3.08(a)(ii) |
| "First Earnout Amyris Brands Revenue" | 2.08(a)(iv) |
| "First Earnout Amyris Brands Revenue Payment" | 2.08(a)(iv)(y)(A)(2) |
| "First Earnout Amyris Brands Revenue Statement" | 2.08(a)(iv) |
| "First Earnout Beauty Labs Revenue" | 2.08(a)(i) |
| "First Earnout Beauty Labs Revenue Payment" | 2.08(a)(ii)(y)(A)(2) |
| "First Earnout Beauty Labs Revenue Statement" | 2.08(a)(i) |
| "First Earnout Brand Metrics Payment" | 2.08(a)(v)(B)(y)(A)(2) |
| "First Earnout Brand Metrics Statement" | 2.08(a)(v) |
| "First Metrics Measurement Period" | 2.08(a)(v)(y)(II) |
| "First Overperformance Earnout Payment" | 2.08(a)(iii)(B) |
| "Hive-Down Agreement" | 3.15(b) |
| "Hive-Down Assets" | 3.15(b) |
| "HMRC" | 3.13(s) |
| "Holdback Consideration" | 2.07(a)(i)(B)(2) |
| "Holdback Release Date" | 8.01 |
| "IHTA" | 3.17(n) |
| "Indemnifying Party" | 8.03(b) |
| "Interested Party" | 3.23 |
| "Interim Financial Statements" | 3.08(a)(ii) |
| "ITEPA 2003" | 3.17(l) |
| "Loss" | 8.02(a) |
| "Material Contracts" | 3.19(a) |
| "Monthly LTV" | 2.08(a)(v)(y) |
| "Monthly MAU/DAU" | 2.08(a)(v)(x) |
| "Nasdaq" | 1.01 |
| "Net Settlement Withholding" | 2.09(a)(ii)(y) |
| "Non-Recourse Party" | 9.14 |
| "Option Cancellation Agreement" | 2.09(a) |
| "Other Seller Securities" | 2.01 |
| "Overperformance Earnout Statement" | 2.08(f) |
| "Overperformance Earnout Threshold" | 2.08(a)(iii) |

20

| Definition | Location |
|---|---|
| "Post-Closing Representation" | 9.17(a) |
| "Pre-Closing Representation" | 9.17(a) |
| "Preliminary Closing Statement" | 2.06(a) |
| "Prior Company Counsel" | 9.17(a) |
| "Prior Month Users" | 1.01 |
| "Prospectus" | 6.07(b) |
| "Purchase Price" | 2.02(a) |
| "Purchaser" | Preamble |
| "Purchaser Indemnified Party" | 8.02(a) |
| "Purchaser Releasees" | 6.05(a) |
| "Purchaser SEC Documents" | 5.05(a) |
| "Purchaser Shares" | 2.02(a)(ii) |
| "Registration Statement" | 6.07(b) |
| "Representative" | 6.06(a) |
| "Restrictive Covenant Agreement" | Recitals |
| "Rule 144" | 1.01 |
| "Sanctions" | 3.22(a)(i) |
| "Second Earnout Amyris Brands Revenue" | 2.08(b)(iv)(y)(A)(2) |
| "Second Earnout Amyris Brands Revenue Payment" | 2.08(b)(iv)(y)(A)(2) |
| "Second Earnout Amyris Brands Revenue Statement" | 2.08(b)(iv) |
| "Second Earnout Beauty Labs Revenue" | 2.08(b)(i) |
| "Second Earnout Beauty Labs Revenue Payment" | 2.08(b)(ii)(y)(A)(2) |
| "Second Earnout Beauty Labs Revenue Statement" | 2.08(b)(i) |
| "Second Earnout Brand Metrics Payment" | 2.08(b)(v)(II)(y)(A)(2) |
| "Second Earnout Brand Metrics Statement" | 2.08(b)(v)(1) |
| "Second Metrics Measurement Period" | 2.08(b)(v)(2) |
| "Second Overperformance Earnout Payment" | 2.08(b)(iii)(B) |
| "Seller Pre-Closing Communications" | 9.17(a) |
| "Seller Releasees" | 6.05(c) |
| "Seller Securities" | Recitals |
| "Sellers" | Preamble |
| "Synthetic Beauty Labs Revenue" | 1.01 |
| "Third Party Beauty Labs Revenue" | 1.01 |
| "Third Party Claim" | 8.03(a) |
| "Trade, AML and ATL Laws" | 3.22(a) |
| "TUPE" | 3.13(m) |

SECTION 1.03    Interpretation and Rules of Construction.  In this Agreement and each Ancillary Document, except to the extent otherwise expressly provided or that the context otherwise requires:

(a)    when a reference is made in this Agreement to an Article, Section, Exhibit or Schedule, such reference is to an Article or Section of, or an Exhibit or Schedule to, this Agreement unless otherwise indicated;

Case 1.23-cv-02245-RA   Document 1-2   Filed 03/15/23   Page 45 of 185

(b)     when a reference is made to an agreement (including this Agreement), document or instrument, such reference is to such agreement, document or instrument as amended or modified and in effect from time to time in accordance with the terms thereof and, if applicable, the terms hereof;

(c)     when a reference is made to Law, such reference means any such Law as amended, modified, codified or reenacted, in whole or in part, and in effect from time to time, including rules and regulations promulgated thereunder;

(d)     the table of contents and headings for this Agreement are for reference purposes only and do not affect in any way the meaning or interpretation of this Agreement;

(e)     whenever the words "include," "includes" or "including" are used in this Agreement, they are deemed to be followed by the words "without limitation;"

(f)     the words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, refer to this Agreement as a whole and not to any particular provision of this Agreement;

(g)     the words "the date hereof," when used in this Agreement, refer to the date of this Agreement;

(h)     all terms defined in this Agreement have the defined meanings when used in any certificate or other document made or delivered pursuant hereto, unless otherwise defined therein;

(i)     words of any gender include each other gender and words using the singular or plural number also include the plural or singular number, respectively;

(j)     the definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms;

(k)     references to a Person are also to its predecessors-in-interest, successors and permitted assigns;

(l)     the use of "or" is not intended to be exclusive unless expressly indicated otherwise;

(m)     when calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded, and if the last day of such period is not a Business Day, the period shall end on the immediately following Business Day;

(n)     each accounting term used herein that is not specifically defined herein shall have the meaning given to it (i) under U.K. GAAP, to the extent such accounting term refers to the Financial Statements or to the Company for any period of the Company ending on or prior to the Closing, or (ii) under U.S. GAAP, to the extent such accounting term

refers to Purchaser or to the Company for any period of the Company commencing following the Closing;

(o)     all references to the "ordinary course of business" and similar terms shall mean the ordinary course of business of the Company consistent with past custom and practice; and

(p)     all references to materials being "made available" by the Company means documents posted and accessible to Purchaser and its advisors in the cloud storage site for "Project BL" hosted by Google LLC at least one (1) Business Day prior to the date of this Agreement.

## ARTICLE II

## PURCHASE AND SALE

SECTION 2.01     Purchase and Sale of the Seller Shares; Cancellation of the Other Seller Securities.  On the terms and subject to the conditions of this Agreement, at the Closing, each Seller shall sell, assign, transfer, convey and deliver, or cause to be sold, assigned, transferred, conveyed and delivered, to Purchaser, free and clear of any and all Liens, and Purchaser shall purchase from each such Seller, all rights, title and interest in and to all Equity Securities of the Company held by Sellers as of the Closing, which constitute, following the Option Cancellation and Warrant Cancellation, one hundred percent (100%) of the Equity Securities of the Company.  In addition, each Optionholder and Seller that is a Warrantholder shall cause all issued and outstanding Options and Warrants, respectively, to be cancelled at the Closing on the terms and conditions set forth herein (such Options and Warrants held by Sellers and the Optionholders, the "Other Seller Securities").

SECTION 2.02     Purchase Price.

(a)     The aggregate purchase price (the "Purchase Price") for the Seller Shares and the cancellation of the Other Seller Securities shall be:

(i)     $12,500,000 in cash (the "Cash Consideration");

(ii)     that number of validly issued, fully paid and nonassessable shares of common stock, par value $0.0001 per share, of Purchaser ("Purchaser Shares") (rounded down to the nearest whole share) equal to the quotient determined by dividing (i) (A) $32,500,000 plus (B) the Estimated Adjustment Amount (which may be either a positive or negative number), by (ii) the Issuance Price determined as of the date hereof (the "Closing Stock Consideration"); and

(iii)     that number of validly issued, fully paid and nonassessable Purchaser Shares (rounded down to the nearest whole share) equal to the quotient determined by dividing (i) an amount equal to (A) $30,000,000, plus (B) the Net Adjustment Amount (which may be either a positive or negative number) (the amount set forth in this clause (i), as finally determined pursuant to Section 2.06, the "Deferred

23

Consideration"), by (ii) the Issuance Price determined as of the date such Purchaser Shares are issued pursuant to Section 2.07(a) (the "Deferred Stock Consideration").

(b)     The Purchaser Shares to be issued pursuant to this Agreement shall be issued via direct registration with Purchaser's transfer agent.  No Purchaser Shares will be issued to any Seller or Optionholder until such Seller or Optionholder shall provide the information required by the Preliminary Closing Statement pursuant to the last sentence of Section 2.06(a).

SECTION 2.03    Closing.

(a)     Subject to the terms and conditions of this Agreement, the sale and purchase of the Seller Shares contemplated by this Agreement and the cancellation of the Other Seller Securities shall take place at a closing (the "Closing") to be held at the offices of Shearman & Sterling LLP, 535 Mission Street, San Francisco, California, immediately upon the execution and delivery of this Agreement by the Parties or at such other place or at such other time or on such other date as Sellers and Purchaser may mutually agree upon in writing.

(b)     At the Closing, Purchaser shall pay, or cause to be paid, to each Seller or Optionholder (subject to Section 2.09(a), in the case of Options, and Section 2.09(b), in the case of Warrants), an amount equal to such Seller's or Optionholder's Pro Rata Portion of the Cash Consideration, in each case, as set forth in the Preliminary Closing Statement, by wire transfer of immediately available funds to the account designated in the Preliminary Closing Statement.

(c)     At the Closing, Purchaser shall issue to each Seller or Optionholder (subject to Section 2.09(a), in the case of Options, and Section 2.09(b), in the case of Warrants) a number of Purchaser Shares (rounded down to the nearest whole share) equal to such Seller's or Optionholder's Pro Rata Portion of the Closing Stock Consideration, and, if required pursuant to Section 2.09(a), such Optionholder's portion of the Deferred Stock Consideration, in each case, as set forth in the Preliminary Closing Statement.

(d)     Each Seller hereby, and under the Option Cancellation Agreement each Optionholder thereby, (a) agrees to be bound by the Preliminary Closing Statement and the allocation of the Purchase Price to each Seller and Optionholder and other consideration pursuant thereto and (b) releases and agrees to hold harmless Purchaser and its Affiliates, including the Company, from, and hereby waives, any and all claims that such Seller or Optionholder, as applicable, may have, whether arising before or after the Closing, in respect the Preliminary Closing Statement and the allocation of the Purchase Price to each Seller and Optionholder pursuant thereto.

SECTION 2.04    Closing Deliveries by Sellers.  At the Closing, Sellers shall deliver or cause to be delivered to Purchaser:

(a)     share certificates evidencing the Seller Shares (or lost certificate indemnities in the case of any missing certificates), accompanied by duly completed and executed stock transfer forms in respect of the Seller Shares in favor of Purchaser;

(b)     executed irrevocable voting powers of attorney, duly executed by each Seller in respect of the Seller Shares registered in the name of such Seller;

24

(c)      executed counterparts of each Ancillary Document to which any Seller or Optionholder is a party, duly executed by the Company, such Seller or Optionholder, as applicable;

(d)      a receipt from each Seller for such Seller's portion of the Cash Consideration;

(e)      the resignations, effective as of the Closing, of all of the directors of the Company;

(f)      a properly completed applicable IRS Form W-8 from Disruptional and a properly executed IRS Form W-9 from AndVest Beauty Labs LP;

(g)      a duly executed pay-off and release letter from each holder of the Company's Indebtedness (other than Indebtedness related to Taxes) set forth in <u>Section 2.04(g)</u> of the Disclosure Schedule, in form and substance reasonably satisfactory to Purchaser;

(h)      an executed pay-off and release letter from all recipients of, or other evidence of satisfaction of, the Transaction Expenses, in form and substance reasonably satisfactory to Purchaser;

(i)      a termination letter, terminating each Contract set forth in <u>Section 2.04(i)</u> of the Disclosure Schedule, in form and substance reasonably satisfactory to Purchaser;

(j)      the statutory books (which shall be written up to but not including the Closing Date) and common seal (if any) of the Company, in each case made available only to the extent not currently held at the Company's registered office or current business address; and

(k)      a certificate from the Company, validly executed by a director or the secretary of the Company, certifying solely in their capacity as director or secretary (as applicable) as to the valid adoption of resolutions of the directors of the Company approving (i) the transfer and, subject only to stamping, the registration of transfer of the Seller Shares; (ii) the appointment of the individuals set forth in <u>Section 2.04(k)(ii)</u> of the Disclosure Schedule as directors of the Company, effective as of the Closing; and (iii) the acceptance of the resignation of all current directors of the Company, effective as of the Closing.

SECTION 2.05      <u>Closing Deliveries by Purchaser</u>.  At the Closing, Purchaser shall deliver or cause to be delivered:

(a)      to each Seller and Optionholder (in each case, subject to <u>Section 2.09(a)</u>, in the case of Options, and <u>Section 2.09(b)</u>, in the case of Warrants), as applicable, the Pro Rata Portion of the Cash Consideration to be paid to such Seller or Optionholder, as set forth in the Preliminary Closing Statement;

25

(b)      to each Seller and Optionholder (in each case, subject to <u>Section 2.09(a)</u>, in the case of Options, and <u>Section 2.09(b)</u>, in the case of Warrants), as applicable, the Pro Rata Portion of the Closing Stock Consideration, and, if required pursuant to <u>Section 2.09(a)</u>, such Optionholder's portion of the Deferred Stock Consideration, to be issued to such Seller or Optionholder, as set forth in the Preliminary Closing Statement;

(c)      to each holder of Indebtedness who has delivered to the Company a pay-off and release letter, an amount in cash equal to the amount specified in such pay-off and release letter as owed to such holder, which shall be paid in accordance with the wire instructions of such holder as set forth in the Preliminary Closing Statement;

(d)      to each payee of Transaction Expenses who has delivered to the Company an invoice marked as final, an amount in cash equal to the amount specified in such invoice as owed to such payee, which shall be paid in accordance with the wire instructions of such payee as set forth in the Preliminary Closing Statement; and

(e)      executed counterparts of each Ancillary Document to which Purchaser is a party, duly executed by Purchaser.

SECTION 2.06      <u>Determination of the Adjustment Amount and Net Adjustment Amount</u>.

(a)      Prior to the Closing Date, the Company and Sellers have delivered to Purchaser a written statement (the "<u>Preliminary Closing Statement</u>"), which is attached as <u>Exhibit C</u> and has been certified by the Company and Sellers, setting forth in reasonable detail (A) Sellers' good faith estimates of (i) Net Working Capital (the "<u>Estimated Net Working Capital</u>") and the Net Working Capital Adjustment Amount (the "<u>Estimated Net Working Capital Adjustment Amount</u>"), (ii) the amount of Cash and Cash Equivalents (the "<u>Estimated Cash and Cash Equivalents</u>"), (iii) the amount of Closing Date Indebtedness (the "<u>Estimated Closing Date Indebtedness</u>"), (iv) the amount of Transaction Expenses (the "<u>Estimated Transaction Expenses</u>") and (v) the Aggregate Exercise Price Amount (the "<u>Estimated Aggregate Exercise Price Amount</u>") and, based thereon, the Company's and Sellers' calculation of the Estimated Adjustment Amount, along with a reasonable itemization and the supporting detail therefor, which estimates Sellers have prepared in accordance with the definitions herein and the Accounting Principles and (B) (i) the portion of the Cash Consideration to be paid, and the portion of the Closing Stock Consideration to be issued, to each Seller, in respect of any and all Seller Shares, and to each applicable Seller and Optionholder, in respect of the cancellation of any and all Other Seller Securities, and if required pursuant to <u>Section 2.09(a)</u>, the portion of the Deferred Stock Consideration to be issued to any Optionholder, in each case, along with wire instructions therefor, (ii) each Seller's and each Optionholder's Pro Rata Portion and (iii) each Seller's Pro Rata Indemnification Portion.  The Preliminary Closing Statement shall also include, for each Seller and Optionholder, such Seller's or such Optionholder's taxpayer identification number and address.

(b)      No later than ninety (90) days after the Closing Date (the "<u>Final Closing Statement Due Date</u>"), Purchaser shall deliver to the Representative a written statement (the "<u>Final Closing Statement</u>") setting forth the proposed final Deferred Consideration, including its good

faith calculations of (i) Net Working Capital and the Net Working Capital Adjustment Amount, (ii) the amount of Cash and Cash Equivalents, (iii) the amount of Closing Date Indebtedness, (iv) the amount of Transaction Expenses and (v) the Aggregate Exercise Price Amount and, based thereon, Purchaser's calculation of the Adjustment Amount and the Net Adjustment Amount, along with a reasonable itemization and the supporting detail therefor, which calculations Purchaser shall prepare in accordance with the definitions herein and the Accounting Principles. In connection with the Representative's review of the Final Closing Statement, the Company and Purchaser shall provide the Representative and its representatives and accountants all books, records, work papers and other information used in preparing the Final Closing Statement reasonably requested by the Representative, and provide reasonable access, during normal business hours, to members of the Company's accounting and financial staff in connection with the Representative's review thereof. If Purchaser fails to deliver the Final Closing Statement by the Final Closing Statement Due Date, the Net Working Capital and the Net Working Capital Adjustment Amount, the Cash and Cash Equivalents, the Closing Date Indebtedness, the Transaction Expenses, the Aggregate Exercise Price Amount and the Adjustment Amount shall be deemed to be equal to the Estimated Net Working Capital and the Estimated Net Working Capital Adjustment Amount, the Estimated Cash and Cash Equivalents, the Estimated Closing Date Indebtedness, the Estimated Transaction Expenses, the Estimated Aggregate Exercise Price Amount and the Estimated Adjustment Amount, respectively, and, subject to Article VIII, such amounts shall be final, conclusive, and binding on the Parties and on all Optionholders for all purposes of this Agreement.

(c)       The Final Closing Statement shall be final, conclusive and binding on the Parties and on all Optionholders for all purposes of this Agreement, subject to Article VIII, unless the Representative provides a written notice (a "Dispute Notice") to Purchaser no later than the thirtieth (30th) day after the delivery to the Representative of the Final Closing Statement; provided, however, that any objections in a Dispute Notice shall only be made on the basis that the amounts set forth in the Final Closing Statement (i) were not determined in accordance with the Accounting Principles, (ii) were not determined in accordance with the definitions of Net Working Capital and the Net Working Capital Adjustment Amount, Cash and Cash Equivalents, Indebtedness, Transaction Expenses and the Aggregate Exercise Price Amount or (iii) were arrived at based on mathematical or clerical error. Any Dispute Notice must set forth in reasonable detail (x) any item (a "Disputed Item") on the Final Closing Statement with respect to which the Representative disagrees and the nature of any disagreement so asserted and (y) the Representative's alternative calculation of each such item. Any item or amount with respect to which no dispute is raised in a Dispute Notice shall be final, conclusive and binding on the Parties and on all Optionholders.

(d)       The Disputed Items shall be resolved as follows:

(i)       The Representative and Purchaser shall attempt to promptly resolve in good faith such Disputed Items. Any written resolution by the Representative and Purchaser as to such Disputed Items shall be final and binding on the Parties and on all Optionholders.

(ii)      If the Representative and Purchaser do not reach a resolution of all Disputed Items within thirty (30) days after delivery of the Dispute Notice (as such period

27

Case 1:23-cv-02245-RA   Document 1-2   Filed 03/15/23   Page 51 of 185

may be extended by the mutual written agreement of the Representative and Purchaser), then the Representative and Purchaser shall promptly enter into a customary engagement agreement with the Neutral Accountant and thereafter submit such unresolved Disputed Items to the Neutral Accountant for final resolution.

(iii)    The Neutral Accountant shall act as an expert, not as an arbitrator, in resolving such Disputed Items. The proceeding before the Neutral Accountant shall be an expert determination under applicable Laws governing expert determination and appraisal proceedings. All communications between the Representative and Purchaser or any of their respective representatives, on the one hand, and the Neutral Accountant, on the other hand, shall be in writing with copies simultaneously delivered to the non-communicating Party.

(iv)    The Neutral Accountant shall be instructed to promptly, in accordance with the rules set forth in the Neutral Accountant's engagement letter and its customary practices, review only those unresolved Disputed Items specifically set forth and objected to in the Dispute Notice and resolve the dispute with respect to each such specific Disputed Item in accordance with this Agreement. A single partner of the Neutral Accountant selected by such Neutral Accountant in accordance with its normal procedures and having expertise with respect to settlement of such disputes and the industry in which the Company operates shall act for the Neutral Accountant in the determination proceeding, and the Neutral Accountant shall render a written decision as to each Disputed Item, including a statement in reasonable detail of the basis for its decision. In no event shall the decision of the Neutral Accountant provide for a calculation of any element of the Deferred Consideration that is less than the lower calculation thereof shown in the Final Closing Statement or in the Dispute Notice or greater than the higher calculation thereof shown in the Final Closing Statement or in the Dispute Notice.

(v)     The Neutral Accountant shall be instructed to resolve the unresolved Disputed Items in accordance with the definitions of Closing Date Indebtedness, Cash and Cash Equivalents, Net Working Capital, Net Working Capital Adjustment Amount and Transaction Expenses and shall be instructed not to independently investigate any other matters. The Representative and Purchaser shall request that the Neutral Accountant make a final determination (which determination shall set forth the reasons for such determination) with respect to any unresolved Disputed Items within thirty (30) days from the date such unresolved Disputed Items were submitted to the Neutral Accountant, and such final determination shall be deemed final for purposes of the Final Closing Statement. During the thirty (30)-day review by the Neutral Accountant, the Representative (for itself and on behalf of all Sellers and Optionholders), the Company and Purchaser shall each make available to the Neutral Accountant all books, records, work papers and other information reasonably requested by the Neutral Accountant, and provide reasonable access, during normal business hours, to members of their respective accounting and financial staff as may be reasonably required by the Neutral Accountant to make its final determination.

(vi)    The final determination by the Neutral Accountant of the Disputed Items submitted to it for resolution, absent fraud or clerical or mathematical error, shall be

28

conclusive and binding on the Parties and on all Optionholders. The Parties and each Optionholder (by the acceptance of its entitlement to receive (i) its Pro Rata Portion of the Purchase Price plus (ii) the right to receive its Pro Rata Portion of any Earnout Payments that become payable to such Optionholder pursuant to Section 2.08) agree that the procedure set forth in this Section 2.06(d) for resolving disputes with respect to the Final Closing Statement shall be the sole and exclusive method for resolving any such disputes. The fees and expenses of the Neutral Accountant shall be allocated between all Sellers and on all Optionholders, on the one hand, and Purchaser, on the other hand, in inverse proportion to the relative success of the payor of such Deferred Consideration and the recipient of such Deferred Consideration with respect to the value of Disputed Items submitted by the Representative (for itself and on behalf of all Sellers and Optionholders), on the one hand, or Purchaser, on the other hand, to the Neutral Accountant.

(e)    The Final Closing Statement, including any modifications resulting from the resolution of any Disputed Items set forth in any Dispute Notice, shall be final and binding and deemed to set forth the final Closing Date Indebtedness, Cash and Cash Equivalents, Net Working Capital Adjustment Amount, Transaction Expenses, Adjustment Amount and Net Adjustment Amount and Deferred Consideration, in each case, for purposes of determining the Deferred Stock Consideration, upon the earliest to occur of (i) the delivery by the Representative of written notice of the acceptance of the Final Closing Statement, (ii) the failure of the Representative to submit a timely Dispute Notice pursuant to Section 2.06(c), (iii) the resolution of all Disputed Items by the Representative and Purchaser pursuant to Section 2.06(d)(i) or (iv) the resolution of any otherwise unresolved Disputed Items pursuant to Section 2.06(d)(v) by the Neutral Accountant.

SECTION 2.07    Payment of Deferred Consideration.

(a)    If the Deferred Consideration is a positive number, then, within five (5) Business Days after the date on which the Deferred Consideration is finally determined pursuant to Section 2.06 or, if later, the six (6) month anniversary of the Closing Date, (subject to Section 2.09(a), in the case of Options, and Section 2.09(b), in the case of Warrants) Purchaser shall issue (i) to each Seller, a number of Purchaser Shares equal to the excess of (A) such Seller's Pro Rata Portion of the Deferred Stock Consideration (rounded down to the nearest whole share) over (B) such Seller's Pro Rata Indemnification Portion of a number of Purchaser Shares (rounded down to the nearest whole share) equal to the quotient determined by dividing (1) $7,500,000 by (2) the Issuance Price determined as of the date that the Deferred Stock Consideration is issued (the "Holdback Consideration"), if any, and (ii) to each Optionholder, a number of Purchaser Shares equal to such Optionholder's Pro Rata Portion of the Deferred Stock Consideration (rounded down to the nearest whole share), less any portion of such Optionholder's Pro Rata Portion of the Deferred Consideration that was issued at Closing pursuant to Section 2.09 in order to permit the full amount of Net Settlement Withholding to be deducted from the consideration payable to such Optionholder at Closing; provided that such payments of Deferred Stock Consideration shall be made in cash to the extent required pursuant to Section 2.10.

(b)    If the Deferred Consideration is a negative number, then no Deferred Consideration shall be due and payable hereunder.

SECTION 2.08    Earnout.  Subject to the terms of this Agreement, including this Section 2.08, as additional consideration for the Seller Shares and cancellation of the Other Seller Securities, Purchaser shall make, or cause to be made, to Sellers and Optionholders, in accordance with the terms of this Section 2.08 (subject to Section 2.09(a), in the case of Options, and Section 2.09(b), in the case of Warrants), the following Earnout Payments, if any (provided, that if the First Earnout Beauty Labs Revenue Payment shall be payable hereunder Purchaser shall have no obligation to pay the First Earnout Amyris Brands Revenue Payment or any First Earnout Brand Metrics Payment, and if the Second Earnout Beauty Labs Revenue Payment shall be payable hereunder Purchaser shall have no obligation to pay the Second Earnout Amyris Brands Revenue Payment or any Second Earnout Brand Metrics Payment):

(a)    First Earnout.

(i)    Within twenty (20) Business Days after December 31, 2022, Purchaser will deliver to the Representative a written statement (the "First Earnout Beauty Labs Revenue Statement") setting forth Purchaser's calculation of the Beauty Labs Revenue, Third Party Beauty Labs Revenue and Synthetic Beauty Labs Revenue recognized during the twelve (12) month period between January 1, 2022 and December 31, 2022 (the "First Earnout Beauty Labs Revenue").

(ii)    If the First Earnout Beauty Labs Revenue is equal to or greater than ████ then (within ten (10) Business Days after (x) the date on which the First Earnout Beauty Labs Revenue is finally determined pursuant to Section 2.08(c) or (y) if the First Earnout Beauty Labs Revenue Statement indicates that the First Earnout Beauty Labs Revenue Payment is payable, the date the First Earnout Beauty Labs Revenue Statement is delivered to the Representative) Purchaser will issue to each Seller and each Optionholder a number of Purchaser Shares equal to (A) its Pro Rata Portion of, subject to any reduction required under the retention provisions set forth in Schedule 2.08, that number of validly issued, fully paid and nonassessable Purchaser Shares (rounded down to the nearest whole share) equal to the quotient determined by dividing (1) an amount equal to (a) $31,250,000, less (but not below zero) solely in respect of any Seller (but not any Optionholder) (b) any amounts set off pursuant to Article VIII that are not reflected in the calculation of any other Earnout Payment, by (2) the Issuance Price determined as of the date of such issuance (the "First Earnout Beauty Labs Revenue Payment"); provided that all such payments shall be made in cash to the extent required pursuant to Section 2.10.  For the avoidance of doubt, if the First Earnout Beauty Labs Revenue is less than ████, then there shall be no proration and Sellers and Optionholders shall not be entitled to any portion of the First Earnout Beauty Labs Revenue Payment.  It is the intention of the Parties that any amounts set off pursuant to Article VIII that are not reflected in the calculation of any other Earnout Payment shall be deducted solely in respect of the portion of the First Earnout Beauty Labs Revenue Payment otherwise payable to Sellers only and not the portion of the First Earnout Beauty Labs Revenue Payment payable to any Optionholders.

(iii)    If the First Earnout Beauty Labs Revenue exceeds ████ (the "Overperformance Earnout Threshold"), then (within ten (10) Business Days after the date on which the First Earnout Beauty Labs Revenue is finally determined pursuant to Section

30

2.08(c)) Purchaser will pay or cause to be paid in cash to each Seller and each Optionholder its Pro Rata Portion of, subject to any reduction required under the retention provisions set forth in Schedule 2.08, an amount equal to (A) either (1) (a)  the lesser of (x) the amount by which the First Earnout Beauty Labs Revenue exceeds the Overperformance Earnout Threshold and (y) the portion the First Earnout Beauty Labs Revenue that is Third Party Beauty Labs Revenue, multiplied by (b) ███████████████ or (2) the applicable Accelerated Overperformance Payment, if applicable, less (but not below zero) solely in respect of any Seller (but not any Optionholder) (B) any amounts set off pursuant to Article VIII that are not reflected in the calculation of any other Earnout Payment, in immediately available funds by wire transfer to the account of such Seller and such Optionholder set forth in the Preliminary Closing Statement (the "First Overperformance Earnout Payment"); provided that all such payments shall be made in cash to the extent required pursuant to Section 2.10.  It is the intention of the Parties that any amounts set off pursuant to Article VIII that are not reflected in the calculation of any other Earnout Payment shall be deducted solely in respect of the portion of the First Overperformance Earnout Payment otherwise payable to Sellers only and not the portion of the First Overperformance Earnout Payment payable to any Optionholders.

        (iv)    If the First Earnout Beauty Labs Revenue is less than ███████████ then within fifteen (15) Business Days after the filing with the SEC of Purchaser's annual report on Form 10-K for the fiscal year ended December 31, 2022, Purchaser will deliver to the Representative a written statement (the "First Earnout Amyris Brands Revenue Statement") setting forth Purchaser's calculation of the Amyris Brands Revenue recognized during the twelve (12) month period between January 1, 2022 and December 31, 2022 (the "First Earnout Amyris Brands Revenue").  If the First Earnout Amyris Brands Revenue is equal to or greater than the First Earnout Amyris Brands Revenue Target, then (within ten (10) Business Days after (x) the date on which the First Earnout Amyris Brands Revenue is finally determined pursuant to Section 2.08(c) or (y) if the First Earnout Amyris Brands Revenue Statement indicates that the First Earnout Amyris Brands Revenue Payment is payable, the date the First Earnout Amyris Brands Statement Revenue is delivered to the Representative, but in no event prior to it being determined that the First Earnout Beauty Labs Revenue Payment shall not be payable hereunder) Purchaser will issue to each Seller and each Optionholder a number of Purchaser Shares equal to (A) its Pro Rata Portion of, subject to any reduction required under the retention provisions set forth in Schedule 2.08, that number of validly issued, fully paid and nonassessable Purchaser Shares (rounded down to the nearest whole share) equal to the quotient determined by dividing (1) an amount equal to (a) ███████████less (but not below zero) solely in respect of any Seller (but not any Optionholder) (b) any amounts set off pursuant to Article VIII that are not reflected in the calculation of any other Earnout Payment, by (2) the Issuance Price determined as of the date of such issuance (the "First Earnout Amyris Brands Revenue Payment"); provided that all such payments shall be made in cash to the extent required pursuant to Section 2.10.  For the avoidance of doubt, if the First Earnout Amyris Brands Revenue is less than the First Earnout Amyris Brands Revenue Target, then there shall be no proration and Sellers and Optionholders shall not be entitled to any portion of the First Earnout Amyris Brands Revenue Payment.  It is the intention of the Parties that any amounts set off pursuant to Article VIII that are not reflected in the calculation of any other Earnout Payment shall be deducted solely in respect of the portion of the First Earnout

31

Amyris Brands Revenue Payment otherwise payable to Sellers only and not the portion of the First Earnout Amyris Brands Revenue Payment payable to any Optionholders.

(v)     If the First Earnout Beauty Labs Revenue is less than ███████, then for each application of any Company Product for any Amyris Brands Product Launched on or prior to June 30, 2022, within thirty (30) Business Days following December 31, 2022, Purchaser will deliver to the Representative a written statement (each, an applicable "First Earnout Brand Metrics Statement") setting forth Purchaser's calculation of (x) the actual ratio of average Daily Active Users to Monthly Active Users for the applicable Amyris Brands Product (the "Monthly MAU/DAU") for each full calendar month following such Launch through December 31, 2022, and (y) the actual ratio of Average Monthly Revenue Per User to User Churn for the applicable Amyris Brands Product (the "Monthly LTV") for each full calendar month following the date of such Launch through the earlier of (I) the end of the twelfth (12th) full calendar month following the date of such Launch and (II) December 31, 2022 (the "First Metrics Measurement Period"). If (A) the average of the Monthly MAU/DAU for the full calendar months comprising such First Metrics Measurement Period is equal to or greater than the average of the applicable Target Monthly DAU/MAU for the full calendar months comprising such First Metrics Measurement Period, and (B) the average of the Monthly LTV for the full calendar months comprising such First Metrics Measurement Period is equal to or greater than the average of the applicable Target Monthly LTV for the full calendar months comprising such First Metrics Measurement Period, then (within ten (10) Business Days after (x) the date on which the applicable average of the Monthly MAU/DAU and the applicable average of the Monthly LTV is finally determined pursuant to Section 2.08(c) or (y) if the applicable First Earnout Brand Metrics Statement for such Amyris Brands Product indicates that the First Earnout Brand Metrics Payment is payable for such Amyris Brands Product, the date the applicable First Earnout Brand Metrics Statement is delivered to the Representative, but in no event prior to it being determined that the First Earnout Beauty Labs Revenue Payment shall not be payable hereunder) Purchaser will issue to each Seller and each Optionholder a number of Purchaser Shares equal to (A) its Pro Rata Portion of, subject to any reduction required under the retention provisions set forth in Schedule 2.08, that number of validly issued, fully paid and nonassessable Purchaser Shares (rounded down to the nearest whole share) equal to the quotient determined by dividing (1) an amount equal to (a) ███████ divided by the number of Amyris Brands Products with respect to which applications of Company Products have been Launched on or prior to June 30, 2022, less (but not below zero) solely in respect of any Seller (but not any Optionholder) (b) any amounts set off pursuant to Article VIII that are not reflected in the calculation of any other Earnout Payment, by (2) the Issuance Price determined as of the date of such issuance (each, a "First Earnout Brand Metrics Payment"); provided that all such payments shall be made in cash to the extent required pursuant to Section 2.10. It is the intention of the Parties that any amounts set off pursuant to Article VIII that are not reflected in the calculation of any other Earnout Payment shall be deducted solely in respect of the portion of the First Earnout Brand Metrics Payment otherwise payable to Sellers only and not the portion of the First Earnout Brand Metrics Payment payable to any Optionholders.

     (b)    <u>Second Earnout</u>.

     (i)    Within twenty (20) Business Days after December 31, 2023, Purchaser will deliver to the Representative a written statement (the "<u>Second Earnout Beauty Labs Revenue Statement</u>") setting forth Purchaser's calculation of the Beauty Labs Revenue, Third Party Beauty Labs Revenue and Synthetic Beauty Labs Revenue recognized during the twelve (12)-month period between January 1, 2023 and December 31, 2023 (the "<u>Second Earnout Beauty Labs Revenue</u>").

     (ii)    If the Second Earnout Beauty Labs Revenue is equal to or greater than ██████, then (within ten (10) Business Days after (x) the date on which the Second Earnout Beauty Labs Revenue is finally determined pursuant to <u>Section 2.08(c)</u> or (y) if the Second Earnout Beauty Labs Revenue Statement indicates that the Second Earnout Beauty Labs Revenue Payment is payable, the date the Second Earnout Beauty Labs Revenue Statement is delivered to the Representative) Purchaser will issue to each Seller and each Optionholder a number of Purchaser Shares equal to (A) its Pro Rata Portion of, subject to any reduction required under the retention provisions set forth in <u>Schedule 2.08</u>, that number of validly issued, fully paid and nonassessable Purchaser Shares (rounded down to the nearest whole share) equal to the quotient determined by <u>dividing</u> (1) an amount equal to $31,250,000, <u>less</u> (but not below zero) solely in respect of any Seller (but not any Optionholder) any amounts set off pursuant to <u>Article VIII</u> that are not reflected in the calculation of any other Earnout Payment, <u>by</u> (2) the Issuance Price determined as of the date of such issuance (the "<u>Second Earnout Beauty Labs Revenue Payment</u>"); <u>provided</u> that all such payments shall be made in cash to the extent required pursuant to <u>Section 2.10</u>. For the avoidance of doubt, if the Second Earnout Beauty Labs Revenue is less than ██████ then there shall be no proration and Sellers and Optionholders shall not be entitled to any portion of the Second Earnout Beauty Labs Revenue Payment.  It is the intention of the Parties that any amounts set off pursuant to <u>Article VIII</u> that are not reflected in the calculation of any other Earnout Payment shall be deducted solely in respect of the portion of the Second Earnout Beauty Labs Revenue Payment otherwise payable to Sellers only and not the portion of the Second Earnout Beauty Labs Revenue Payment payable to any Optionholders.

     (iii)    If the Second Earnout Beauty Labs Revenue exceeds the Overperformance Earnout Threshold, then, within ten (10) Business Days after the date on which the Second Earnout Beauty Labs Revenue is finally determined pursuant to <u>Section 2.08(c)</u>, Purchaser will pay or cause to be paid in cash to each Seller and each Optionholder its Pro Rata Portion of, subject to any reduction required under the retention provisions set forth in <u>Schedule 2.08</u>, an amount equal to (A) either (1) (a) the lesser of (x) the amount by which the Second Earnout Beauty Labs Revenue exceeds the Overperformance Earnout Threshold and (y) the portion of the Second Earnout Beauty Labs Revenue that is Third Party Beauty Labs Revenue, <u>multiplied by</u> (b) ██████ or (2) the applicable Accelerated Overperformance Payment, if applicable, <u>less</u> (but not below zero) solely in respect of any Seller (but not any Optionholder) (B) any amounts set off pursuant to <u>Article VIII</u> that are not reflected in the calculation of any other Earnout Payment, in immediately available funds by wire transfer to the account of each Seller and Optionholder set forth in the Preliminary Closing Statement (the "<u>Second Overperformance Earnout Payment</u>");

provided that all such payments shall be made in cash to the extent required pursuant to Section 2.10. It is the intention of the Parties that any amounts set off pursuant to Article VIII that are not reflected in the calculation of any other Earnout Payment shall be deducted solely in respect of the portion of the Second Overperformance Earnout Payment otherwise payable to Sellers only and not the portion of the Second Overperformance Earnout Payment payable to any Optionholders.

(iv)    If the Second Earnout Beauty Labs Revenue is less than ███████, then within fifteen (15) Business Days after the filing with the SEC of Purchaser's annual report on Form 10-K for the fiscal year ended December 31, 2023, Purchaser will deliver to the Representative a written statement (the "Second Earnout Amyris Brands Revenue Statement") setting forth Purchaser's calculation of the Amyris Brands Revenue recognized during the twelve (12) month period between January 1, 2023 and December 31, 2023 (the "Second Earnout Amyris Brands Revenue"). If the Second Earnout Amyris Brands Revenue is equal to or greater than the Second Earnout Amyris Brands Revenue Target, then (within ten (10) Business Days after (x) the date on which the Second Earnout Amyris Brands Revenue is finally determined pursuant to Section 2.08(c) or (y) if the Second Earnout Amyris Brands Revenue Statement indicates that the Second Earnout Amyris Brands Revenue Payment is payable, the date the Second Earnout Amyris Brands Statement Revenue is delivered to the Representative, but in no event prior to it being determined that the Second Earnout Beauty Labs Revenue Payment shall not be payable hereunder) Purchaser will issue to each Seller and each Optionholder a number of Purchaser Shares equal to (A) its Pro Rata Portion of, subject to any reduction required under the retention provisions set forth in Schedule 2.08, that number of validly issued, fully paid and nonassessable Purchaser Shares (rounded down to the nearest whole share) equal to the quotient determined by dividing (1) an amount equal to (a) $9,375,000, less (but not below zero) solely in respect of any Seller (but not any Optionholder) (b) any amounts set off pursuant to Article VIII that are not reflected in the calculation of any other Earnout Payment, by (2) the Issuance Price determined as of the date of such issuance (the "Second Earnout Amyris Brands Revenue Payment"); provided that all such payments shall be made in cash to the extent required pursuant to Section 2.10. For the avoidance of doubt, if the Second Earnout Amyris Brands Revenue is less than the Second Earnout Amyris Brands Revenue Target, then there shall be no proration and Sellers and Optionholders shall not be entitled to any portion of the Second Earnout Amyris Brands Revenue Payment. It is the intention of the Parties that any amounts set off pursuant to Article VIII that are not reflected in the calculation of any other Earnout Payment shall be deducted solely in respect of the portion of the Second Earnout Amyris Brands Revenue Payment otherwise payable to Sellers only and not the portion of the Second Earnout Amyris Brands Revenue Payment payable to any Optionholders.

(v)    If the Second Earnout Beauty Labs Revenue is less than ███████ then (1) for each application of any Company Product for any Amyris Brands Product Launched on or prior to June 30, 2022, within thirty (30) Business Days following December 31, 2023, Purchaser will deliver to the Representative a written statement (each, an applicable "Second Earnout Brand Metrics Statement") setting forth Purchaser's calculation of the Monthly MAU/DAU and the Monthly LTV for each of the first twelve (12) full calendar months following the expiration of the First Metrics Measurement Period

34

applicable to such Amyris Brands Product, and (2) for each application of any Company Product for any Amyris Brands Product Launched between July 1, 2022 and June 30, 2023, within thirty (30) Business Days following December 31, 2023, the Second Earnout Brand Metrics Statement shall set forth Purchaser's calculation of the Monthly MAU/DAU and the Monthly LTV for each full calendar month following the date of such Launch ending on or prior to December 31, 2023 (the measurement period set forth in clause (1) or (2) above, as applicable, the "Second Metrics Measurement Period").  If for each application of any Company Product for any Amyris Brands Product Launched on or prior to June 30, 2023, (I) the average of the Monthly MAU/DAU for the full calendar months comprising such Second Metrics Measurement Period is equal to or greater than the average of the applicable Target Monthly DAU/MAU for the full calendar months comprising such Second Metrics Measurement Period, based on the date of such Launch, and (II) the average of the Monthly LTV for the full calendar months comprising such Second Metrics Measurement Period is equal to or greater than the average of the applicable Target Monthly LTV for the full calendar months comprising such Second Metrics Measurement Period, then (within ten (10) Business Days after (x) the date on which the applicable average of the Monthly MAU/DAU and the applicable average of the Monthly LTV is finally determined pursuant to Section 2.08(c) or (y) if the applicable Second Earnout Brand Metrics Statement for such Amyris Brands Product indicates that the Second Earnout Brand Metrics Payment is payable for such Amyris Brands Product, the date the applicable Second Earnout Brand Metrics Statement is delivered to the Representative, but in no event prior to it being determined that the Second Earnout Beauty Labs Revenue Payment shall not be payable hereunder) Purchaser will issue to each Seller and each Optionholder a number of Purchaser Shares equal to (A) its Pro Rata Portion of, subject to any reduction required under the retention provisions set forth in Schedule 2.08, that number of validly issued, fully paid and nonassessable Purchaser Shares (rounded down to the nearest whole share) equal to the quotient determined by dividing (1) an amount equal to (a) $21,875,000 divided by the number of Amyris Brands Products with respect to which applications of Company Products have been Launched on or prior to June 30, 2023, less (but not below zero) solely in respect of any Seller (but not any Optionholder) (b) any amounts set off pursuant to Article VIII that are not reflected in the calculation of any other Earnout Payment, by (2) the Issuance Price determined as of the date of such issuance (each, a "Second Earnout Brand Metrics Payment"); provided that all such payments shall be made in cash to the extent required pursuant to Section 2.10.  It is the intention of the Parties that any amounts set off pursuant to Article VIII that are not reflected in the calculation of any other Earnout Payment shall be deducted solely in respect of the portion of the Second Earnout Brand Metrics Payment otherwise payable to Sellers only and not the portion of the Second Earnout Brand Metrics Payment payable to any Optionholders.

(c)    Determination of Earnout Payments.    In connection with the Representative's review of any Earnout Statement, the Company and Purchaser shall provide the Representative and its representatives and accountants all books, records, work papers and other information used in preparing the Earnout Statement reasonably requested by the Representative, and provide reasonable access, during normal business hours, to members of the Company's accounting and financial staff in connection with the Representative's review thereof.  An Earnout Statement shall be final, conclusive and binding on the Parties and on all Optionholders unless the Representative provides a Dispute Notice to Purchaser no later than the twentieth (20th) Business

35

Day after the delivery to the Representative of such Earnout Statement; provided, however, that any objections in a Dispute Notice shall only be made on the basis that the amounts set forth in such Earnout Statement (i) were not determined in accordance with the definitions of Beauty Labs Revenue, Third Party Beauty Labs Revenue, Synthetic Beauty Labs Revenue, Amyris Brands Revenue, Average Monthly Revenue Per User, Daily Active Users, Monthly Active Users or User Churn, as applicable or (ii) were arrived at based on mathematical or clerical error. For the avoidance of doubt, the Representative may not dispute Purchaser's generally applicable revenue recognition or pricing policies applied by Purchaser to all of its other Subsidiaries and business units, if such policies are in compliance with U.S. GAAP consistently applied. Any Dispute Notice must set forth in reasonable detail (x) any Disputed Item on the applicable Earnout Statement with respect to which the Representative disagrees and the nature of any disagreement so asserted and (y) the Representative's alternative calculation of each such Disputed Item. Any item or amount with respect to which no dispute is raised in a Dispute Notice shall be final, conclusive and binding on the Parties and on all Optionholders. The Representative and Purchaser shall attempt to promptly resolve in good faith such Disputed Items. Any written resolution by the Representative and Purchaser as to such Disputed Items shall be final and binding on the Parties and on all Optionholders. If the Representative and Purchaser do not reach a resolution of all Disputed Items within twenty (20) Business Days after delivery of the Dispute Notice, then the Representative and Purchaser shall promptly enter into a customary engagement agreement with the Neutral Accountant and thereafter submit such unresolved Disputed Items to the Neutral Accountant for final resolution. The Neutral Accountant shall act as an expert, not as an arbitrator, in resolving such Disputed Items. The proceeding before the Neutral Accountant shall be an expert determination under applicable Laws governing expert determination and appraisal proceedings. All communications between the Representative, and Purchaser or any of their respective representatives, on the one hand, and the Neutral Accountant, on the other hand, shall be in writing with copies simultaneously delivered to the non-communicating Party. The Neutral Accountant shall be instructed to promptly, in accordance with the rules set forth in the Neutral Accountant's engagement letter and its customary practices, review only those unresolved Disputed Items specifically set forth and objected to in the Dispute Notice and resolve the dispute with respect to each such specific Disputed Item in accordance with this Agreement. A single partner of the Neutral Accountant selected by such Neutral Accountant in accordance with its normal procedures and having expertise with respect to settlement of such disputes and the industry in which the Company operates shall act for the Neutral Accountant in the determination proceeding, and the Neutral Accountant shall render a written decision as to each Disputed Item, including a statement in reasonable detail of the basis for its decision. The Neutral Accountant shall be instructed to solely resolve the unresolved Disputed Items in accordance with the definition of Beauty Labs Revenue, Third Party Beauty Labs Revenue, Synthetic Beauty Labs Revenue, Amyris Brands Revenue, Average Monthly Revenue Per User, Daily Active Users, Monthly Active Users or User Churn, as applicable. The Representative and Purchaser shall request that the Neutral Accountant make a final determination (which determination shall set forth the reasons for such determination) with respect to any unresolved Disputed Items within thirty (30) days from the date such unresolved Disputed Items were submitted to the Neutral Accountant, and such final determination shall be deemed final for purposes of the applicable Earnout Statement. During the thirty (30)-day review by the Neutral Accountant, the Representative (for itself and on behalf of all Sellers and Optionholders), the Company and Purchaser shall each make available to the Neutral Accountant all books, records, work papers and other information reasonably requested by the

Neutral Accountant, and provide reasonable access, during normal business hours, to members of their respective accounting and financial staff as may be reasonably required by the Neutral Accountant to make its final determination. The final determination by the Neutral Accountant of the Disputed Items submitted to it for resolution, absent fraud or clerical or mathematical error, shall be conclusive and binding upon the Parties and on all Optionholders. The Parties and the Optionholders agree, and it is a condition for the entitlement to receive any amount of an Earnout Payment on the terms and conditions of this Agreement that any such Person accepting such entitlement hereby agrees, that the procedure set forth in this Section 2.08(c) for resolving disputes with respect to an Earnout Statement shall be the sole and exclusive method for resolving any such disputes. The fees and expenses of the Neutral Accountant shall be allocated between Sellers and Optionholders, on the one hand, and Purchaser, on the other hand, in inverse proportion to the relative success of the payor of such Earnout Payment and the recipient of such Earnout Payment with respect to the value of the Earnout Payment submitted by the Representative (for itself and on behalf of all Sellers and Optionholders), on the one hand, or Purchaser, on the other hand, to the Neutral Accountant relative to the value of the Earnout Payment as determined by the Neutral Accountant.

(d)     Notwithstanding anything in this Section 2.08 to the contrary, if there are any claims made in good faith by Purchaser or any Purchaser Indemnified Party pursuant to Article VIII that are not reflected in the calculation of any other Earnout Payment and that are not finally resolved prior to the time any Earnout Payment becomes payable pursuant to this Section 2.08, Purchaser may withhold from any such Earnout Payment an amount equal to the aggregate amount claimed in good faith until such claims are finally resolved.

(e)     Post-Closing Conduct of the Continuing Business.

(i)     Prior to December 31, 2023, Purchaser shall:

(A)     comply with the business plan set forth on Schedule 2.08(e)(i)(A) (the "Business Plan");

(B)     permit the Company to be operated as a standalone business unit of Purchaser, including by allowing the Key Employees to (1) negotiate, execute and determine pricing for third party commercial contracts for Third Party Beauty Labs Revenue, and (2) execute on any reasonable Synthetic Beauty Labs Revenue generation initiatives, subject in each case to Purchaser's generally applicable policies and procedures applied by Purchaser to all of its other Subsidiaries and business units and the Business Plan;

(C)     permit the Company to make commercially reasonable operating decisions, subject in each case to Purchaser's generally applicable policies and procedures applied by Purchaser to all of its other Subsidiaries and business units and the Business Plan; and

(D)     in the event the employment of the Key Employees shall terminate for any reason, use commercially reasonable efforts to continue to operate the business of the Company in accordance with the Business Plan.

(ii) Sellers and Optionholders (by their acceptance thereof) acknowledge and agree that, notwithstanding anything else contained herein, but subject to Section 2.08(e)(i), from and following the Closing, Purchaser will have sole control over (and will not have any limitations on) the Company and the operation of the Company's business; provided that, during the period beginning on January 1, 2022 and ending on December 31, 2023, Purchaser shall operate and manage the Company in good faith and, except with the prior written consent of the Representative, Purchaser shall not take any action for the purpose of, or with the primary intention of, reducing the Earnout Payments.

(iii) During the period beginning on the Closing Date and ending on December 31, 2023, the Company shall be the seller or licensor, as applicable, under all Contracts for the sale or license of Company Products.

(iv) Each Seller and Optionholder acknowledges and agrees, and it is a condition for the entitlement to receive any amount of an Earnout Payment on the terms and conditions of this Agreement that any such Person (by its acceptance of such entitlement) hereby acknowledges and agrees, that (A) the Earnout Payments are speculative and are each subject to numerous factors outside the control of Purchaser and the Company, (B) there is no assurance that such Person will receive any Earnout Payment and neither Purchaser nor the Company has promised nor projected any Earnout Payment, (C) Purchaser and the Company owe no fiduciary duty to any such Person, and (D) it is intended that solely the express provisions of this Agreement governs the legal relationship with respect to any Earnout Payment to which such Person may be entitled.

(v) Without limiting the generality of the foregoing, except as expressly set forth in Section 2.08(e)(i), none of Purchaser, the Company, nor any of their respective Affiliates will be required to, in each case, (A) preserve or expand the business organization of the Continuing Business or keep available the services of any employees of, or any consultants to, the Company, (B) develop, improve or upgrade the Company Products or any present or future products of the Continuing Business, (C) provide any working capital to the Company or the Continuing Business or (D) cause Purchaser, the Company or any of their respective Affiliates to incur any Indebtedness in connection with the operation of the Continuing Business.

(f) If, between the Closing Date and December 31, 2023, (i) a Change of Control occurs (a "Control Acceleration Event"), or (ii) Purchaser breaches its obligations set forth in Section 2.08(e)(i) in any material respect, and such material breach is not cured within ten (10) Business Days following receipt by Purchaser of written notice from the Representative of such material breach (a "Covenant Acceleration Event" and, together with a Control Acceleration Event, an "Acceleration Event"), then (A) in the event an Acceleration Event occurs between the Closing Date and December 31, 2022, subject to the resolution of any dispute regarding whether an Acceleration Event has occurred, Purchaser shall make the First Earnout Beauty Labs Revenue Payment and the Second Earnout Beauty Labs Revenue Payment, in full, and, to the extent payable pursuant to Section 2.08(a)(iii) based on the amount of First Earnout Beauty Labs Revenue as of the date of the Acceleration Event, the applicable Overperformance Earnout Payment, in full, to Sellers and Optionholders, or (B) in the event an Acceleration Event occurs between January 1, 2023 and December 31, 2023, subject to the resolution of any dispute regarding whether an

38

Acceleration Event has occurred, Purchaser shall make (1) the Second Earnout Beauty Labs Revenue Payment, in full, and, to the extent payable pursuant to Section 2.08(b)(iii) based on the amount of Second Earnout Beauty Labs Revenue as of the date of the Acceleration Event, the applicable Overperformance Earnout Payment, in full, and (2) if payable pursuant to Section 2.08(a) and not yet paid, the First Earnout Beauty Labs Revenue Payment and First Overperformance Earnout Payment, in each case of clauses (A) and (B), less any amounts set off pursuant to Article VIII that are not reflected in the calculation of any other Earnout Payment.  No later than fifteen (15) Business Days after the filing with the SEC of Purchaser's quarterly report on Form 10-Q for the quarterly period in which an Acceleration Event occurs, if such Acceleration Event occurs during the first three quarters of any fiscal year of Purchaser, or the filing with the SEC of Purchaser's annual report on Form 10-K for the fiscal year in which an Acceleration Event occurs, if such Acceleration Event occurs during the fourth quarter of any fiscal year of Purchaser, subject to the resolution of any dispute regarding whether an Acceleration Event has occurred, Purchaser will deliver to the Representative a written statement (the "Overperformance Earnout Statement") setting forth Purchaser's calculation of the Beauty Labs Revenue, Third Party Beauty Labs Revenue and Synthetic Beauty Labs Revenue achieved during the period from (i) the Closing Date, (ii) January 1, 2022 or (iii) January 1, 2023, through the Acceleration Event, as applicable, for the purposes of calculating the applicable Overperformance Earnout Payment, as applicable (and the final amount of such Overperformance Earnout Payment, if any, shall, for the avoidance of doubt, be subject to the procedures of Section 2.08(c)).  Any Earnout Payment that becomes payable pursuant to this Section 2.08(f) shall be made by Purchaser, as promptly as practicable and in any event (x) substantially concurrently with a Control Acceleration Event, and (y) within five (5) Business Days following the delivery of the Overperformance Earnout Statement in respect of the Covenant Acceleration Event, subject to the resolution of any dispute regarding whether an Acceleration Event has occurred; provided, that (1) if the portion of such Earnout Payment constituting an Overperformance Earnout Payment shall not have been finally determined prior to the date on which the payments become due, the portion of such Earnout Payment constituting an Overperformance Earnout Payment shall be payable five (5) Business Days following the date that such Overperformance Earnout Payment shall be finally determined pursuant to Section 2.08(c) and (2) all such payments shall be made in cash to the extent required pursuant to Section 2.10.

(g)     Each Seller and Optionholder acknowledges, and it is a condition for the entitlement to receive any amount of an Earnout Payment on the terms and conditions of this Agreement, that any such Person (by its acceptance of such entitlement) hereby acknowledges, that its right to receive any Earnout Payment (i) is solely a contractual right and is not a security for purposes of any federal or state securities Laws (and will confer upon such Person only the rights of a general unsecured creditor under applicable state Law); (ii) will not be represented by any form of certificate or instrument; (iii) does not give such Person any dividend rights, voting rights, liquidation rights, preemptive rights or other rights common to holders of Purchaser's or the Company's Equity Securities; (iv) is not redeemable; and (v) may not be sold, assigned, pledged, gifted, conveyed, transferred or otherwise disposed of, except by operation of law or pursuant to the Laws of descent and distribution (and any sale, assignment, pledge, gift, conveyance, transfer or other disposal in violation of this Section 2.08 shall be null and void).  Each Seller and Optionholder (by its acceptance of such entitlement) hereby agrees to maintain the confidentiality of any information delivered to it pursuant to this Section 2.08, except as otherwise required by applicable Law, in which case such Person shall use commercially reasonable efforts

to provide Purchaser with advance notice of such requirement and a reasonable opportunity to attempt to seek confidential treatment with respect to such information.

SECTION 2.09    Treatment of Options and Warrants.

(a)    Each outstanding Option shall be cancelled at the Closing in accordance with the applicable Option Cancellation Agreement executed by the Company, Purchaser and each Optionholder in the form attached hereto as Exhibit E prior to the Closing (each agreement, an "Option Cancellation Agreement"), and each Optionholder shall be entitled to receive in exchange for the cancellation of its Options, (i) its Pro Rata Portion of the Purchase Price plus (ii) the right to receive its Pro Rata Portion of any Earnout Payments that become payable to such Optionholder pursuant to Section 2.08, in each case, as set forth in the Preliminary Closing Statement in respect of such Options, less (x) any applicable Tax withholding in accordance with Section 2.11 and (y) the aggregate cash exercise prices that would be payable upon the exercise in full of such Options (together with (x), the "Net Settlement Withholding").  With respect to each Optionholder, the Net Settlement Withholding will (i) be deducted first from its Pro Rata Portion of the Cash Consideration, (ii) to the extent the Net Settlement Withholding exceeds its Pro Rata Portion of the Cash Consideration, such excess shall be deducted from its Pro Rata Portion of the Closing Stock Consideration, and (iii) to the extent the Net Settlement Withholding exceeds its Pro Rata Portion of the Closing Stock Consideration, such excess shall be deducted from its Pro Rata Portion of the Deferred Stock Consideration, the payment of which portion shall be accelerated to the Closing to permit such deduction to occur at Closing.  The payments described in this Section 2.09(a) shall be made through the Company's payroll system on the first payroll date immediately following the date on which the payments become due.  The payments described in this Section 2.09(a) shall be deemed to have been paid in full satisfaction of the cancellation of all rights pertaining to such Options, pursuant to the Option Cancellation Agreements.

(b)    Each outstanding Warrant held by a Seller that is a Warrantholder is hereby cancelled, and the Warrant Instrument is hereby terminated, effective at the Closing, and each Seller that is a Warrantholder shall be entitled to receive in exchange for the cancellation of such Seller's Warrants issuable to it under the Warrant Instrument, (i) its Pro Rata Portion of the Purchase Price plus (ii) the right to receive its Pro Rata Portion of any Earnout Payments that become payable to such Seller pursuant to Section 2.08, in each case, as set forth in the Preliminary Closing Statement in respect of such Ordinary Shares that would have been issued upon the exercise (at the conversion or exchange rate applicable at the Closing) in full of all Warrants pursuant to the Warrant Instrument (less any applicable Net Settlement Withholding).  With respect to each Seller that is a Warrantholder, the Net Settlement Withholding will (i) be deducted first from its Pro Rata Portion of the Cash Consideration solely in respect of the cancellation of such Warrants and (ii) to the extent the Net Settlement Withholding exceeds its Pro Rata Portion of the Cash Consideration payable in respect of the cancellation of such Warrants, such excess shall be deducted from its Pro Rata Portion of the Closing Stock Consideration issuable solely in respect of the cancellation of such Warrants.  The amounts described in this Section 2.09(b) shall be deemed to have been paid in full satisfaction of the cancellation of the Warrants issued or issuable to a Seller under the Warrant Instrument.

SECTION 2.10    Nasdaq Limitation.  Notwithstanding anything to the contrary in this Agreement, in the event that any issuance of Purchaser Shares in respect of any Deferred

Stock Consideration pursuant to <u>Section 2.07</u> or any Earnout Payment pursuant to <u>Section 2.08</u> would require Purchaser to obtain shareholder approval pursuant to Nasdaq Listing Rule 5635(d), Purchaser shall have no obligation to issue such Purchaser Shares in respect of such Deferred Stock Consideration or Earnout Payments, as applicable, solely to the extent that any portion of such issuance would require Purchaser to obtain such shareholder approval in respect of the Deferred Stock Consideration or Earnout Payments, as applicable, and shall pay only such portion of the Deferred Stock Consideration or Earnout Payments, as applicable, in cash.

SECTION 2.11    <u>Withholding</u>.  Purchaser or any authorized agent of Purchaser shall be entitled to deduct and withhold from any amounts otherwise payable pursuant to this Agreement (including the Purchase Price, transaction bonuses and the Earnout Payments, if any) to any Seller (including any Warrantholder), Optionholder, Employee or other Person such amount as Purchaser or its agent is required to deduct and withhold with respect to such payment under any provision of applicable Law.  Purchaser shall promptly upon becoming aware that it or any of its authorized agents must make such a deduction or withholding notify the relevant recipient accordingly and Purchaser shall in addition promptly provide the relevant recipient with evidence reasonably satisfactory to the relevant recipient that the relevant deduction or withholding has been made and any appropriate payment has been paid to the relevant taxing authority.  To the extent that amounts are so withheld, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to such Person in respect of which such deduction and withholding was made.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF THE COMPANY

Except as set forth in the corresponding Section of the Disclosure Schedule (with specific reference to the particular Section of this Agreement to which the information in the Disclosure Schedule relates, it being agreed that disclosure of any item in any Section of the Disclosure Schedule shall be deemed disclosed with respect to any other Section of this Agreement to which the applicability of such item is reasonably apparent on the face of such disclosure without investigation or reference to underlying documentation), the Company hereby represents and warrants to Purchaser as of the date hereof that:

SECTION 3.01    <u>Organization and Qualification; Subsidiaries</u>.

(a)    The Company is a private company limited by shares duly organized, validly existing and in good standing (to the extent applicable in its jurisdiction) under the Laws of England and Wales and has the requisite power and authority to own, lease and operate its properties and to conduct the business of the Company as currently conducted.  The Company is duly qualified or licensed as a foreign company to do business, and is in good standing (to the extent applicable in such jurisdiction) in each jurisdiction where the character of the properties owned, leased or operated by it or the nature of its business makes such qualification or licensing necessary, except where the failure to be so qualified, licensed or in good standing (to the extent applicable in such jurisdiction) would not, individually or in the aggregate, be expected to have a Material Adverse Effect.

(b)    The Company has no, and has never had any, Subsidiaries.  The Company does not own, directly or indirectly, any Equity Securities in any other Person.

(c)    Section 3.01(c) of the Disclosure Schedule sets forth a complete and correct list of directors of the Company.

(d)    Section 3.01(d) of the Disclosure Schedule sets forth those jurisdictions where the Company is qualified or licensed to do business.

SECTION 3.02    Governing Documents.    The Company has heretofore furnished to Purchaser a complete and correct copy of the Governing Documents and any other Organizational Documents of the Company, each as amended to date.  Other than as made available by the Company to Purchaser, there are no other Organizational Documents of the Company.  The Governing Documents and such Organizational Documents are in full force and effect.  The Company is not in material violation of any of the provisions of the Governing Documents or such other Organizational Documents, as applicable.

SECTION 3.03    Capitalization.

(a)    Section 3.03(a) of the Disclosure Schedule sets forth:  (i) the authorized Equity Securities (and type) of the Company and (ii) the number of Equity Securities (and type) of the Company that are issued and outstanding, all of which are duly authorized, validly issued, fully paid and non-assessable, and all of which are owned by Sellers, free and clear of any and all Liens.  Other than the Options and Warrants that are outstanding immediately prior to Closing as set forth in Section 3.03(a) of the Disclosure Schedule, there are no options, warrants, convertible debt, or other convertible instruments, and, except as set forth in the Governing Documents, there are no other rights, agreements, arrangements or commitments of any character relating to the issued or unissued Equity Securities of the Company or obligating the Company to issue or sell any Equity Securities.  Immediately following the Closing, subject only to stamping of the stock transfer forms and the registration of transfer of the Seller Shares in the Company's register of members, Purchaser will own one hundred percent (100%) of the Equity Securities of the Company, free and clear of any and all Liens, other than Liens created by Purchaser.  All Equity Securities of the Company subject to issuance prior to the Closing, upon issuance on the terms and conditions specified in the instruments pursuant to which they are issuable, will be duly authorized, validly issued, fully paid and non-assessable.  There are no outstanding contractual obligations of the Company to repurchase, redeem or otherwise acquire any Equity Securities of any Person, or to provide funds to, make any investment (in the form of a loan, capital contribution or otherwise) in, return capital to, or make any payment to, any Person.  There are no Liabilities for, or obligation with respect to, any dividends or distributions declared or accumulated but unpaid with respect to the Equity Securities of the Company.  Except as set forth in the Governing Documents, there are no outstanding agreements of the Company (i) restricting the transfer of, (ii) relating to the voting of, or (iii) requiring the registration under any securities Law for the sale of, any Seller Securities or any other Equity Securities of the Company.  No bonds, debentures, notes or other Indebtedness of the Company having the right to vote (or convertible into or exercisable for securities having the right to vote) on any matters on which equityholders of the Company may vote are issued or outstanding.

42

(b)     All outstanding Seller Securities (i) have been duly authorized and issued in compliance with (A) all applicable securities Laws and other applicable Laws and (B) all requirements set forth in the Governing Documents, and (ii) immediately prior to the Closing, constitute one hundred percent (100%) of the outstanding Equity Securities of the Company.

SECTION 3.04     <u>Authority</u>.     The Company has all necessary power and authority to execute and deliver this Agreement, to perform its obligations hereunder and to consummate the transactions contemplated hereby.     The execution and delivery of this Agreement by the Company, the performance by the Company of its obligations hereunder, and the consummation by the Company of the transactions contemplated hereby have been duly and validly authorized by all necessary action, and no corporate or other proceedings on the part of the Company are necessary to authorize this Agreement or to consummate the transactions contemplated hereby.  This Agreement has been duly and validly executed and delivered by the Company and, assuming the due authorization, execution and delivery by the other parties hereto and thereto, constitutes the legal, valid and binding obligation of the Company, enforceable against the Company, in accordance with its terms, subject to the effect of any applicable bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting creditors' rights generally and subject to the effect of general principles of equity.

SECTION 3.05     <u>Corporate Books and Records</u>.     The minute books of the Company contain true, complete and accurate records of all meetings and accurately reflect all other material actions taken by the equityholders, boards of directors or managers and all committees of the board of directors of the Company.  Complete and accurate copies of all such minute books and of the equity register of the Company have been made available by the Company to Purchaser.  The register of members, register of people with significant control (PSC Register) and all other statutory books and registers of the Company have been properly kept in accordance with all applicable Laws.  No notice or allegation has been received that any such registers or books are incorrect or should be rectified.

SECTION 3.06     <u>No Conflict; Required Filings and Consents</u>.

(a)     The execution and delivery of this Agreement by the Company do not, and the performance of this Agreement by the Company and the consummation of the transactions contemplated hereby will not, (i) conflict with or violate the Governing Documents or any other Organizational Document of the Company; (ii) assuming all consents, approvals, authorizations and other actions described in <u>Section 3.06(b)</u> have been obtained or taken and all filings and obligations described in <u>Section 3.06(b)</u> have been made or satisfied, conflict with or violate any Law applicable to the Company or by which any property or asset of the Company is bound or affected; or (iii) except as set forth on <u>Section 3.06(a)(iii)</u> of the Disclosure Schedule, violate, conflict with, require consent under, result in any breach of, result in loss of any benefit under, or constitute a default (or an event which, with notice or lapse of time or both, would become a default) under, or give to others any right of termination, amendment, acceleration or cancellation of, or result in the creation of a Lien on any property or asset of the Company pursuant to, any Contract, Company Permit or other instrument or obligation to which the Company is a party or by which the Company or any of its assets or properties is bound or affected, except, with respect to <u>clause (ii)</u> or <u>(iii)</u>, for any such violations, conflicts, breaches, defaults or other occurrences that would not, individually or in the aggregate, prevent or materially delay the transactions

43

contemplated by this Agreement, and that would not reasonably be expected to be material to the Company, taken as a whole.

(b)      The execution and delivery of this Agreement by the Company do not, and the performance of this Agreement by the Company and the consummation of the transactions contemplated hereby will not, require any consent, approval, authorization or permit of, action by, filing with or notification to, any Governmental Authority, except where failure to obtain such consent, approval, authorization or action, or to make such filing or notification, would not, individually or in the aggregate, prevent or materially delay the transactions contemplated by this Agreement, and that would not reasonably be expected to be material to the Company, taken as a whole.

SECTION 3.07      Compliance with Laws; Permits.

(a)      (i) The Company has conducted and continues to conduct its business in compliance in all material respects with all Laws applicable to the Company and its assets, (ii) there are no pending or, to the Knowledge of the Company, threatened violations of any Law alleged against the Company, and (iii) the Company has not received any notification or communication, nor are there any facts or circumstances that would be reasonably expected to result in the receipt of any written notice, from any Governmental Authority or other Person of any alleged, potential or actual violation by the Company of any Law, except as would not reasonably be expected to be material to the Company, taken as a whole.

(b)      Section 3.07(b) of the Disclosure Schedule contains a true and complete list of all Company Permits.  The Company is in possession of all Company Permits and all such Company Permits are in full force and effect.  No suspension or cancellation of any of the Company Permits is pending or, to the Knowledge of the Company, threatened.  Neither the Company nor any Person acting on behalf of the Company is or has been in conflict with, or in material default, breach or violation of, any Law or Company Permit applicable to the Company or by which any property or asset of the Company is bound or affected, except for any such conflicts, defaults, breaches or violations that would not reasonably be expected to be material to the Company, taken as a whole.

SECTION 3.08      Financial Statements; Books and Records.

(a)      True, complete and accurate copies of the (i) audited consolidated balance sheets of the Company as of December 31, 2020, and the related audited consolidated statements of comprehensive income, changes in equity and cash flows of the Company for the fiscal year then ended (the "Audited Financial Statements") and (ii) unaudited consolidated balance sheet of the Company as of July 31, 2021 and the related unaudited consolidated statements of income and cash flows of the Company for the seven-month period then ended (but excluding any notes thereto) (the "Interim Financial Statements" and, together with the Audited Financial Statements, the "Financial Statements") have been made available by the Company to Purchaser.  The Financial Statements (i) were prepared in accordance with U.K. GAAP applied on a basis consistent with the past practices of the Company and on a consistent basis throughout the periods indicated (except as expressly indicated in the notes thereto), (ii) were prepared in good faith and in accordance with the books and records of the Company, (iii) fairly present the financial

44

condition, results of operations and cash flows of the Company as of the dates thereof or for the periods covered thereby (subject, in the case of the Interim Financial Statement, to the absence of footnotes and normal year-end recurring audit adjustments which, if included, would not differ materially from those presented in the Audited Financial Statements) and (iv) include all adjustments (consisting only of normal recurring accruals) that are necessary for a fair presentation of the financial condition of the Company and the results of the operations and cash flows of the Company as of the dates thereof or for the periods covered thereby.

(b)     The books of account and other financial records of the Company:  (i) are in all material respects complete and correct and (ii) have been maintained in accordance with good business and accounting practices.  There are no material deficiencies in the internal accounting controls over financial reporting of the Company that would adversely effect in any material respect the Company's ability to record and report financial data or material weaknesses in internal controls over financial reporting.  The Company has not received, and to the Company's Knowledge there is not, any complaint, allegation, assertion or claim regarding the accounting or auditing practices, procedures, methodologies, methods or controls of the Company.

(c)     The Company has not applied for a loan under the Paycheck Protection Program, the Bounce Back Loan Scheme, the Coronavirus Business Interruption Loan Scheme, the Coronavirus Large Business Interruption Loan Scheme or the Recovery Loan Scheme or otherwise applied for or received any other direct assistance from any Governmental Authority in connection with the COVID-19 pandemic.

SECTION 3.09     Absence of Certain Changes or Events.  Since January 1, 2021, (a) the Company has conducted its business only in the ordinary course and in a manner consistent with past practice in all material respects, (b) there has not been a Material Adverse Effect and (c) the Company has not otherwise taken any of the following actions:

(i)     amended or otherwise changed the Governing Documents or its other Organizational Documents;

(ii)     (A) issued, sold, pledged or disposed of, (B) granted any Liens on or permitted any Liens to exist on, (C) authorized the issuance, sale, pledge or disposition of, or granting or placing of any Liens on, or (D) amended the terms of, any Equity Securities, or other ownership interests, of the Company, or any options, warrants, convertible securities or other rights of any kind to acquire Equity Securities, or any other ownership interest (including any phantom interest) of the Company;

(iii)     (A) sold, pledged or disposed of, (B) granted any Liens on or permitted any Liens to exist on, or (C) authorized the sale, pledge or disposition of, or granting or placing of any Liens on, any material assets of the Company, including the Company Intellectual Property, Company IT Assets and Company Products, in each case, to the extent such assets are material to the operation of the Business;

(iv)     declared, set aside, made or paid any dividend or other distribution, payable in cash, stock, property or otherwise, with respect to any of its Equity Securities;

(v)     adjusted, reclassified, combined, split, subdivided or redeemed, or purchased or otherwise acquired, directly or indirectly, any of its Equity Securities;

(vi)     (A) acquired (including by merger, consolidation or acquisition of stock or assets or any other business combination) any corporation, partnership, other business organization or any division thereof or any assets (other than assets purchased under ordinary course agreements with suppliers); (B) formed, or entered into any commitment to form, a Subsidiary, (C) incurred any Indebtedness or issued any debt securities or assumed, guaranteed or endorsed, or otherwise became responsible for, the obligations of any Person, or made any loans or advances or capital contribution to, or investment in, any Person; (D) authorized, or made any commitment with respect to, any single capital expenditure which is in excess of $25,000 or capital expenditures which are, in the aggregate, in excess of $50,000; or (E) entered into or amended any Contract with respect to any matter set forth in this Section 3.09(c)(vi);

(vii)     (A) established, adopted, entered into, amended or terminated any collective bargaining agreement or Company Benefit Plan (including, but not limited to, any employment, change-in-control, retention, severance, compensation or similar agreement or arrangement); (B) increased in any manner the compensation (including severance, change-in-control and retention compensation) or benefits of any of the current or former Employees or service providers; (C) paid or awarded, or committed to pay or award, any bonuses or incentive compensation (including retention bonuses); (D) accelerated the vesting or payment timing of any rights or benefits; (E) established or funded any rabbi trust or other funding arrangement in respect of any Company Benefit Plan; or (F) hired, promoted or terminated (other than for cause as determined by the Company) the employment or services of any Employees who have annualized base compensation greater than $100,000;

(viii)     paid, discharged or satisfied any Liability, other than in the ordinary course of business;

(ix)     commenced or settled any Action by or against the Company or that relates to the transactions contemplated by this Agreement, in each case, other than in the ordinary course of business;

(x)     entered into, amended, modified or consented to the termination of any Material Contract, or entered into, amended, waived, modified or consented to the termination of any of the rights of the Company thereunder (including any waiver or modification of prepayment obligations of customers thereunder);

(xi)     (A) abandoned, disclaimed, dedicated to the public, sold, assigned or granted any security interest in, to or under any Company Intellectual Property, Company IT Assets or Company IP Agreement, including failing to perform or cause to be performed all required filings, recordings and other acts, or to pay or cause to be paid all required fees and Taxes, to maintain and protect its interest in the Company Intellectual Property, Company IT Assets and Company IP Agreements; (B) granted to any other Person any license, or enter into any covenant not to sue, with respect to any Company

46

Case 1:23-cv-02245-RA   Document 1-2   Filed 03/15/23   Page 70 of 185

Intellectual Property or Company IT Asset, except non-exclusive licenses granted in the ordinary course of business; (C) developed, created or invented any Intellectual Property jointly with any other Person, except under existing arrangements that have been disclosed to Purchaser; or (D) disclosed or allowed to be disclosed any confidential information or confidential Company Intellectual Property to any Person, other than Employees or disclosed counterparties that are subject to a confidentiality or non-disclosure covenant protecting against further disclosure thereof;

(xii)    terminated, let lapse or materially amended or modified any material insurance policy maintained by the Company unless such policy was replaced by a reasonably comparable policy;

(xiii)    cancelled or forgave any material debts or claims, except in the ordinary course of business;

(xiv)    adopted any plan of merger, consolidation, reorganization, liquidation or dissolution or filed a petition in bankruptcy under any provisions of federal or state bankruptcy Law or consented to the filing of any bankruptcy petition against it under any similar Law;

(xv)    failed to maintain the Company's property and equipment (including Company IT Assets) in good repair and operating condition, ordinary wear and tear excepted;

(xvi)    acquired or entered into a Contract to acquire any real property, or transfer, lease, sublease, license, abandon or otherwise dispose of any Leased Real Property, other than in the ordinary course of business;

(xvii)   discounted any accounts receivable of the Company, or accelerated the collection of any accounts receivable or delayed the payment of any accounts payable, other than in the ordinary course of business; or

(xviii)  announced an intention, entered into any formal or informal agreement or otherwise make a commitment, to do, or authorized, any of the foregoing.

SECTION 3.10    Absence of Undisclosed Liabilities.  There are no Liabilities of the Company, other than Liabilities (a) as and to the extent expressly set forth on the balance sheet of the Company as of July 31, 2021, including the notes thereto, included in the Interim Financial Statements (the "Balance Sheet") or (b) incurred since the date of the Balance Sheet in the ordinary course of business that are not, individually or in the aggregate, material to the Company or the Business (and none of which are Indebtedness or other Liabilities resulting from any violation of Law or breach of Contract).

SECTION 3.11    Absence of Litigation.  There is no (and there has been no) Action pending or, to the Knowledge of the Company, threatened, against the Company or, to the Knowledge of the Company, involving the Company, or any property or asset, or any director, officer, employee or other representative (in their capacities as such) of the Company, that seeks (a) the issuance of an order restraining, enjoining or otherwise prohibiting or making illegal the

47

consummation of any of the transactions contemplated by this Agreement or any Ancillary Document (b) any injunction or other equitable relief against the Company or any of its directors, officers, employees or other representatives (in their capacities as such) or (c) any damages, fines, awards, judgments, penalties or expenses in excess of $25,000, individually, or $100,000, in the aggregate. Neither the Company nor, to the Knowledge of the Company, any material property or asset, or any director, officer, employee or other representative (in their capacities as such) of the Company, is, or has been, subject to any Governmental Order, settlement agreement or other similar written agreement with, or, to the Knowledge of the Company, investigation by, any Governmental Authority. The Company has not entered into any settlement agreement that has resulted in the loss to the Company in excess of $25,000 or involved any restricting limitations or obligations on the Company that are material to the Company, taken as a whole.

SECTION 3.12     Employee Benefit Plans.

(a)     Section 3.12(a) of the Disclosure Schedule contains a list of all Employee Benefit Plans maintained or contributed to by the Company or under which the Company has any obligations or liabilities in respect of any of the Employees, service providers (to the extent eligible) or any of their respective dependents or beneficiaries (individually referred to as a "Company Benefit Plan" and collectively referred to as the "Company Benefit Plans"). The Company has delivered or made available to Purchaser true and complete copies of all documents, as they may have been amended through the date hereof, embodying or relating to each Company Benefit Plan.

(b)     The Company has not announced, promised or proposed to materially modify, change or terminate any Company Benefit Plan in the twelve (12) months prior to the date of this Agreement.

(c)     Each Company Benefit Plan has been established, maintained and administered in all material respects in accordance with its terms and with all provisions of applicable Law. No material Actions with respect to any Company Benefit Plan are pending or threatened against the Company, and to the Knowledge of the Company, there are no facts that reasonably would be expected to give rise to any such Actions.

(d)     As at the last working day of the month prior to the date of this Agreement, all contributions, premiums or payments required to be made to or, with respect to any Company Benefit Plan (other than holiday pay), have been made on or before their due dates.

(e)     Neither the execution, delivery or performance of this Agreement nor the consummation of the transactions contemplated hereby shall (either alone or in combination with another event, including the termination of employment or service of any Employee or service provider following or in connection with, the transactions contemplated hereby): (i) result in any payment becoming due, or increase the amount of any compensation due, to any Employee or service provider, except as provided for in this Agreement or otherwise required under applicable Law; (ii) entitle any Employee or service provider to severance pay or benefits, or any increase in severance pay or benefits, change in control payments, unemployment compensation or any other payment upon any termination of employment or service with the Company, except as provided for in this Agreement or otherwise required under applicable Law; (iii) accelerate the time of

payment or vesting, increase the amount of compensation or benefits due, trigger any payment or funding (through a grantor trust or otherwise) of compensation or benefits due, or trigger any other obligation pursuant to, any of the Company Benefit Plans to any Employee or service provider; or (iv) limit or restrict the right of the Company or, after the consummation of the transactions contemplated hereby, Purchaser to merge, amend or terminate any of the Company Benefit Plans.

(f)     Prior to the date of this Agreement, Disruptional has transferred the following Employee Benefit Plans of Disruptional into the Company's sole name on materially the same terms as provided by Disruptional immediately prior to such transfer: (i) the private health care plan provided through AXA PPP Healthcare; (ii) the group income protection plan provided through Canada Life; and (iii) the death-in-service benefit plan provided through Canada Life. No employees or service providers of Disruptional or any of its Affiliates (other than the Company) or any of their respective dependents or beneficiaries are entitled to participate in or receive benefits under any of such plans from and after such transfer.

SECTION 3.13    Labor Matters.

(a)     Anonymized details of all current Employees have been provided or made available to Purchaser, including, as applicable for each such individual: (i) job title(s), (ii) date of hire, (iii) work location, (iv) employing entity, (v) full- or part-time status and (vi) current base compensation or wage rate.

(b)     Each Employee employed in the United Kingdom who requires immigration clearance to work and remain in the United Kingdom has the necessary clearance and permissions to work and remain in the United Kingdom.

(c)     (i) The Company is not a party to any collective bargaining, trade union or works council agreement or other labor union Contract applicable to persons employed by the Company, and, to the Company's Knowledge, there are no organizational campaigns, petitions or other unionization activities seeking recognition of a collective bargaining unit relating to any Employee or service provider; (ii) no grievance or arbitration or other Action arising out of or under any collective bargaining agreement relating to the Company is pending or, to the Company's Knowledge, threatened; (iii) the consent of, consultation of or the rendering of formal advice by any labor or trade union, works council or any other employee representative body is not required for the Company to enter into this Agreement or to consummate any of the transactions contemplated by this Agreement; and (iv) there have been no "collective redundancies" (as defined in the Trade Union and Labour Relations Consolidation Act 1992) affecting any establishment of the Company.

(d)     (i) The Company is currently in compliance with all applicable Laws relating to the employment of labor, including those related to health and safety, immigration, discrimination, wages, hours, collective bargaining and the payment and withholding of Taxes and other sums as required by the appropriate Governmental Authority and has withheld and paid to the appropriate Governmental Authority or is holding for payment not yet due to such Governmental Authority all amounts required to be withheld from Employees of the Company and is not liable for any arrears of wages, Taxes, penalties or other sums for failure to comply with any of the foregoing, and for obligations to post and distribute certain legally required notices; (ii) as

49

at the last working day of the month prior to the date of this Agreement, the Company has paid in full to all its Employees and service providers or adequately accrued for in accordance with U.K. GAAP all wages, fees, salaries, commissions, bonuses, benefits and other compensation (other than holiday pay) due to or on behalf of such Employees and service providers; (iii) to the Company's Knowledge, there is no claim with respect to payment of wages, fees or salary that has been asserted or is now pending or threatened before any Governmental Authority with respect to any Employee or service provider of the Company.

(e)      (i) The Company has not misclassified any person as a worker, independent contractor, consultant, temporary employee, leased employee, volunteer, intern or any other servant or agent compensated other than through reportable wages and the Company does not employ or engage any volunteer workers, paid or unpaid interns or any other unpaid workers; and (ii) any individual treated as an independent contractor by the Company is properly classified as an independent contractor and the Company has no Liability to provide health or welfare benefits with respect to its independent contractors under the Company Benefit Plans or otherwise.

(f)      The Company has delivered or made available to Purchaser (i) a copy of the individual employment Contracts for each of the Key Employees and a copy of the standard-form employment Contract in use for all other Employees (and such Employees are employed on such standard form with no material deviations); (ii) a copy of the terms of engagement of any service providers to the Company who are not Employees; (iii) copies of all current employee handbooks and policies, outstanding employee loans or other financial transactions between the Company and any Employee or service provider; (iv) a list of Employees currently on a leave of absence (other than regular holiday absence) and the reason for such leave of absence; (v) Employee attendance and disciplinary action records; and (vi) material documentation relating to outstanding disciplinary or grievance matters relating to any Employee.

(g)      There is no contract of employment with any Employee under which the employing entity would, on a termination without cause, be required to give more than six (6) months' notice of termination.

(h)      There are no material Actions brought by or on behalf of any Employee or any other Person who is or was providing services to the Company pending, or to the Company's Knowledge, threatened, against the Company.

(i)      To the Company's Knowledge, no Employee who directly reports to any Key Employee or is at the level of manager or higher has disclosed any plans to terminate his, her or their employment or other relationship with the Company, nor, to the Company's Knowledge, is any Key Employee likely to leave employment as a result of the execution, delivery or performance of the transactions contemplated by this Agreement.

(j)      No Employee would, in the event of being dismissed by reason of redundancy or upon any other termination without cause, be entitled to or have an expectation of receiving a severance payment in excess of the statutory minimum provided under applicable Law. There has been no custom, practice, policy or arrangement (whether or not legally binding) by the Company of paying redundancy or severance payments in excess of the statutory minimum provided under applicable Law.  There is no agreed procedure for selection of employees for

50

redundancy.  No Employee has been notified of a potential redundancy by the Company in the six (6) months prior to the date of this Agreement.

(k)     No Key Employee nor any material number, grade or category of other Employees has given or received notice of termination of his or their contract of employment.

(l)     There are no outstanding offers of employment or engagement made by the Company and no person has accepted such an offer but not yet taken up the position accepted.

(m)     The Company complied with all requirements of the Transfer of Undertakings (Protection of Employment) Regulations 2006 ("TUPE") on the transfer that occurred pursuant to that certain Intra Group Sale Agreement, dated as of January 1, 2020, between Disruptional and the Company.

(n)     Other than the transfer referred to in Section 3.13(m) between Disruptional and the Company, the Company has not, within the last three (3) years, entered into any agreement or arrangement which involved or, to the Company's Knowledge, may involve the Company acquiring or disposing of any undertaking or part of one, to which TUPE may apply, whether on commencement or termination of such agreement or arrangement or otherwise.  No Employee has had their terms of employment varied for any reason as a result of or in connection with any such transfer.

(o)     The Company has complied with its automatic enrolment obligations as required by the Pensions Act 2008 and associated Laws.  No notices, fines, or other sanctions have been issued by the Pensions Regulator and no instances of non-compliance with the automatic enrolment obligations have been notified to the Pensions Regulator in respect of the Company.

(p)     The only pension arrangement which the Company participates or has ever participated in is the defined contribution group personal pension scheme with Aviva plc.  In particular, but without limitation, the Company does not and never has participated in any pension scheme under which benefits are or were calculated on a defined benefit basis.  No Employee has any rights in respect of any occupational pension scheme which transferred to be enforceable against the Company pursuant to TUPE whether on the transfer between Disruptional and the Company in January 2020 or otherwise.

(q)     Details of the Company's share option plan and Disruptional's share option plan (to the extent relevant) have been provided or made available to Purchaser, together with details of participation in those arrangements, and Section 3.13(q) of the Disclosure Schedule sets forth, with respect to each EMI Option (vested or unvested), the grant date, option exercise price, vesting date and exercise period.

(r)     All EMI Options are "qualifying options" under Schedule 5 of ITEPA and no "disqualifying event" for the purposes of Chapter 9 of Part 7 of ITEPA has occurred after the grant of any EMI Option purporting to be a qualifying option for the purposes of Schedule 5 ITEPA other than any transaction referred to in this Agreement.

(s)     Advance assurance that Disruptional was a qualifying company for the purposes of Schedule 5 of ITEPA was received in written form from Her Majesty's Revenue and

51

Customs ("HMRC") prior to grant of the EMI Options.  Disruptional provided HMRC with accurate information in relation to Disruptional as part of the advance assurance application process.

(t)  The market value of a share in the capital of Disruptional at the time of grant of each EMI Option which is or is purporting to be a qualifying option for the purposes of Schedule 5 ITEPA was agreed in written form with HMRC on an appropriate basis and the exercise price of each such EMI Option is not less than the corresponding actual market value at the time of grant of the relevant EMI Option.  Disruptional provided HMRC with accurate information in relation to Disruptional at the time the valuation was sought.

(u)  No claims have arisen or, to the Knowledge of the Company, are likely to arise in respect of any Option granted or proposed to be granted by the Company or an EMI Option.

(v)  Each Optionholder who is tax resident in the United Kingdom has agreed, as a condition of exercise, to enter into an election pursuant to section 431(1) of ITEPA in respect of his or her shares within fourteen (14) days of exercise of his respective options.

(w)  Each EMI Optionholder has made and signed a written declaration that he, she or it meets the requirements of paragraph 26 (commitment of working time) to Schedule 5 ITEPA in relation to the EMI Options, and Disruptional has complied with paragraph 44(5A) to Schedule 5 ITEPA in relation to the same.

(x)  All HMRC notifications and annual share scheme returns (including Form EMI, Forms 40 and Forms 42) made by the Company have been correctly completed and returned to HMRC within the relevant time period and no penalties have arisen in respect of any such returns.

(y)  There are no trusts or other arrangements in place, whether funded or established by the Company, Disruptional or any parent or Subsidiary of either such entity under which any Employees of the Company, Disruptional or any parent or Subsidiary of either such entity, or any Persons associated with such Employees, can obtain a benefit in any form.

SECTION 3.14    Real Property.

(a)  The Company does not own, and has never owned, any real property.

(b)  Section 3.14(b) of the Disclosure Schedule sets forth a true, complete and accurate list of all Leases pursuant to which the Company leases or subleases any Leased Real Property, together with:  (i) the street address or location of each parcel of Leased Real Property and (ii) the identity of the lessor, lessee, current occupant (if different from lessee) of each such parcel of Leased Real Property and any guarantor.  The Company or one of its Subsidiaries, as the case may be, has a valid leasehold interest in the Leased Real Property, free and clear of any and all Liens, except for Permitted Liens.  The Leased Real Property listed on Section 3.14(b) of the Disclosure Schedule represents all the real property used, occupied or held for use in the Business. The Company has delivered to Purchaser true, accurate, and complete copies of all Leases pursuant to which the Company leases or subleases any Leased Real Property.

(c)    With respect to each of the Leases pertaining to the Leased Real Property, the Company has not exercised or given any notice of exercise, nor has any landlord or sublandlord exercised or received any notice of exercise by a landlord or sublandlord of, any Leased Real Property Option.  The Company has the full right to exercise any Leased Real Property Options contained in the Leases pertaining to the Leased Real Property on the terms and conditions contained therein and upon due exercise to enjoy the full benefit of such Leased Real Property Options with respect thereto.  All rent and other sums and charges currently due under all Leases pertaining to the Leased Real Property have been paid when due.  No uncured material default by the Company or, to the Knowledge of the Company, by any landlord exists with respect to the Leased Real Property, and to the Knowledge of the Company, no event has occurred or condition exists which, with the giving of notice or the lapse of time or both, would constitute such a material default.  The rental payment amount set forth in each lease provided to the Company for the Leased Real Property is the actual rental payment amount being paid, and there are no separate agreements or understandings with respect to the same.

(d)    There are no contractual or legal restrictions that preclude or restrict the ability to use the Leased Real Property for the purposes for which it is currently being used.  The Company has not leased or subleased any parcel or any portion of any parcel of the Leased Real Property to any other Person, and no other Person has any rights to the use, occupancy or enjoyment thereof pursuant to any Lease, nor has the Company assigned its interest under any Lease listed in Section 3.14(b) of the Disclosure Schedule to any third party.

SECTION 3.15    Assets.

(a)    The Company has good title to, valid leasehold interests in or a valid license to use, all of the properties and assets forming a part of, used or held for use in, its business (the "Assets").  The Assets are not subject to any Liens other than Permitted Liens.  Each item of material tangible personal property included in the Assets is in all material respects in good operating condition and state of repair (ordinary wear and tear excepted) and the Assets are in all material respects suitable for the purposes for which they are used and intended to be used.  The Assets are sufficient for the continued conduct of the Business after the Closing in substantially the same manner as currently conducted prior to the Closing, and constitute all of the rights, property and assets necessary to conduct the Business.

(b)    Except as set forth on Section 3.15(b) of the Disclosure Schedule, the assets and properties that Disruptional Ltd. ("Disruptional") transferred, assigned, conveyed and delivered to the Company pursuant to the that certain Intra Group Sale Agreement, dated as of January 1, 2020, between Disruptional and the Company (the "Hive-Down Agreement"), constituted all of Disruptional's and its Subsidiaries' assets and properties that were used or held for use in, or reasonably necessary for the conduct of, the Business at such time (such assets, the "Hive-Down Assets"), and neither Disruptional nor any of its Affiliates (other than the Company) owns, leases, licenses or otherwise has any rights to any Assets or the Hive-Down Assets.

SECTION 3.16    Intellectual Property and IT Assets; Data and Privacy Laws.

(a)    Section 3.16(a) of the Disclosure Schedule sets forth a true and complete list of all (i) Registered Owned Intellectual Property, indicating for each such item, as applicable,

the application or registration number, date and jurisdiction of filing or issuance, and the identity of the current applicant or registered owner, (ii) material unregistered trademarks included in the Owned Intellectual Property, and (iii) Company Products.  The Company has sufficient rights to use the Company Intellectual Property and Company IT Assets in connection with the operation of the business of the Company as currently conducted and as contemplated to be conducted pursuant to the Business Plan, all of which rights shall survive unchanged upon the consummation of the transactions contemplated by this Agreement.  The Company Intellectual Property includes all Intellectual Property used or held for use in connection with the operation of the Business and there are no other items of Intellectual Property that are used in or necessary for the operation of the Business or for the continued operation of the Business immediately after the Closing in substantially the same manner as operated prior to the Closing.  The Company is the exclusive owner of all right, title and interest in and to each item of Owned Intellectual Property, free and clear of all Liens, other than Permitted Liens.  The Company has a valid license to use the Licensed Intellectual Property in connection with the operation of the Business.  The Company has provided Purchaser with true and complete copies of all Company IP Agreements, other than (i) non-exclusive licenses granted to customers in the ordinary course of business and (ii) licenses of Off-the-Shelf Software.  Each Company IP Agreement is valid and binding on the Company in accordance with its terms and is in full force and effect.

(b)     Neither the Company nor any other party thereto is, or is alleged in writing to be, in breach of or default under, or has provided or received any notice of breach of, default under, or intention to terminate (including by non-renewal), any Company IP Agreement.

(c)     The Registered Owned Intellectual Property is (i) valid, subsisting and, enforceable; (ii) currently in compliance with any and all formal legal requirements necessary to maintain the validity and enforceability thereof; and (iii) not subject to any outstanding Governmental Order affecting the Company's use thereof or rights thereto.  There is no Action pending, asserted or threatened, and to the Knowledge of the Company no facts reasonably expected to give rise to an Action (i) by or against the Company concerning any Company Product or the ownership, validity, registrability, enforceability or use of, or licensed right to use, any Intellectual Property; or (ii) contesting or challenging the ownership, validity, registrability or enforceability of, or the Company's or any of its customers' or licensees' right to use, any Company Intellectual Property or Company Product.

(d)     The operation of the Business and the use of the Company Intellectual Property, Company IT Assets and Company Products in connection therewith does not, and has not during any time within the last six (6) years, infringed, misappropriated or otherwise violated or conflicted with the Intellectual Property rights of any other Person, except as would not be material to the business of the Company or would not result in any material Liability to the Company.  There is no Action pending, asserted or threatened against the Company concerning any of the foregoing, nor has the Company received any valid notification that a license under any other Person's Intellectual Property (other than licenses included in the Company IP Agreements) is or may be required to operate the Business.  To the Knowledge of the Company, no Person is engaging, or has engaged during any time within the last three (3) years, in any activity that infringes, misappropriates or otherwise violates or conflicts with any Company Intellectual Property.

Case 1:23-cv-02245-RA   Document 1-2   Filed 03/15/23   Page 78 of 185

(e)     The Company has taken commercially reasonable measures to maintain the confidentiality of all trade secrets and other confidential information that are part of the Company Intellectual Property, including the source code for any Company Software and all other confidential Company Intellectual Property, used or held for use in connection with the operation of the Business.  No confidential information, trade secrets or other confidential Company Intellectual Property has been disclosed by the Company to any Person except pursuant to appropriate non-disclosure or license agreements that (i) obligate such Person to keep such trade secrets and other confidential Company Intellectual Property confidential both during and after the term of such agreement and (ii) are valid and binding on the parties thereto and with respect to which no party thereto is in default thereunder and no condition exists that with notice or the lapse of time or both could constitute a default thereunder.

(f)     Each Employee or current or former agent of the Company who conceived, developed or created any Company Product, or otherwise contributed to the creation or development of any Intellectual Property for or on behalf of the Company, has executed an employment agreement, non-disclosure agreement, assignment of inventions agreement or similar applicable agreement relating to the protection, ownership, development, use or transfer of Intellectual Property for the benefit of the Company and, to the Knowledge of the Company, no such Employee or agent is in default or breach of any term of any such agreement.  To the extent that any Intellectual Property or Company Products have been conceived, developed or created for the Company by any Person, the Company has executed valid and enforceable written agreements with such Person with respect to such Intellectual Property or Company Products irrevocably transferring to the Company the entire and unencumbered right, title and interest therein and thereto by valid written assignment.

(g)     The Company IT Assets are adequate for the operation of the business of the Company as currently conducted and as contemplated to be conducted pursuant to the Business Plan, and operate and perform in all material respects in accordance with their documentation and functional specifications.  The Company IT Assets are free from bugs or other defects, have not materially malfunctioned, broken down or failed within the past three (3) months, and do not contain any Viruses.  The Company (i) has taken commercially reasonable steps to prevent the introduction of Viruses into the Company IT Assets, including implementing any and all security patches or upgrades that are generally available for any of the Company IT Assets and to protect the integrity and security of the Company IT Assets and the data and other information stored or processed thereon (including Personally Identifiable Information), including implementing reasonable backup, security and disaster recovery measures and technology; (ii) acts in compliance with any such backup, security and disaster recovery measures; and (iii) tests such plans and procedures on a regular basis.  There has been no unauthorized access, use, intrusion or breach of security to, nor exfiltration of any Personally Identifiable Information from, any Company IT Assets.

(h)     With respect to any and all items of Public Software incorporated into or used in connection with any Company Software or any Company Products, (i) Section 3.16(h) of the Disclosure Schedule identifies the underlying Public Software, the license governing the use of such Public Software, the particular Company Software and/or Company Product in which such Public Software is present, the general nature of any modifications to such Public Software in the Company Software and/or Company Product and whether such modifications were made by the

55

Company or by a third party and (ii) no such use, development, incorporation or distribution of such Public Software, or any other use of or activities with respect to such Public Software by the Company has, will, or would be reasonably expected to, (A) require the licensing, disclosure or distribution of any Company Product or any other proprietary Software that is part of the Company Intellectual Property to licensees or any other Person; (B) prohibit or limit the receipt of consideration in connection with licensing, sublicensing, assigning, transferring or distributing any other Company Software or Company Product; (C) except as specifically permitted by Law, allow any Person to decompile, disassemble, modify or otherwise reverse engineer any other Company Software; (D) require the licensing, sublicensing, assignment or transfer of any Company Software or Company Product to any other Person for the purpose of making derivative works; or (E) require the grant of any patent license, non-assertion covenant or other rights or immunities under any Company Intellectual Property or rights to modify, make derivative works based on, decompile, disassemble, or reverse engineer any Company Product or any other proprietary Software.  The Company has not participated in, joined or been a member of any standards-setting organization, Public Software projects or similar activities.

(i)      The Company has complied in all material respects with all notice, attribution and other terms and conditions of each license applicable to the Public Software disclosed in Section 3.16(h) of the Disclosure Schedule.

(j)      All Company Software and Company Products are free from Viruses and are sufficiently documented to enable a Software developer of reasonable skill to understand, modify, debug, enhance, compile, maintain, operate, support and otherwise utilize such Company Software and Company Products, without reference to other sources of information.  Neither the Company nor any Person then acting on its behalf, has disclosed, delivered, licensed or otherwise made available, and neither the Company nor any such Person has a duty or obligation (whether present, contingent or otherwise) to disclose, deliver, license, or otherwise make available, any source code for any Company Product to any escrow agent or any other Person, other than (A) employees, independent contractors or consultants of the Company pursuant to a valid and enforceable written agreement prohibiting use or disclosure except in accordance with the performance of services for the Company; or (B) an independent third-party escrow agent pursuant to a valid and enforceable written source code escrow agreement providing for limited release only upon the occurrence of specified release events, and no such release event has occurred, and no circumstance or condition exists that would reasonably be expected to result in the occurrence of any such release event.  Without limiting the foregoing, neither the execution of this Agreement nor the consummation of any of the transactions contemplated by this Agreement will, or would reasonably be expected to, result in the release from escrow or other delivery to any Person of any source code for any Company Product.  No event has occurred, and no circumstance or condition exists, that (with or without notice or lapse of time, or both) will, or would reasonably be expected to, result in the disclosure, delivery or license by the Company or any Person then acting on its behalf to any Person of any source code.

(k)      Neither the negotiation, execution, delivery or performance of this Agreement or the Ancillary Documents, nor the consummation of the transactions contemplated hereby or thereby, will result in (i) the grant of any license under, or creation of any Lien on, any Company Intellectual Property or any Intellectual Property that is owned by or licensed to Purchaser or any of its Affiliates prior to the Closing; (ii) Purchaser or any of its Affiliates, or the

Company, being (A) bound by, or subject to, any non-compete obligation, covenant not to sue or other restriction on the operation or scope of its business, which such party was not bound by or subject to prior to the Closing, or (B) obligated to (1) pay any royalties, honoraria, fees or other payments to any Person in excess of those payable by such party prior to the Closing or (2) provide or offer any discounts or other reduced payment obligations to any Person in excess of those provided to such Person prior to the Closing; or (iii) the loss or impairment of, nor require the consent of any other Person in respect of, the Company's right to own or use any Company Intellectual Property or any Intellectual Property subject to any Company IP Agreement, in the case of each of clauses (i) through (iii) pursuant to any Contract to which Purchaser or any of its Affiliates, or the Company, is a party.

(l)     The Company has complied and is currently in compliance in all material respects with (i) all applicable Information Privacy and Security Laws and (ii) all of the Company's internal and public-facing privacy policies and Contracts, in each case to the extent relating to the use, collection, storage, disclosure, transfer or other processing of any Personally Identifiable Information.  The Company has adopted and published privacy notices and policies that accurately describe their privacy practices (as applicable), to each and every Company Website, mobile application or other electronic platform and has complied with those notices and policies.  The Company has not received any complaints regarding the collection, storage, processing, transfer, disposal or use of Personally Identifiable Information by the Company.

(m)     No Person (including any Governmental Authority) has threatened in writing to assert an Action pursuant to any written notice, or commenced any Action with respect to the Company's privacy or data protection practices or compliance with Information Privacy and Security Laws, or with respect to any actual or alleged violation of any Person's privacy, personal or confidentiality rights under any Information Privacy and Security Laws, including any loss, damage or unauthorized access, use, disclosure, modification or other misuse of any Personally Identifiable Information maintained by, or on behalf of, the Company and, to the Knowledge of the Company, there is no reasonable basis for any such Action.  The execution, delivery, performance and consummation of the transactions contemplated by this Agreement (including the processing of Personally Identifiable Information in connection therewith) complies with the Company's applicable privacy notices and policies and with all applicable Information Privacy and Security Laws.  The Company currently has and has at all times made all disclosures to, and obtained any necessary consents and authorizations from, users, customers, employees, contractors and other applicable Persons required by applicable Information Privacy and Security Laws and have filed any required registrations with the applicable data protection authority, including any consents or authorizations necessary to operate the Business.

(n)     To the Knowledge of the Company, none of the Personally Identifiable Information in the possession, custody or control of the Company, or otherwise used or disclosed by the Company in connection with the Business, has been provided to the Company by a third party in violation of applicable Law, including Information Privacy and Security Laws, or in a manner inconsistent with such third party's own privacy policies.  The Company has taken commercially reasonable steps necessary to confirm that each third party that provides the Company with Personally Identifiable Information has provided that Personally Identifiable Information in accordance with applicable Laws (including Information Privacy and Security Laws), Contracts or other terms to which the Company is bound (as applicable).  Without limiting

the generality of the foregoing, the Company has conducted commercially reasonable diligence on all third parties that provide Personally Identifiable Information to the Company regarding such third parties' data collection methods and data sharing practices as necessary to ensure such collection and sharing complies with all applicable Laws (including Information Privacy and Security Laws), Contracts or other terms to which the Company is bound.

(o)      With respect to all Personally Identifiable Information and user data gathered or accessed in the course of the operation of any business of the Company, the Company has at all times taken commercially reasonable measures to ensure that such Personally Identifiable Information is protected against loss and unauthorized access, use, modification, disclosure or destruction or other misuse, including by implementing, maintaining and executing, as necessary or required by applicable Information Privacy and Security Laws, a comprehensive security plan that is designed to (i) identify, mitigate and resolve internal and external risks to the security of any proprietary or confidential information in its possession, including Personally Identifiable Information; (ii) implement, monitor and improve adequate and effective administrative, electronic, technical and physical safeguards to control those risks; and (iii) maintain notification procedures in compliance with applicable Laws (including Information Privacy and Security Laws) in the case of any breach of security compromising unencrypted data containing Personally Identifiable Information. The Company has not experienced any breach of security or other loss, unauthorized access, use, disclosure or destruction, or other misuse, to proprietary or confidential information in its possession, custody or control, including Personally Identifiable Information and user data in the possession, custody or control of the Company.

SECTION 3.17    Taxes.

(a)      All Tax Returns required to be filed by or with respect to the Company have been timely filed, and all such Tax Returns (taking into account the filing of any amended Tax Returns) are true, complete and accurate in all material respects. All information returns required to be filed by the Company have been filed, and all statements required to be furnished to payees by the Company have been furnished to such payees, and the information set forth on such information returns and statements is accurate and complete in all material respects.

(b)      All Taxes of the Company (whether or not shown to be due and payable on any Tax Return) required to be paid by the Company, have been timely paid to the appropriate Governmental Authority.

(c)      There are no Liens for Taxes on the assets of the Company (other than Permitted Liens).

(d)      The Company has timely paid or withheld (including, for the avoidance of doubt, any UK National Insurance contributions and any amount deducted on account of income tax under the UK Pay-As-You-Earn scheme) all Taxes required to be paid or withheld with respect to its Employees, creditors and other third parties (and timely paid over such Taxes to the appropriate Governmental Authority).

(e)      The Company has not executed any outstanding waiver or extension of any statute of limitations for the assessment or collection of any Tax, no such waiver or extension is

58

pending, and there has been no request by a Governmental Authority to execute such a waiver or extension.  To the Knowledge of the Company, no audit or other examination or administrative, judicial or other proceeding of, or with respect to, any Tax Return or Taxes of the Company is currently in progress, and the Company has not been notified of any request for, or threat of, such an audit or other examination or administrative, judicial or other proceeding.  No deficiency for any amount of Tax has been asserted or assessed by a Governmental Authority against the Company that has not been satisfied by payment, settled or withdrawn.  No power of attorney that is currently in force has been granted by the Company to any Person with respect to any Tax matter.

(f)    No claim has been made by a Governmental Authority in a jurisdiction where the Company does not file Tax Returns that the Company is or may be subject to taxation by such jurisdiction.

(g)    The Company has no liability for the Taxes of any other Person as a result of being, having been or ceasing to be a member of a Tax Group, by operation of Law, as a transferee or successor, under a Tax allocation agreement, Tax sharing agreement, or Tax indemnity agreement relating to any Tax (other than a contractual agreement entered into the ordinary course of business the principal subject matter of which is not Taxes) or otherwise.

(h)    The terms and conditions of any Tax exemption, Tax holiday or other Tax reduction agreement or order of a Governmental Authority with respect to the Company have been complied with and the transactions contemplated by this Agreement will not violate any such terms and conditions.

(i)    The Company will not be required to include any item of income in, or exclude any item of deduction from, taxable income for any Post-Closing Straddle Period or Post-Closing Tax Period as a result of any (i) change in method of accounting implemented in a Pre-Closing Tax Period or Pre-Closing Straddle Period, (ii) written agreement between the Company and a Governmental Authority with respect to any Tax executed on or prior to the Closing Date, (iii) intercompany transaction entered into prior to the Closing Date, (iv) installment sale or open transaction disposition made on or prior to the Closing Date or (v) prepaid amount received prior to the Closing.

(j)    The Company is and has always been resident for Tax purposes only in the United Kingdom and has never been resident in any other territory or treated as so resident for the purposes of any double tax agreement, and has never had a branch, agency or permanent establishment for any Tax purpose outside the United Kingdom.

(k)    All instruments (other than those which have ceased to have a legal effect) executed by the Company (and which are or were subject to stamp duty, stamp duty reserve tax, bearer instrument duty, stamp duty land tax or any other similar Tax, or may be necessary or desirable in proving the title of the Company to any asset or which the Company may wish to enforce or produce as evident) have been duly stamped or, where relevant, are accompanied by a certificate from the relevant Governmental Authority evidencing submission of a valid land transaction return for the purpose of stamp duty land tax.  No documents relating to assets of the

Company that are outside the United Kingdom would attract duty if they were brought into the United Kingdom.

(l)     If any Seller Securities are, or have ever been, subject to the income tax "restricted securities" rules of Chapter 2 Part 7 of the UK Income Tax (Earnings and Pensions) Act 2003 ("ITEPA 2003"), the relevant Sellers have entered into elections with the Company in respect of such Seller Securities under Section 431(1) of ITEPA 2003 within the statutory time limit.

(m)     No loan or advance within any of Sections 455, 459 and 460 of the UK Corporation Tax Act 2010 ("CTA 2010") has been made by the Company and remains outstanding, or has been agreed to by the Company, and the Company has not released or written off the whole or part of the debt in respect of any such loan or advance.  The Company has never been involved in the provision of benefit to which Section 464A of the CTA 2010 applies.

(n)     The Company has not made any transfer of value within Sections 94 and 202 of the UK Inheritance Tax Act 1984 ("IHTA"); or received any value such that liability might arise under Section 199 of IHTA; or been a party to associated operations in relation to a transfer of value as defined by Section 268 of IHTA.  No shares in or assets of the Company were acquired by it in circumstances such that they continued to be subject to any Inland Revenue charge to which they were subject immediately prior to such acquisition or such that, if they had been subject to an Inland Revenue charge immediately prior to such acquisition, they would have continued to be subject to it.  No shares in or assets of the Company are subject to any such power of sale, charge or mortgage as is mentioned in Section 212 or Section 237 of the IHTA and, to the Knowledge of the Company, there are no circumstances which might lead to such a power arising. No transfer of value (as defined by IHTA) or disposal by way of gift (within the meaning of Section 102 of the UK Finance Act 1986) has at any time been made by or to the Company.

(o)     The Company has disclosed on its Tax Returns all Tax reporting positions that the Company has been required to disclose under applicable Law in order to prevent the imposition of penalties.

(p)     The Company is, to the extent that it is required to be registered, a registered person for the purposes of the relevant value added or turnover tax applicable in any relevant jurisdiction and is not and has never been treated as a member of a group for such value added or turnover tax.

(q)     Neither the execution of this Agreement nor the consummation of the transactions contemplated hereby will result in any chargeable asset being deemed to have been disposed of and re-acquired by the Company for Tax purposes under:

(i)     section 179 of the UK Taxation of Chargeable Gains Act 1992;

(ii)     sections 345 and 346 of the UK Corporation Tax Act 2009 ("CTA 2009");

(iii)     sections 630-632 of CTA 2009; or

60

(iv)     section 780 or 785 of CTA 2009 (or under paragraph 58 or 60 of Schedule 29 to the UK Finance Act 2002).

(r)     All material transactions or arrangements made by the Company have been made on fully arm's length terms.  There are no circumstances in which Part 4 of Taxation (International and Other Provisions) Act 2010 or any other rule or provision could apply causing any Governmental Authority to make an adjustment to the terms on which such transaction or arrangement is treated as being made for Tax purposes.

(s)     The Company has not entered into any notifiable arrangements for the purposes of Part 7 of the UK Finance Act 2004 or Council Directive (EU) 2018/822, any notifiable contribution arrangement for the purpose of the UK National Insurance Contribution (Application of Part 7 of the Finance Act 2004) Regulations 2007 (SI 2007/785) or any notifiable schemes for the purposes of Schedule 11A to the UK Value Added Tax Act 1994 or Schedule 17F to the UK Finance (No.2) Act 2017.

(t)     The Company has in place (and has had in place at all times since 30 September 2017) such prevention procedures (as defined in Sections 45(3) and 46(4) of the UK Criminal Finances Act 2017 ("CFA 2017")) as are proportionate to its business risk and are in line with any guidance published from time to time pursuant to Section 47 of CFA 2017.

(u)     Since its formation, the Company has not made a U.S. federal tax classification election under U.S. Treas. Reg. § 301.7701-3.

SECTION 3.18     Environmental Matters.  The Company has not violated in any material respect, is not in violation in any material respect of, and does not have any material Liability under, any Environmental Law.  There has been no Release of any Hazardous Substance that requires any Remedial Action under Environmental Law or that could give rise to an Environmental Claim against the Company (i) by the Company, (ii) at, on, in, to or from any real property owned or operated by the Company or (iii) during the period of its ownership or operation thereof, at, on, in, to or from any real property formerly owned or operated by the Company.  The Company is not conducting or funding any Remedial Action either voluntarily or pursuant to any order or the requirements of Environmental Law.  The Company has all permits, licenses, approvals and other authorizations required under any Environmental Law ("Environmental Permits"), except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.  The Company is and has been in material compliance with the Environmental Permits.  There are no pending or, to the Knowledge of the Company, threatened Environmental Claims against the Company.

SECTION 3.19     Material Contracts.

(a)     Section 3.19(a) of the Disclosure Schedule contains a true, complete and accurate list of the following types of Contracts to which the Company is a party or bound, or to which any properties or assets of the Company may be bound by or subject to (such Contracts as are required to be set forth in Section 3.19(a) of the Disclosure Schedule being the "Material Contracts"):

61

(i)      any and all Contracts that involve consideration of more than $100,000, in the aggregate, paid by, or received by, the Company over the remaining term of such Contract;

(ii)     any and all joint venture, partnership arrangements or other Contracts involving a sharing of profits, losses, costs or Liabilities by the Company with any third party;

(iii)    any and all Contracts with Key Employees;

(iv)     any and all Contracts relating to Indebtedness for borrowed money of the Company;

(v)      any and all Contracts that contain obligations of the Company secured by a Lien (other than a Permitted Lien), and interest rate or currency hedging agreements;

(vi)     any and all Contracts (A) with any Governmental Authority or (B) pursuant to which the Company provides products, services or other benefits that are, to the Company's Knowledge, used by any third party in satisfying such third party's obligations under any Contract with any Governmental Authority;

(vii)    any and all Contracts that limit, or purport to limit, the ability of the Company or any of its Affiliates or Employees, or that would limit or purport to limit Purchaser or any of its Affiliates following the Closing, to enter into, engage or compete in any line of business or with any Person or in any geographic area or during any period of time or restrict the ability of the Company or any of its Affiliates to solicit the employment or hiring of any individual;

(viii)   any and all Contracts that result in any Person holding a power of attorney from the Company that relates to the Company or the Business;

(ix)     any and all Company IP Agreements, other than (x) non-exclusive licenses granted to customers in the ordinary course of business and (y) licenses of Off-the-Shelf Software;

(x)      any and all Contracts concerning the use, occupancy, management or operation of, or evidencing any interests in, any Leased Real Property;

(xi)     any and all Contracts with respect to any capital lease, lease or other Contract pursuant to which the Company is a lessor or a lessee of any personal property, or holds or operates any tangible personal property owned by another Person, except for any leases of personal property;

(xii)    any and all Contracts for the acquisition or disposition, directly or indirectly (including by merger, consolidation, combination or amalgamation), of assets or Equity Securities of another Person;

62

(xiii)   any and all Contracts that include a continuing indemnification, warranty, "earn out" or other contingent payment obligation or under which the Company is required to assume any material Liability, other than such Contracts entered into in the ordinary course of business;

(xiv)   any and all Contracts between or among the Company, on the one hand, and any Seller, Optionholder or an Affiliate of the Company, a Seller or an Optionholder, on the other hand;

(xv)   any and all Contracts containing a "most favored nation" provision or that obligate the Company to conduct business on an exclusive or preferential basis with any third party;

(xvi)   any and all Contracts granting rights of first refusal, rights of first offer or similar rights to any Person;

(xvii)   any and all Contracts relating to any capital expenditures;

(xviii) any and all Contracts that are a collectively bargained agreement or similar Contract, including any Contract with any union, works council, personnel delegates or similar labor entity;

(xix)   any and all Contracts involving any resolution or settlement of any actual or threatened Action that imposes continuing obligations on the Company;

(xx)   any and all Contracts under which the Company is, or may become, obligated to incur any severance or termination pay or termination benefits or post-termination payments (in cash or otherwise) that would become payable by reason of the transactions contemplated hereby;

(xxi)   any and all Contracts providing for the employment or consultancy of any Person on a full-time, part-time, consulting or other basis, the performance of which mandates payment of total compensation in excess of $100,000 annually;

(xxii)   any and all Contracts with any customer of the Company;

(xxiii) any and all Contracts with any supplier of the Company with annual spend in the twelve (12)-month period prior to the date of this Agreement in excess of $25,000; and

(xxiv)  all other Contracts, whether or not made in the ordinary course of business, that are material to the Company or the conduct of the Business.

(b)   Each Material Contract (i) is a legal, valid and binding obligation of the Company and, to the Company's Knowledge, the other parties thereto, enforceable by the Company and, to the Company's Knowledge, the other parties thereto in accordance with its terms, and each such Contract is in full force and effect, and (ii) upon consummation of the transactions contemplated by this Agreement, shall continue in full force and effect.  Neither the Company nor,

to the Company's Knowledge, any other party thereto is in material breach or material violation of, or material default under, any Material Contract, and no event has occurred or not occurred through the Company's action or inaction or, to the Company's Knowledge, the action or inaction of any third party, that with notice or lapse of time or both would constitute a material breach or material violation of, or material default under, or result in the termination of, any Material Contract. The Company has not received any claim or notice of default, termination, non-renewal or cancellation under any such Material Contract, nor has any party thereto threatened or indicated its intention to default, terminate, not renew or cancel any such Material Contract. The Company has furnished or made available to Purchaser correct and complete copies of all Material Contracts, including any amendments, waivers or changes thereto.

SECTION 3.20    <u>Insurance</u>.  Each of the Company Insurance Policies is, to the Company's Knowledge, in full force and effect as of the date of this Agreement, and a true, complete and accurate copy of each Company Insurance Policy has been made available to Purchaser by the Company prior to the date of this Agreement. All premiums payable under the Company Insurance Policies prior to the date of this Agreement, have been duly paid to date. No written notice of cancellation or termination has been received with respect to any Company Insurance Policy. There is no anticipated (to the Company's Knowledge) or actual material claim by the Company under any Company Insurance Policy and no material claim made has been denied.

SECTION 3.21    <u>Accounts Receivable</u>.  Except, in each case, as would not reasonably be expected to be material to the Company, taken as a whole, each of the accounts and notes receivable of the Company (a) has arisen from a bona fide sales transaction in the ordinary course of business and is payable on ordinary trade terms, (b) is the legal, valid and binding obligation of the respective debtor, enforceable against such debtor in accordance with its respective terms, (c) is not subject to any set-off or counterclaim and (d) is not the subject of any pending or threatened Actions brought by or on behalf of the Company or any third party. There are no security arrangements or collateral securing the repayment or other satisfaction of receivables of the Company.

SECTION 3.22    <u>Certain Business Practices</u>.

(a)    None of the Company, or any of its Affiliates, agents, directors, managers or Employees, or, to the Company's Knowledge, any other Person acting for or on behalf of any of the foregoing ("<u>Company Persons</u>") (i) is a target of any sanctions, Laws, lists, regulations, embargoes or restrictive measures administered, enacted or enforced by the United States or other government, including the Office of Foreign Assets Control of the U.S. Department of the Treasury, the U.S. Department of State, the United Kingdom, the European Union (and any of its member states) or the United Nations Security Council, or any other relevant authority or sanctions-administering body (collectively, the "<u>Sanctions</u>"); (ii) is located, organized or resident in a country or territory that is the target of any such Sanctions (including Cuba, Iran, North Korea, North Sudan or Syria); or (iii) will use, directly or indirectly, any portion of the Purchase Price or Earnout Payments, if any, or lend, contribute or otherwise make available such proceeds, to any Person or country that is the target of Sanctions, or for the purpose of financing or facilitating the activities of any Person or country that is the target of any Sanctions. The operations of the Company and Company Persons are and have been conducted at all times in material compliance

with applicable trade Laws and anti-money laundering and anti-terrorism financing Laws of all jurisdictions in which they operate, the rules and regulations promulgated thereunder, and any related or similar rules, regulations or guidelines, issued, administered or enforced by any Governmental Authority thereof or therein (collectively, the "Trade, AML and ATL Laws"). None of the Company, or any of its Affiliates, agents, directors, managers or Employees, or, to the Company's Knowledge, any other Person acting for or on behalf of any of the foregoing has (i) engaged in conduct that would reasonably be expected to violate any anti-corruption Laws, including the U.S. Foreign Corrupt Practices Act, the UK Bribery Act, the OECD Convention on Combating Bribery of Foreign Public Officials in International Business Transactions and related implementing legislation, and any other similar Laws against bribery or corruption (the "Anti-Corruption Laws") or (ii) offered, promised, given, or authorized the offer, promise, or giving, or accepted or requested, any compensation, payment or gift or anything of value, directly or indirectly, to or from any Person (whether government-affiliated or not) for the purpose of influencing or inducing any act or decision or inaction in order to obtain, retain or direct business or to secure an improper advantage.

(b)      To the Knowledge of the Company, no Action involving the Company or any Company Person with respect to Sanctions, Anti-Corruption Laws or Trade, AML and ATL Laws is pending or threatened.

SECTION 3.23      Interested Party Transactions.  Except as set forth on Section 3.23 of the Disclosure Schedule, no Seller or Optionholder or, to the Knowledge of the Company, any of their respective Affiliates (other than the Company) or any director, officer, manager, employee, equityholder of any Seller or Optionholder or any of their respective Affiliates, as applicable, (nor any immediate family member of any of such Persons, or any trust, partnership or corporation in which any of such Persons has or has had an interest or is otherwise affiliated with) (each, an "Interested Party"), (a) has or has had, directly or indirectly, any interest in any, or is a, Person which furnished or sold, or furnishes or sells, services, products, technology or Intellectual Property that the Company furnishes or sells, or propose to furnish or sell, (b) has or has had, directly or indirectly, any interest in any, or is a, Person that purchases from or sells or furnishes to the Company, any goods or services, or (c) has or has had, directly or indirectly, any interest in, or is a party to, any Contract to which the Company is a party; provided, however, that ownership of no more than one percent (1%) of the outstanding voting stock of a publicly traded corporation shall not be deemed to be an "interest in any Person" for purposes of this Section 3.23.  Except as set forth on Section 3.23 of the Disclosure Schedule, there are no Contracts with regard to contribution or indemnification between or among any Interested Party and the Company other than as provided to all officers and directors of the Company in the Governing Documents or any other Organizational Documents of the Company.  Each transaction pursuant to which any Interested Party has purchased any service, product, technology or Intellectual Property from, or sold or furnished any service, product, technology or Intellectual Property to, the Company has been on an arm's-length basis on terms no less favorable to the Company than would be available from an unaffiliated party.

SECTION 3.24      Brokers.  No broker, finder, financial advisor or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated hereby or by an Ancillary Document based upon arrangements made by or on behalf of the Company or any Seller or Optionholder.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF SELLERS

Except as set forth on the Disclosure Schedule (with specific reference to the particular Section of this Agreement to which the information in the Disclosure Schedule relates, it being agreed that disclosure of any item in any Section of the Disclosure Schedule shall be deemed disclosed with respect to any other Section of this Agreement to which the applicability of such item is reasonably apparent on the face of such disclosure without investigation or reference to underlying documentation), each Seller (or in the case of Section 4.08, Disruptional) and, solely with respect to Section 4.07, each Optionholder (by the acceptance of its entitlement to receive (i) its Pro Rata Portion of the Purchase Price plus (ii) the right to receive its Pro Rata Portion of any Earnout Payments that become payable to such Optionholder pursuant to Section 2.08), severally and not jointly, hereby represents and warrants to Purchaser as of the date hereof that:

SECTION 4.01    Organization.  Such Seller is a legal entity duly organized, validly existing and in good standing (to the extent applicable in its jurisdiction) under the Laws of the jurisdiction of its organization and has all necessary power and authority to carry on its business as now conducted.

SECTION 4.02    Authority.  Such Seller has all necessary power and authority to execute and deliver this Agreement and each Ancillary Document to which such Seller is a party, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.  The execution and delivery by such Seller of this Agreement and each Ancillary Document to which such Seller is a party, the performance by such Seller of its obligations hereunder and thereunder and the consummation by such Seller of the transactions contemplated hereby and thereby have been duly and validly authorized by all necessary action on the part of such Seller, and no other proceedings on the part of such Seller are necessary to authorize this Agreement or any Ancillary Document to which such Seller is a party or to consummate the transactions contemplated hereby or thereby.  This Agreement and each Ancillary Document to which such Seller is a party has been duly and validly executed and delivered by such Seller and, assuming the due authorization, execution and delivery by the other Parties, constitutes a legal, valid and binding obligation of such Seller, enforceable against such Seller in accordance with its terms, subject to the effect of any applicable bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting creditors' rights generally and subject to the effect of general principles of equity.

SECTION 4.03    Title to the Seller Securities.  Such Seller is the sole legal and beneficial owner of the Seller Securities set forth opposite such Seller's name on Exhibit A, and such Seller has good and marketable title to such Seller Securities, free and clear of any and all Liens.  Such Seller has the sole right to vote or direct the voting, as applicable, of any Seller Securities owned by such Seller, at its discretion, on any matter submitted to a vote of the equityholders of the Company.  There are no voting trusts, voting agreements, proxies, equityholder agreements or other arrangements or understandings relating to any of the Seller Securities owned by such Seller that will not be terminated as of or prior to the Closing.

66

SECTION 4.04    No Claims.  Such Seller and its Affiliates have no claims (and have never asserted any claims) against the Company, any other Seller, any Optionholder (other than claims by Disruptional against Optionholders arising out of or relating to any loan provided by Disruptional to holders of EMI Options in connection with the exercise thereof) or any of their respective Affiliates relating to the Company or the Business.

SECTION 4.05    No Conflict; Required Filings and Consents.

(a)    The execution and delivery of this Agreement by such Seller does not, the execution and delivery of the Ancillary Documents by such Seller will not, and the performance of this Agreement and the Ancillary Documents by such Seller, and the consummation of the transactions contemplated hereby and thereby will not, (i) conflict with or violate any Organizational Documents of such Seller, (ii) assuming all consents, approvals, authorizations and other actions described in Section 4.05(b) have been obtained or taken and all filings and obligations described in Section 4.05(b) have been made or satisfied, conflict with or violate any Law applicable to such Seller or Purchaser or by which any property or asset of such Seller is bound or affected, (iii) violate, conflict with, require consent under, result in any breach of, result in loss of any benefit under, or constitute a default (or an event which, with notice or lapse of time or both, would become a default) under, or give to others any right of termination, amendment, acceleration or cancellation of, or result in the creation of a Lien on any property or asset of such Seller pursuant to, any Contract, permit or other instrument or obligation to which such Seller is a party or by which such Seller or any of its Seller Securities or other properties or assets is bound or affected, or (iv) result in the creation of a Lien on the Seller Securities held by such Seller, except, with respect to clauses (ii) and (iii), for any such conflicts, violations, breaches, defaults or other occurrences which would not, individually or in the aggregate, have a material adverse effect on such Seller's ownership of such Seller Securities or otherwise prevent or materially delay such Seller from consummating the transactions contemplated hereby.

(b)    The execution and delivery of this Agreement by such Seller do not, the execution and delivery of the Ancillary Documents by such Seller will not, and the performance of this Agreement and the Ancillary Documents by such Seller, and the consummation of the transactions contemplated hereby and thereby, will not, require any consent, approval, authorization or permit of, action by, filing with or notification to, any Governmental Authority, except where failure to obtain such consent, approval, authorization or action, or to make such filing or notification, would not, individually or in the aggregate, prevent or materially delay such Seller from consummating the transactions contemplated hereby or by any Ancillary Document, and that would not reasonably be expected to be material to such Seller.

SECTION 4.06    Absence of Litigation.  There is no Action pending or, to such Seller's knowledge, threatened against such Seller, or any property or asset of such Seller that in any manner challenges such Seller's ownership of any of such Seller's Seller Securities or that in any manner challenges or seeks to prevent, enjoin, alter or materially delay such Seller from consummating the transactions contemplated hereby.  Such Seller is not subject to any continuing Governmental Order, settlement agreement or other similar written agreement with, or, to such Seller's knowledge, continuing investigation by, any Governmental Authority that would adversely affect such Seller's ownership of any of such Seller's Seller Securities, or would

67

otherwise prevent, enjoin or alter or materially delay such Seller from consummating the transactions contemplated hereby.

SECTION 4.07   <u>U.S. Investment Representations</u>.   Such Seller, or such Optionholder, as applicable, will acquire its, his or her Purchaser Shares under the terms of this Agreement for its, his or her own account for investment and not with a view to or for sale in connection with any distribution thereof or with any present intention of selling or distributing all or any part thereof (other than to the final beneficial owners of such Seller in connection with the liquidation, dissolution or winding up of such Seller).   Such Seller, or such Optionholder, as applicable, is not a party to any Contract with any other Person to sell or transfer, or to have any other Person sell, on behalf of such Seller, or such Optionholder, as applicable, all or any portion of its, his or her Purchaser Shares.   Such Seller, or such Optionholder, as applicable, acknowledges that the Purchaser Shares have not been and will not be registered under the Securities Act, and may not be offered or sold within the U.S. or to, or for the account or benefit of, U.S. persons except in accordance with Regulation S or pursuant to an exemption from the registration requirements of the Securities Act.   Such Seller, or such Optionholder, as applicable, (a) is an "accredited investor" within the meaning of Rule 501(a) of the Securities Act and/or (b) is sufficiently knowledgeable and experienced in making investments of this type as to be able to evaluate the risks and merits of its, his or her investment in the Purchaser Shares.   Such Seller, or such Optionholder, as applicable, has made such independent investigation of Purchaser, its management and related matters as such Seller, or such Optionholder, as applicable, deems to be necessary or advisable in connection with its acquisition of Purchaser Shares pursuant to this Agreement.

SECTION 4.08   <u>Disruptional Representation</u>.   Disruptional hereby represents and warrants to Purchaser that the assets and properties that Disruptional transferred, assigned, conveyed and delivered to the Company pursuant to the Hive-Down Agreement, constituted all of the Hive-Down Assets, and neither Disruptional nor any of its Affiliates (other than the Company) owns, leases, licenses or otherwise has any rights to any Assets or the Hive-Down Assets.

SECTION 4.09   <u>Brokers</u>.   No broker, finder, financial advisor or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of such Seller.

<strong>ARTICLE V</strong>

<strong>REPRESENTATIONS AND WARRANTIES OF PURCHASER</strong>

Purchaser hereby represents and warrants to the Company and Sellers as of the date hereof that:

SECTION 5.01   <u>Organization</u>.   Purchaser is duly organized, validly existing and in good standing under the Laws of its jurisdiction of organization and has all necessary entity power and authority to carry on its business as now conducted.

68

SECTION 5.02    <u>Authority</u>.  Purchaser has all necessary power and authority to execute and deliver this Agreement and each Ancillary Document to which it is a party, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.  The execution and delivery by Purchaser of this Agreement and each Ancillary Document to which it is a party, the performance by Purchaser of its obligations hereunder and thereunder, and the consummation by Purchaser of the transactions contemplated hereby and thereby have been duly and validly authorized by all necessary corporate action on the part of Purchaser, and no other corporate proceedings on the part of Purchaser are necessary to authorize this Agreement or any Ancillary Document to which Purchaser is a party or to consummate the transactions contemplated hereby or thereby.  This Agreement has been, and each Ancillary Document to which Purchaser is a party will have been, duly and validly executed and delivered by Purchaser, and, assuming the due authorization, execution and delivery by the other Parties, constitute, a legal, valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms, subject to the effect of any applicable bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting creditors' rights generally and subject to the effect of general principles of equity.

SECTION 5.03    <u>No Conflict; Required Filings and Consents</u>.

(a)    The execution and delivery of this Agreement by Purchaser do not, the execution and delivery of the Ancillary Documents by Purchaser will not, and the performance of this Agreement and the Ancillary Documents by Purchaser, and the consummation of the transactions contemplated hereby and thereby, will not, (i) conflict with or violate the Organizational Documents of Purchaser; (ii) assuming all consents, approvals, authorizations and other actions described in <u>Section 5.03(b)</u> have been obtained or taken and all filings and obligations described in <u>Section 5.03(b)</u> have been made or satisfied, conflict with or violate any Law applicable to Purchaser or by which any property or asset of Purchaser is bound or affected; or (iii) violate, conflict with, require consent under, result in any breach of, result in loss of any benefit under, or constitute a default (or an event which, with notice or lapse of time or both, would become a default) under, or give to others any right of termination, amendment, acceleration or cancellation of, or result in the creation of a Lien on any property or asset of Purchaser pursuant to, any Contract, permit or other instrument or obligation to which Purchaser is a party or by which Purchaser or any of its properties or assets is bound or affected, except, with respect to <u>clauses (ii)</u> and <u>(iii)</u>, for any such conflicts, violations, breaches, defaults or other occurrences which would not, individually or in the aggregate, prevent or materially delay Purchaser from consummating the transactions contemplated hereby.

(b)    The execution and delivery of this Agreement by Purchaser do not, the execution and delivery of the Ancillary Documents by Purchaser will not, and the performance of this Agreement and the Ancillary Documents by Purchaser, and the consummation of the transactions contemplated hereby and thereby, will not, require any consent, approval, authorization or permit of, action by, filing with or notification to, any Governmental Authority.

(c)    There are no Actions pending or, to Purchaser's actual knowledge, threatened against or by Purchaser or any Affiliate of Purchaser that would materially impair the ability of Purchaser to consummate the transactions contemplated by this Agreement.

SECTION 5.04    Sufficient Funds.  As and when needed, Purchaser will have available all the funds that are necessary to consummate the transactions contemplated by this Agreement, to pay the Cash Consideration in full and to otherwise perform its obligations hereunder.

SECTION 5.05    SEC Reports and Financial Statements.

(a)    Since January 1, 2021, Purchaser has filed all forms, reports, statements, schedules and other documents required to be filed by it with the SEC (as amended and supplemented from time to time, collectively, the "Purchaser SEC Documents").  As of their respective filing dates, the Purchaser SEC Documents (i) complied in all material respects with the requirements of the Securities Act and the Exchange Act applicable to such Purchaser SEC Documents and (ii) did not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading.

(b)    Each of the consolidated financial statements (including, in each case, any notes thereto) contained in the Purchaser SEC Documents was prepared in accordance with U.S. GAAP applied on a consistent basis throughout the periods indicated (except as may be indicated in the notes thereto or, in the case of unaudited statements, as permitted by Form 10-Q of the SEC) and each fairly presents, in all material respects, the consolidated financial position, results of operations and cash flows of Purchaser and its consolidated Subsidiaries as at the respective dates thereof and for the respective periods indicated therein, except as otherwise noted therein (subject, in the case of unaudited statements, to the absence of notes and normal and recurring year-end adjustments).

(c)    As of the date hereof, Purchaser is eligible to use Form S-3 with respect to the registration of the resale of the Purchaser Shares.

(d)    Purchaser has taken no action intended to, or which to its actual knowledge is likely to have the effect of, terminating the registration of Purchaser's shares of common stock under the Exchange Act nor has Purchaser received any written notification that the SEC is threatening terminating such registration.

(e)    As of the date hereof, Purchaser is in compliance in all material respects with all listing and maintenance requirements for any trading market on which Purchaser's shares of common stock are listed or quoted (including the NASDAQ Capital Markets).

SECTION 5.06    Stock Consideration.  The Purchaser Shares to be issued by Purchaser to Sellers and Optionholders hereunder have been duly authorized, and upon the issuance of such Purchaser Shares pursuant to and in accordance with the terms hereof, will be validly issued, fully paid and non-assessable.

SECTION 5.07    No Material Adverse Effect.  Since January 1, 2021, there has not been any event, circumstance, change or effect that, individually or in the aggregate with all other events, circumstances, changes or effects, is or would reasonably likely be, materially adverse to the business, condition (financial or otherwise), assets, Liabilities, employees, customers or results of operations of Purchaser and its Subsidiaries, taken as a whole.

70

SECTION 5.08     <u>Brokers</u>.  No broker, finder, financial advisor or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of Purchaser.

SECTION 5.09     <u>Purchaser's Investigation and Reliance</u>.     Purchaser is a sophisticated purchaser and has made its own independent investigation, review and analysis regarding the Company and the transactions contemplated hereby, which investigation, review and analysis were conducted by Purchaser together with expert advisors, including legal counsel, that it has engaged for such purpose.  Purchaser and its representatives have been provided with access to certain information about the Company that they have requested in connection with their investigation of the Company and the transactions contemplated hereby.  None of Sellers, the Company or any of their respective Affiliates or representatives has made any representation or warranty, express or implied, as to the accuracy or completeness of any information concerning the Company contained herein or made available in connection with Purchaser's investigation of the Company, except for the representations and warranties expressly set forth in this Agreement, including the Disclosure Schedule, or any Ancillary Document, in each case, on which Purchaser is expressly relying, and Sellers, the Company and their respective Affiliates and representatives expressly disclaim any representations or warranties, other than the representations and warranties expressly set forth in this Agreement, including the Disclosure Schedule, or any Ancillary Document.  Purchaser has not relied and is not relying on any representation or warranty, oral or written, express or implied, made by Sellers, the Company or any their respective Affiliates or representatives, except for the representations and warranties expressly set forth in this Agreement, including the Disclosure Schedule, or any Ancillary Document, in each case, on which Purchaser is expressly relying.  None of Sellers, the Company or any of their respective Affiliates or representatives shall have any liability to Purchaser or any of its Affiliates or representatives resulting from the use of any information, documents or materials made available to Purchaser, whether orally or in writing, in any confidential information memoranda, "data rooms," management presentations, due diligence discussions or in any other form in expectation of the transactions contemplated by this Agreement, unless any such information is expressly included in a representation or warranty set forth in this Agreement, including the Disclosure Schedule, or any Ancillary Document.  None of Sellers, the Company or any of their respective Affiliates or representatives is making, directly or indirectly, any representation or warranty with respect to any estimates, projections or forecasts involving the Company, unless any such information is expressly included in a representation or warranty set forth in this Agreement, including the Disclosure Schedule, or any Ancillary Document.     Purchaser acknowledges that Purchaser shall acquire the Company on an "as is" and "where is" basis, except as otherwise expressly set forth in <u>Article III</u> and <u>Article IV</u>.  Nothing herein shall relieve any Party for any Liability for Fraud.

# ARTICLE VI

# ADDITIONAL AGREEMENTS

SECTION 6.01     <u>Access to Information</u>.

(a)     In order to facilitate the resolution of any claims made against or incurred by Purchaser, or the Company relating to the Company's business, for a period of three (3) years

after the Closing, each Seller shall (i) retain the books and records in such Seller's possession as of the date hereof relating to the Company relating to periods prior to the Closing which shall not otherwise have been delivered to Purchaser or the Company, and (ii) upon reasonable notice, afford the officers, employees, agents and representatives of Purchaser reasonable access (including the right to make, at Purchaser's expense, photocopies), during normal business hours, to such books and records.

(b)     Purchaser acknowledges that the Representative may from time to time until the third (3rd) anniversary of the Closing require access to the books and records (solely to the extent in possession of the Company as of the Closing), and agrees that, until the third (3rd) anniversary of the Closing or, if shorter, for so long as Purchaser controls the Company, upon reasonable prior written notice, it will, and will ensure that the Company will, during normal business hours, provide the Representative and its representatives with either reasonable access to or copies of such books and records for the purpose of complying with any applicable Tax, financial reporting or regulatory requirements; provided, however, that such access shall be at the Representative's sole cost and expense and the Representative and its representatives shall not unreasonably disrupt the personnel and operations of the Company or its Affiliates.  If the Company shall desire to dispose of any such books and records prior to the third (3rd) anniversary of the Closing Date and Purchaser then controls the Company, the Company shall, prior to any such disposition, notify the Representative and provide to the Representative and its representatives a reasonable opportunity, at the Representative's sole cost and expense, to make copies of or remove such books and records.

SECTION 6.02     Confidentiality.

(a)     Effective as of the Closing, the Non-Disclosure Agreement shall terminate and be of no further force and effect.

(b)     Following the Closing, each Seller (including the Representative) and each Optionholder will, and will cause its Affiliates and representatives to (1) hold, in strict confidence, all Confidential Information and (2) not use or disclose to any other Person any Confidential Information; provided, that nothing in this Section 6.02 shall prevent a Seller or Optionholder from (x) disclosing such information to its attorneys and accountants and other professional advisors, who owe a duty of confidentiality to such Seller or such Optionholder or have undertaken in writing not to disclose or use such Confidential Information, to the extent required to enforce such Seller's or such Optionholder's rights under this Agreement or the Ancillary Documents (and such Seller or such Optionholder, as applicable, shall be liable for any disclosure or use of Confidential Information by any such representative) and (y) furnishing such portion (and only such portion) of the Confidential Information as such Seller, such Optionholder or such Affiliate reasonably determines, on the advice of counsel, that it is legally obligated to disclose pursuant to applicable Law (provided, that the requirement to make the disclosure does not arise from a breach by any Seller, any Optionholder or their respective representatives) if:   (i) such Seller or such Optionholder receives a request to disclose all or any part of the Confidential Information under the terms of a subpoena, civil investigative demand or order issued by a Governmental Authority; (ii) to the extent not prohibited by such request or applicable Law, such Seller or such Optionholder as promptly as practicable notifies Purchaser (prior to any disclosure) of the existence, terms and circumstances surrounding such request and consults with Purchaser on the advisability of taking

steps available under applicable Law to resist or narrow such request so that Purchaser may seek, at its sole cost and expense, a protective order or other remedy to limit such disclosure; and (iii) such Seller or such Optionholder exercises its commercially reasonable efforts, and causes its Affiliates to exercise their commercially reasonable efforts to, cooperate with, and provide reasonable assistance to, Purchaser, at Purchaser's sole cost and expense, to obtain a protective order or other remedy; provided that, in the event that a protective order or other remedy is not obtained, such Seller or such Optionholder shall, and shall cause such Affiliate to, exercise its commercially reasonable efforts to obtain other reliable assurance that confidential treatment will be accorded to the disclosed Confidential Information.  For purposes of this Section 6.02, "Confidential Information" consists of all information and data relating to the Company, this Agreement or the transactions contemplated hereby, including any information or data provided pursuant to Section 6.01(b) (other than data or information that is or becomes generally available to the public other than as a result of a breach of this Section 6.02).

       SECTION 6.03   Public Announcements.  Each Seller and each Optionholder shall not, and shall cause its respective Affiliates not to, issue any press release or make any public statement with respect to this Agreement or the transactions contemplated hereby prior to obtaining the written approval of Purchaser, which approval shall not be unreasonably withheld, except that no such approval shall be necessary to the extent such release or statement may be required by applicable Law, court process or by obligations pursuant to any listing agreement with any national securities exchange or national securities quotation system, in which case the party required to make the release or announcement shall provide Purchaser prompt prior written notice of such requirement and use its reasonable best efforts to allow Purchaser reasonable time to comment on such release or announcement in advance of such issuance.

       SECTION 6.04   Related Party Accounts and Agreements.  Effective as of the Closing, except as set forth on Section 6.04 of the Disclosure Schedule, all accounts between any Interested Party, on the one hand, and the Company or any of its Employees, on the other hand, shall be settled and paid in full (regardless of the terms of payment of such accounts), and Sellers and the Company shall cause all Contracts between any Interested Party, on the one hand, and the Company, on the other hand, to be terminated, in each case without further Liability of any party thereunder.

       SECTION 6.05   Release and Waiver.

       (a)   As of the Closing, each Seller, on behalf of itself and each of its Affiliates and its and their respective equityholders, hereby irrevocably, unconditionally and completely releases and forever discharges Purchaser, the Company and their respective Affiliates and representatives (separately and collectively, as the case may be, the "Purchaser Releasees") from, and hereby irrevocably, unconditionally and completely waives and relinquishes, any Liabilities of the Purchaser Releasees, and any and all Actions, losses, causes of action of whatever kind, known or unknown, that it may have had in the past, may now have or may have in the future against the Purchaser Releasees, for, upon or by reason of any matter, cause or thing whatsoever that occurred at or prior to the Closing, including any obligations or claims arising under the Governing Documents, except for (i) rights or claims of such Seller under or specifically related to any breach of the terms of this Agreement and any Ancillary Document to which such Seller is a party or (ii) Fraud.

73

(b)      Each Seller, on behalf of itself and each of its Affiliates and its and their respective equityholders, as the case may be, hereby acknowledges that it has considered the possibility that it may not now know the nature or value of the claims that are generally released pursuant to this Section 6.05 and that such general release extends to all claims of every nature and kind, known or unknown, suspected or unsuspected, past or present, however arising, and that any and all rights granted to such Seller pursuant to Section 1542 of the California Civil Code or any analogous applicable Law are hereby expressly waived.  Said Section 1542 of the Civil Code of the State of California reads as follows:

"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."

(c)      As of the Closing, each Seller, the Company and Purchaser hereby irrevocably, unconditionally and completely releases and forever discharges each director of the Company in his or her capacity as such (in such capacity, the "Seller Releasees") from, and hereby irrevocably, unconditionally and completely waives and relinquishes, any Liabilities of the Seller Releasees, and any and all Actions, losses, causes of action of whatever kind, known or unknown, that it may have had in the past, may now have or may have in the future against the Seller Releasees, for, upon or by reason of any matter, cause or thing whatsoever that occurred at or prior to the Closing, including any obligations or claims arising under the Governing Documents, except for (i) rights or claims of such Seller, the Company or Purchaser under or specifically related to any breach of the terms of this Agreement or any Ancillary Documents or (ii) Fraud.

SECTION 6.06      Representative.

(a)      Sellers and each Optionholder (by the acceptance of its entitlement to receive (i) its Pro Rata Portion of the Purchase Price plus (ii) the right to receive its Pro Rata Portion of any Earnout Payments that become payable to such Optionholder pursuant to Section 2.08) hereby appoint, authorize and empower Disruptional (the "Representative") to act for the benefit of Sellers and such Persons, as applicable, as the exclusive agent and attorney-in-fact to act on behalf of each Seller and each such Person, in connection with and to facilitate the consummation of the transactions contemplated hereby, which shall include the power and authority:

(i)      to execute and deliver such waivers and consents in connection with, and amendments to, this Agreement as the Representative, in its sole discretion, determines to be desirable;

(ii)      to enforce and protect the rights and interests of Sellers and each such Person arising out of or under or in any manner relating to this Agreement and each other agreement, document, instrument or certificate referred to herein or therein or the transactions provided for herein or therein (including in connection with any and all claims for indemnification brought under Article VIII), and to take any and all actions that the Representative believes are necessary or appropriate under this Agreement for and on behalf of Sellers and each such Person;

74

(iii) to refrain from enforcing any right of any Seller or any such Person arising out of or under or in any manner relating to this Agreement; and

(iv) to make, execute, acknowledge and deliver all such other agreements, guarantees, orders, receipts, endorsements, notices, requests, instructions, certificates, stock powers, letters and other writings, and, in general, to do any and all things and to take any and all actions that the Representative, in its sole discretion, deems desirable in connection with or to carry out the transactions contemplated by this Agreement.

(b) Each Seller and each Optionholder (by the acceptance of its entitlement to receive (i) its Pro Rata Portion of the Purchase Price plus (ii) the right to receive its Pro Rata Portion of any Earnout Payments that become payable to such Optionholder pursuant to Section 2.08) hereby agrees to receive correspondence from the Representative, including in electronic form.

(c) Purchaser shall have the right to rely upon all actions taken or omitted to be taken by the Representative pursuant to this Agreement, all of which actions or omissions shall be legally binding upon Sellers and each Optionholder.

(d) The grant of authority provided for herein (i) is coupled with an interest and shall be irrevocable and survive the death, incompetency, bankruptcy or liquidation of any Seller or any Optionholder (by the acceptance of its entitlement to receive (i) its Pro Rata Portion of the Purchase Price plus (ii) the right to receive its Pro Rata Portion of any Earnout Payments that become payable to such Optionholder pursuant to Section 2.08) and (ii) shall survive the consummation of the transactions contemplated hereunder.

SECTION 6.07 Purchaser Shares; Resale Registration Statement.

(a) Purchaser Shares. The Purchaser Shares to be issued pursuant to the terms of this Agreement will be issued in a transaction exempt from registration under the Securities Act (by reason of Section 4(a)(2) of the Securities Act and Rule 506 of Regulation D promulgated by the SEC under the Securities Act and/or Regulation S promulgated under the Securities Act) and therefore may not be re-offered or resold other than in conformity with the registration requirements of the Securities Act and such other applicable rules and regulations or pursuant to an exemption therefrom. All recipients of such Purchaser Shares either shall be "accredited investors" or not "U.S. Persons" as such terms are defined in Regulation D and Regulation S, respectively. The Purchaser Shares to be issued pursuant to the terms of this Agreement will be "restricted securities" within the meaning of Rule 144 under the Securities Act and may not be offered, sold, pledged, assigned or otherwise transferred unless (i) a registration statement with respect thereto is effective under the Securities Act and any applicable state securities Laws or (ii) (A) an exemption from such registration exists and (B) either (1) Purchaser receives an opinion of counsel to the holder of such securities, which counsel and opinion are reasonably satisfactory to Purchaser, that such securities may be offered, sold, pledged, assigned or transferred in the manner contemplated without an effective registration statement under the Securities Act or applicable state securities Laws or (2) the holder complies with the requirements of Regulation S, if

75

applicable. Purchaser Shares issued pursuant to the terms of this Agreement will bear an appropriate legend and restriction on the books of Purchaser's transfer agent to that effect.

(b)     <u>Resale Registration Statement</u>. Within five (5) Business Days following the Closing Date, Purchaser shall file with the SEC a prospectus supplement to Purchaser's existing automatic shelf registration statement on Form S-3ASR (File No. 333-255105) (including any amendments or supplements, the "<u>Registration Statement</u>"), and the prospectus (including any amendments or supplements, the "<u>Prospectus</u>") forming part of the Registration Statement in compliance with Rule 415 under the Securities Act covering the resale on a continuous basis of all of the Registrable Securities. Purchaser shall use commercially reasonable efforts to maintain the effectiveness of such Registration Statement (or a replacement registration statement, if applicable) until such time as there are no Registrable Securities. As a condition to its obligations under this <u>Section 6.07(b)</u>, Purchaser may require each Holder of Registrable Securities (as hereinafter defined) as to which any registration is being effected to (i) furnish Purchaser with such information regarding such Person that is necessary to satisfy the disclosure requirements relating to the registration and the distribution of such securities under the Securities Act and the rules and regulations promulgated thereunder as Purchaser may from time to time reasonably request in writing and (ii) promptly notify Purchaser in writing of any changes in the information set forth in the applicable Registration Statement or Prospectus after it is prepared regarding the Holder of Registrable Securities. Each Seller and each Optionholder hereby agrees that none of the information supplied (or to be supplied) by or on behalf of any Holder of Registrable Securities for inclusion or incorporation by reference in the applicable Registration Statement or Prospectus will, at the time the Registration Statement is declared effective under the Securities Act (or with respect to any post-effective amendments or supplements thereto, at the time such post-effective amendments or supplements become effective under the Securities Act), contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements made therein, in light of the circumstances under which they are made, not misleading. For the purposes of this <u>Section 6.07</u>, a "Holder of Registrable Securities" refers solely to a holder of Registrable Securities as of or following the Closing Date.

(c)     <u>Blackout Periods</u>. Purchaser may, by prior written notice to the Representative, (a) delay the filing of the Registration Statement or a request for acceleration of the effective date or (b) suspend the Registration Statement after effectiveness and require that Sellers and Optionholders immediately cease sales of shares pursuant to any Registration Statement in each case for a period of not more than thirty (30) days in the event that (i) Purchaser is engaged in any activity or transaction or preparations or negotiations for any activity or transaction that Purchaser desires to keep confidential for business reasons, if Purchaser determines in good faith that the public disclosure requirements imposed on Purchaser under the Securities Act in connection with such Registration Statement would require at that time disclosure of such activity, transaction, preparations or negotiations and such disclosure could result in imminent and material harm to Purchaser or (ii) any other event occurs that makes any statement of a material fact made in such Registration Statement, including any document incorporated by reference therein, untrue or that requires the making of any additions or changes in such Registration Statement in order to make the statements therein not misleading, and, in each case, if a similar blackout period is imposed by Purchaser on all other registration statements Purchaser has on file with the SEC; <u>provided</u>, <u>however</u>, that Purchaser may not invoke this right more than twice in any twelve (12)-month period. If Purchaser suspends the Registration Statement and

requires the Holders of Registrable Securities to cease sales of shares pursuant to this Section 6.07, Purchaser shall, as promptly as reasonably practicable take such actions as may be reasonably necessary to file or reinstate the effectiveness of such Registration Statement and give written notice to all Holders of Registrable Securities authorizing them to resume sales pursuant to such Registration Statement. If as a result thereof the Prospectus included in any Registration Statement has been amended to comply with the requirements of the Securities Act, Purchaser shall enclose such revised Prospectus with the notice to the Holders of Registrable Securities given pursuant to this Section 6.07, and the Holders of Registrable Securities shall make no offers or sales of shares pursuant to such Registration Statement other than by means of such revised Prospectus. Purchaser need not specify the nature of the event giving rise to any delay or suspension in any notice to Holders of Registrable Securities. For the avoidance of doubt, the restrictions in this paragraph shall be in addition to any normal quarterly blackouts that may apply to directors, officers and employees of Purchaser following the Closing Date pursuant to Purchaser's insider trading policies.

(d)      Expenses.    All expenses incident to Purchaser's performance of, or compliance with, its obligations in connection with the registration of Registrable Securities under this Section 6.07 shall be borne by Purchaser, including the fees and expenses of counsel, accountants, agent or experts retained by Purchaser or its Affiliates in connection with the filing and effectiveness of the registration. Purchaser shall not be responsible for the fees and expenses of any counsel, accountants, agents or experts retained by any Holder of Registrable Securities in connection with the sale of Registrable Securities. Holders of Registrable Securities shall also bear and pay the discounts, brokerage fees and underwriting fees, if any, applicable to securities offered for its account in connection with any registrations, filings and qualifications made pursuant to this Agreement.

SECTION 6.08    Directors' Indemnification.

(a)      Subject to any limitations imposed by applicable Law, Purchaser agrees that (i) all rights to indemnification or exculpation existing as of the date hereof in favor of the directors of the Company, to the extent provided in the Company's Organizational Documents, shall survive the Closing and shall continue in full force and effect for a period of six (6) years following the Closing Date, and (ii) until the sixth (6th) anniversary of the Closing Date, the Company will perform and discharge the obligations to provide such indemnity and exculpation after the Closing pursuant to the Company's Organizational Documents in effect on the date hereof, with respect to claims arising out of acts or omissions occurring at or prior to the Closing, in his or her capacity as a director of the Company, that are asserted after the Closing; provided, however, that all rights to indemnification and exculpation in respect of any Action arising out of or relating to matters existing or occurring at or prior to the Closing Date and asserted or made within such six (6)-year period shall continue until the final disposition of such Action. From and after the Closing until the sixth (6th) anniversary of the Closing Date, Purchaser shall not, and shall cause each of its Subsidiaries and Affiliates (including the Company) not to, amend, repeal or otherwise modify the indemnification provisions of the Company's Organizational Documents as in effect at the Closing in any manner that would adversely affect the rights thereunder of individuals who at the Closing were directors of the Company. The foregoing covenants under this Section 6.08(a) shall not apply to any claim for which a Purchaser Indemnified Party would be entitled to recovery in connection with a claim for indemnification made by such Purchaser Indemnified Party under Article VIII.

Case 1:23-cv-02245-RA   Document 1-2   Filed 03/15/23   Page 101 of 185

(b)     Disruptional shall maintain or procure at least six (6)-years of "tail insurance" coverage under its existing insurance policy with CFC Underwriting Limited for the Company's directors or under a comparable policy in a form reasonably acceptable to Purchaser which has at least the same coverage and amounts containing terms and conditions that are at least as favorable as such policy in effect as of the date hereof with respect to claims arising out of actions and omissions occurring prior to the Closing Date.  At each scheduled renewal of such policy prior to the date that is six (6) years following the Closing Date, Disruptional will use commercially reasonable efforts to extend such coverage for at least the duration of such six (6) year period, and if the CFC Underwriting Limited policy is terminated by Disruptional, Disruptional will use commercially reasonable efforts to obtain a "tail insurance policy" that extends such coverage for at least the remainder of such six (6) year period.  The fees, costs and expenses incurred in connection with such "tail insurance policy" or extension of coverage regarding the Company only, in each case, for such six (6) year period only, shall be borne fifty percent (50%) by Disruptional, on the one hand, and fifty percent (50%) by Purchaser; provided that Purchaser shall not be liable for any fees, costs and expenses incurred in connection with such "tail insurance policy" or extension of coverage in excess of $75,000.  Following the Closing, Disruptional shall (x) provide such cooperation and assistance as may reasonably be requested by the Company with respect to any claims that the Company desires to make under such "tail insurance policy" or extension of coverage and, (y) as promptly as practicable following receipt thereof, remit to the Company any proceeds received by Disruptional from the insurer under such "tail insurance policy" or extension of coverage after the Closing with respect to any claims made by the Company thereunder.

(c)     Purchaser covenants, for itself and its Affiliates, successors and assigns, that it and they shall not institute any Action in any court or before any administrative agency or before any other tribunal against any of the current directors of the Company, in their capacity as such, with respect to any liabilities, actions or causes of action, judgments, claims or demands of any nature or description (consequential, compensatory, punitive or otherwise), in each such case to the extent resulting from their approval of this Agreement or the transactions contemplated hereby.

(d)     In the event that Purchaser, the Company or any of their respective successors or assigns (i) consolidates with or merges into any other Person and shall not be the continuing or surviving corporation or entity in such consolidation or merger or (ii) transfers all or substantially all of its properties and assets to any Person, then and in either such case, Purchaser shall make proper provision so that the successors and assigns of Purchaser or the Company, as the case may be, shall assume the obligations set forth in this <u>Section 6.08</u>.

(e)     The provisions of this <u>Section 6.08</u> shall survive the consummation of the Closing and continue for the periods specified herein.  This <u>Section 6.08</u> is intended to benefit the directors of the Company referenced in this <u>Section 6.08</u> or indemnified hereunder, each of whom may enforce the provisions of this <u>Section 6.08</u> (whether or not parties to this Agreement).  Each of the Persons referenced in the immediately preceding sentence are intended to be third party beneficiaries of this <u>Section 6.08</u>.

SECTION 6.09     <u>Non-Solicitation</u>.  For a period of five (5) years from and after the date hereof, each Seller and each Optionholder shall not, and shall cause its Affiliates not to, directly or indirectly, (i) hire or engage or solicit for employment or engagement any employee

of the Company or (ii) induce or encourage any such employee to leave the employ or engagement of the Company; provided, however, that nothing contained in this Section 6.09 shall prohibit any Seller or Optionholder or its Affiliates from (i) soliciting any such employees through general solicitations or advertisements so long as such solicitations and advertisements are not specifically directed at employees or service providers of the Company and no such employee is hired or engaged as a result thereof and (ii) soliciting or hiring any employee that has been terminated without cause by Purchaser prior to the date of such solicitation or hiring.

## ARTICLE VII

## TAX MATTERS

SECTION 7.01    Contests.

(a)    After the Closing, Purchaser shall promptly notify the Representative in writing of any written proposed assessment received by Purchaser or the Company or the commencement of any Tax audit or administrative or judicial proceeding or of any demand or claim that could reasonably be expected to be grounds for indemnification under Section 8.02 if determined adversely to the taxpayer or after the lapse of time.  Such notice shall contain factual information (to the extent known to Purchaser) describing the claim in reasonable detail and shall include copies of any notice or other document received from any taxing authority in respect of any such claim; provided that the failure to so notify (or to timely notify) the Representative of the assessment or claim shall not affect the Purchaser Indemnified Party's right to indemnification under Section 8.02, unless (and then solely to the extent) Sellers are actually and materially prejudiced by such failure.

(b)    In the case of any Tax audit, demand, claim or administrative or judicial proceeding that relates to the Taxes of the Company (a "Contest") for any Pre-Closing Tax Period, the Representative shall have the sole right, at Sellers' expense, to control the conduct of such Contest; provided, that (i) the Representative shall defend diligently the interests of the Company in connection with such Contest, (ii) the Representative shall acknowledge in writing the relevant Sellers' indemnification obligations under Section 8.02 with respect to the full amount of any Losses that may arise as a result of the Contest before the Representative may control such Contest, (iii) the Representative shall elect to control such Contest within the time period set forth in Section 7.01(d), (iv) Purchaser shall promptly take all action reasonably necessary (including providing a power of attorney) to enable Sellers to exercise their control rights as set forth in this Section 7.01(b), (v) Purchaser shall be entitled to participate (at its own expense) in such Contest, (vi) the Representative shall consult with Purchaser and offer Purchaser an opportunity to comment before submitting any written materials prepared or furnished in connection with such Contest, (vii) the Representative shall provide Purchaser with a timely and reasonably detailed account of each phase of such Contest and (viii) the Representative shall not settle such Contest without Purchaser's prior written consent (which consent shall not be unreasonably withheld, delayed or conditioned) if such settlement could increase the Taxes of Purchaser or any of its Affiliates (including the Company) in a Post-Closing Tax Period or a Post-Closing Straddle Period.

(c)    Purchaser shall have the right to control any Contest in respect of Taxes of the Company that relates to any Straddle Period or any Post-Closing Tax Period; provided that,

with respect to a Straddle Period, (i) Purchaser shall provide the Representative with a timely and reasonably detailed account of each phase of such Contest, (ii) Purchaser shall consult with the Representative before taking any significant action in connection with such Contest, (iii) Purchaser shall consult with the Representative and offer the Representative an opportunity to comment before submitting any written materials prepared or furnished in connection with such Contest, (iv) the Representative shall be entitled to participate (at its own expense) in such Contest and (v) Purchaser shall not settle such Contest without the Representative's prior written consent (which shall not be unreasonably withheld, delayed or conditioned).

(d)     If the Representative elects to direct a Contest described in Section 7.01(b), the Representative shall, within twenty (20) days of receipt of the notice described in Section 7.01(a), notify Purchaser of its intent to do so; provided, however, that, if either applicable Law or the applicable Governmental Authority requires the Company to respond (either orally or in writing) within such twenty (20) day period, Purchaser shall (i) notify the Representative of the obligation to respond as promptly as possible and (ii) if the Representative does not elect to control the claim prior to the time that the response is due, cause the Company to timely respond to the Governmental Authority; provided, further, that prior to responding to the applicable Governmental Authority, Purchaser shall consult with the Representative and offer Sellers a reasonable opportunity to comment on the proposed response.

(e)     Notwithstanding anything in this Agreement to the contrary, Purchaser shall have the exclusive right to control any Contest described in Section 7.01(b) if:  (i) the Representative fails to (A) acknowledge the indemnification obligations of the relevant Sellers under Section 8.02 with respect to the full amount of any Losses that may arise as a result of the Contest within twenty (20) days of receipt of the notice described in Section 7.01(a), (B) defend diligently the interests of the Company in connection with such Contest or (C) elect to control the applicable Contest within the time period set forth in Section 7.01(d); or (ii) Purchaser notifies the Representative in writing that Purchaser is waiving its right to indemnification pursuant to Section 8.02 with respect to Taxes imposed as a result of the resolution of such Contest.

(f)     Notwithstanding anything to the contrary in this Agreement, this Section 7.01 shall control with respect to any Contest.

SECTION 7.02     Preparation of Tax Returns.

(a)     The Representative shall prepare, at Sellers' sole expense, all Tax Returns that are required to be filed, by or on behalf of, the Company in respect of any Pre-Closing Tax Period; provided that:  (i) such Tax Returns shall be prepared on a basis consistent with those prepared for prior taxable periods, unless a different treatment of any item is required by applicable Tax Law, (ii) the Representative shall provide a complete copy of such Tax Returns to Purchaser for its review at least ten (10) days prior to the due date for filing of such Tax Returns (taking into account extensions validly obtained), (iii) the Representative shall incorporate any reasonable comments provided by Purchaser to any such Tax Return at least five (5) days prior to the due date for filing of such Tax Returns (taking into account extensions validly obtained) and (iv) Purchaser shall timely file (or cause the Company to timely file) any such Tax Returns.  Sellers shall promptly pay to Purchaser all Taxes shown as due and payable on any Tax Return prepared by the Representative pursuant to this Section 7.02(a) (other than the portion of the Taxes shown as due

80

and payable on such Tax Return to the extent that such Taxes were taken into account in the final calculation of Indebtedness or which are excluded from indemnification under Section 8.04(j)) at least five (5) days prior to the due date of each such Tax Return (taking into account extensions validly obtained).

(b)     Purchaser shall prepare and file (or cause the Company to prepare and file), at Purchaser's sole expense, all Tax Returns that relate to the Company for any Straddle Period; provided that (i) such Tax Returns shall be prepared on a basis consistent with those prepared for prior taxable periods, unless a different treatment of any item is required by Law, (ii) with respect to any such Tax Return that is a corporation Tax Return, Purchaser shall: (A) provide the Representative with a copy of each completed Tax Return at least ten (10) days prior to the due date (taking into account extensions validly obtained) for filing of such Tax Returns and (B) not file any such Tax Returns without first obtaining the prior written consent of the Representative (not to be unreasonably withheld, conditioned or delayed), (iii) Purchaser shall make (and shall cause the Company to make) any election available under applicable Law to treat the Closing Date as the end of a relevant taxable period and (iv) Purchaser shall timely file (or cause the Company to timely file) any such Tax Returns.  Sellers shall pay to Purchaser the portion of the Taxes shown as due on such Tax Return that are allocable to the Pre-Closing Straddle Period (other than the portion of the Taxes shown as due and payable on such Tax Return to the extent that such Taxes were taken into account in the final calculation of Indebtedness or which are excluded from indemnification under Section 8.04(j)) no fewer than five (5) days before the date that such Taxes are due to the applicable Governmental Authority (taking into account extensions validly obtained).

SECTION 7.03     Tax Cooperation and Exchange of Information.  Purchaser and Sellers shall provide each other with such cooperation and information as either of them reasonably may request of the other Person (and Purchaser shall cause the Company to provide such cooperation and information) in filing any Tax Return, amended Tax Return, determining a liability for Taxes or participating in or conducting any Contest.  Such cooperation and information shall include providing copies of relevant Tax Returns or portions thereof, together with related work papers and documents relating to rulings or other determinations by taxing authorities.  Purchaser and Sellers shall make themselves (and their respective employees) reasonably available on a mutually convenient basis to provide explanations of any documents or information provided under this Section 7.03.  Notwithstanding anything to the contrary in Section 6.01, each of Purchaser and Sellers shall retain all Tax Returns, work papers and all material records or other documents in such Person's possession relating to Tax matters of the Company for any Pre-Closing Tax Periods and Pre-Closing Straddle Periods until the later of (a) the expiration of the statute of limitations of the taxable periods to which such Tax Returns and other documents relate, without regard to extensions or (b) six (6) years following the due date (without extension) for such Tax Returns.  After such time, before either Sellers or Purchaser disposes of any such documents in its possession, the other Person shall be given an opportunity, after ninety (90) days' prior written notice, to remove and retain all or any part of such documents as such other Parties may select (at such selecting Party's expense).  Any information obtained under this Section 7.03 shall be kept confidential, except as may be otherwise necessary in connection with the filing of Tax Returns or in conducting a Contest.  Purchaser shall not be required to provide Sellers with (a) any Tax Return of Purchaser or any of its Affiliates (other than the Company) or (b) any Tax Return of a Tax Group of which Purchaser is a member

pursuant to this <u>Section 7.03</u>. Without prejudice to the generality of the foregoing, Sellers shall inform Purchaser as soon as reasonably practicable if any event occurs in connection with or otherwise in relation to the provision of a loan (or similar arrangement) to an EMI Optionholder in order to facilitate the exercise of the EMI Options where that event gives rise to a liability for Taxes or a tax compliance (or similar) obligation on Purchaser.

SECTION 7.04    <u>Conveyance Taxes</u>.  Any Conveyance Taxes imposed upon, or payable or collectible or incurred in respect of, the execution of this Agreement or the transfer of the Seller Shares to Purchaser shall be borne fifty percent (50%) by Sellers and fifty percent (50%) by Purchaser.

SECTION 7.05    <u>Tax Refunds</u>.  Any Tax refund (including any interest paid or credited by a Governmental Authority with respect thereto) relating to Excluded Taxes shall be the property of Sellers (except to the extent that such refund or credit (x) was reflected as an asset in the final calculation of Net Working Capital or (y) arises as a result of a carryback of a loss or other tax attribute arising in a Post-Closing Tax Period or Post-Closing Straddle Period) and, if received by Purchaser or any of its Affiliates, the amount of such refund (less any reasonable expenses and Taxes incurred by Purchaser or any of its Affiliates (including the Company) in receiving such refund or credit) shall be paid over promptly to Sellers.  If any such refund is subsequently reduced, disallowed or otherwise required to be returned to a Governmental Authority, any Taxes imposed on Purchaser or any of its Affiliates (including the Company) as a result of the reduction or disallowance of such refund shall be treated as an Excluded Tax for which Sellers shall be responsible under <u>Section 8.02</u>.  Any other Tax refund or credit (including any interest paid or credited with respect thereto) shall be the property of Purchaser, and if received by Sellers or any of their respective Affiliates, shall be paid over promptly to Purchaser (less any reasonable expenses and Taxes incurred by Sellers or any of their Affiliates in receiving such refund or credit).

SECTION 7.06    <u>Straddle Period</u>.  For purposes of this Agreement, in the case of Taxes that are payable with respect to a Straddle Period, the portion of any such Tax that is allocable to the Pre-Closing Straddle Period shall be:

(a)    in the case of Taxes that are either (A) based upon or related to income or receipts or (B) imposed in connection with any sale or other transfer or assignment of property (real or personal, tangible or intangible) (other than Conveyance Taxes provided for in <u>Section 7.04</u>), deemed equal to the amount which would be payable (after giving effect to amounts which may be deducted from or offset against such Taxes) if the taxable period ended on the Closing Date; <u>provided</u>, that all deductions arising from the payment of Transaction Expenses shall be allocated exclusively to the Pre-Closing Straddle Period to the extent permitted by applicable Law; and

(b)    in the case of Taxes imposed on a periodic basis with respect to the assets of the Company, or otherwise measured by the level of any item, deemed to be the amount of such Taxes for the entire Straddle Period (after giving effect to amounts which may be deducted from or offset against such Taxes) (or, in the case of such Taxes determined on an arrears basis, the amount of such Taxes for the immediately preceding taxable period) <u>multiplied by</u> a fraction, (A)

the numerator of which is the number of days in the Pre-Closing Straddle Period and (B) the denominator of which is the number of days in the entire Straddle Period.

SECTION 7.07  <u>Tax Sharing Agreements</u>.  The Company shall cause all Tax allocation agreements, Tax sharing agreements or Tax indemnity agreements (other than a contractual agreement entered into the ordinary course of business the principal subject matter of which is not Taxes) to which the Company is a party to be terminated in their entirety upon the Closing, in each case, by the parties thereto, whereupon each such Tax allocation agreement, Tax sharing agreement or Tax indemnity agreement shall be deemed voided, cancelled and discharged in its entirety without further liability of any of the parties thereto.

SECTION 7.08  <u>Tax Disputes</u>.  Purchaser and Sellers shall cooperate in good faith to resolve any dispute arising under this <u>Article VII</u>; <u>provided</u>, that if Purchaser and Sellers are unable to resolve such dispute, Purchaser and Sellers shall submit such dispute to the Neutral Accountant for resolution, which resolution shall be final, conclusive and binding on Purchaser and Sellers absent fraud, intentional misconduct or manifest error; <u>provided</u>, that, with respect to any dispute involving a Tax Return prepared pursuant <u>Section 7.02</u>, if any dispute is not resolved prior to the due date of such Tax Return, such Tax Return shall be filed in the manner that Purchaser deems correct without prejudice to the resolution of such dispute; <u>provided</u>, <u>further</u> that an amended Tax Return shall be filed (and additional Taxes paid) if necessary to give effect to the decision of the Neutral Accountant.  The fees and expenses of the Neutral Accountant shall be paid equally by Purchaser and Sellers.

SECTION 7.09  <u>Miscellaneous</u>.

(a)  For applicable Tax purposes, Purchaser and Sellers agree to treat all payments made under <u>Section 2.07</u>, <u>Section 2.08</u> and <u>Article VIII</u> as adjustments to the Purchase Price or as capital contributions, as applicable, except as otherwise required by applicable Law.

(b)  The Parties agree that following the Closing, Purchaser shall make (or cause to be made) an election under Section 338(g) of the Code with respect to the Company.

(c)  From and after Closing, Purchaser shall indemnify (on an after-Tax basis) and hold harmless Sellers and their Affiliates from and against any and all Tax liability (not including any Excluded Taxes) to the extent resulting from a failure of the Company to satisfy in full any Tax liability (other than any Excluded Taxes) of the Company arising from and after Closing which is then assessed on Sellers or any of their Affiliates (together with all interest, penalties and reasonable costs and expenses properly incurred by Sellers or their Affiliates in connection therewith).

<h3 style="text-align:center">ARTICLE VIII</h3>

<h3 style="text-align:center">INDEMNIFICATION</h3>

SECTION 8.01  <u>Survival of Representations, Warranties, Covenants and Agreements</u>.  The representations and warranties of the Company and each Seller contained in this Agreement shall survive the Closing until the date that is the twelve (12)-month anniversary of the Closing Date (the "<u>Holdback Release Date</u>"); <u>provided</u>, <u>however</u>, that the Company

Fundamental Representations, the Seller Fundamental Representations, the representations and warranties of the Company contained in <u>Section 3.15(b)</u> and <u>3.17</u> and the representations and warranties of Disruptional contained in <u>Section 4.08</u> shall each survive the Closing until sixty (60) days following the expiration of the applicable statute of limitations period. The representations and warranties of Purchaser contained in this Agreement shall not survive the Closing and shall expire, and no claim shall be made in respect thereof, as of and following the Closing; <u>provided</u>, <u>however</u>, that the Purchaser Fundamental Representations shall each survive the Closing until sixty (60) days following the expiration of the applicable statute of limitations period. The covenants and agreements of the Company, each Seller, each Optionholder and Purchaser contained in this Agreement shall survive the Closing, and claims may be brought in respect of a breach thereof, until sixty (60) days following the expiration of the term of the applicable statute of limitations. Notwithstanding the foregoing, neither Sellers, Optionholders nor Purchaser shall have any liability with respect to any representations, warranties, covenants or agreements, as applicable, set forth herein (including any indemnification obligation with respect to Excluded Taxes) unless notice of an actual or threatened claim, or of discovery of any facts or circumstances that Sellers, Optionholders or Purchaser, as the case may be, reasonably and in good faith believes may result in a claim hereunder is given to the Representative (in the case of any claim by Purchaser) or Purchaser (in the case of any claim by a Seller) in writing prior to the expiration of the applicable survival period for such representation, warranty, covenant or agreement set forth in this <u>Section 8.01</u>, in which case such representation, warranty, covenant or agreement shall survive as to such claim until such claim has been finally resolved.

SECTION 8.02    <u>Indemnification by Sellers</u>.

(a)    From and after the Closing, each Seller shall (on a several and not joint basis based on its Pro Rata Indemnification Portion) indemnify and hold harmless Purchaser, its Affiliates (including the Company) and its and their respective officers, managers, directors, employees, agents, successors and assigns (each, a "<u>Purchaser Indemnified Party</u>") for, from and against any and all losses, damages, claims, costs and expenses, assessments, Taxes, interest, awards, judgments, penalties and other Liabilities (including reasonable attorneys' and consultants' fees and expenses) (hereinafter, a "<u>Loss</u>") to the extent suffered or incurred by any such Purchaser Indemnified Party and arising out of, relating to or resulting from: (i) the breach of (A) any representation or warranty made by the Company contained in this Agreement (other than (1) the representations and warranties contained in <u>Section 3.17</u> (which shall be indemnifiable under <u>Section 8.02(a)(iv)</u>) and (2) the Company Fundamental Representations); or (B) any Company Fundamental Representation; (ii) the breach of any covenant or agreement by the Company contained in this Agreement; (iii) any inaccuracy in the allocation of the Purchase Price in the Preliminary Closing Statement or any manner in which it is inconsistent with the Governing Documents; (iv) Excluded Taxes; or (v) its discharge of any Liabilities of Disruptional or any of its Affiliates (other than the Company) not expressly assumed by the Company pursuant to the Hive-Down Agreement.

(b)    From and after the Closing, each Seller shall, severally and not jointly, indemnify and hold harmless each Purchaser Indemnified Party for, from and against any and all Losses, to the extent suffered or incurred by such Purchaser Indemnified Party and arising out of, relating to or resulting from: (i) the breach of (A) any representation or warranty made by such Seller contained in this Agreement (other than the Seller Fundamental Representations); or (B)

any Seller Fundamental Representation; or (ii) the breach by such Seller of any covenant or agreement of such Seller contained in this Agreement.

        SECTION 8.03    <u>Procedures</u>.  Except with respect to Contests, which shall be governed and controlled exclusively by <u>Section 7.01</u>:

        (a)    If a Purchaser Indemnified Party seeks indemnification in respect of, arising out of or involving a Loss or a claim or demand made by any Person against such Purchaser Indemnified Party (a "<u>Third Party Claim</u>"), then it shall deliver written notice (a "<u>Claim Notice</u>") in respect thereof to the Representative with reasonable promptness after receipt by such Purchaser Indemnified Party of notice of the Third Party Claim, and shall promptly provide the Representative with such information with respect thereto as the Representative may reasonably request, to the extent reasonably practicable and known by the Purchaser Indemnified Party. The failure to deliver (or to timely deliver) a Claim Notice, however, shall not release the Indemnifying Party from any of his, her or its obligations under this <u>Article VIII</u>, unless (and then solely to the extent that) the Indemnifying Party is actually and materially prejudiced by such failure or delay. Each Party will render to the other such assistance as it may reasonably require of the other in order to ensure prompt and adequate defense of any Action based upon a state of facts which gives rise to a right of indemnification hereunder.

        (b)    The Representative shall have the right, upon written notice to the Purchaser Indemnified Party within fifteen (15) days after receipt of a Claim Notice from the Purchaser Indemnified Party in respect of such Third Party Claim, which written notice shall include a written acknowledgment from Sellers against whom indemnity is sought (the "<u>Indemnifying Party</u>") of such Indemnifying Party's obligation to indemnify the Purchaser Indemnified Party pursuant to this <u>Article VIII</u> with respect to any Losses resulting from such Third Party Claim (subject in all respects to the limitations on indemnification contained in <u>Section 8.04</u> and the other procedures set forth in this <u>Section 8.03</u>), to assume the defense thereof at the cost and expense of the Indemnifying Party with counsel selected by the Representative and reasonably satisfactory to the Purchaser Indemnified Party; <u>provided</u>, that during such fifteen (15)-day period, if the Indemnifying Party has not acknowledged in writing its indemnification obligation or the Representative has not delivered a notice to the Purchaser Indemnified Party indicating that it wishes to assume the defense of such Third Party Claim, then the Purchaser Indemnified Party may take such actions with respect to such Third Party Claim as it deems reasonably necessary. Notwithstanding the foregoing, the Representative shall not be entitled to assume the defense of any Third Party Claim if (i) a part of such Third Party Claim seeks equitable or injunctive relief, (ii) such Third Party Claim relates to, or arises in connection with, any criminal proceeding, (iii) such Third Party Claim involves a current customer or supplier of any Purchaser Indemnified Party, (iv) counsel for the Purchaser Indemnified Party advises the Purchaser Indemnified Party that there are issues which raise conflicts of interest between the Indemnifying Party and the Purchaser Indemnified Party, (vi) the Representative failed or is failing to vigorously (given the nature of such claim) and in good faith prosecute or defend such claim, (vii) a Governmental Authority is a party to such claim or (viii) the amount of such Third Party Claim is reasonably expected to exceed the Cap after taking into account all claims pending or satisfied pursuant to <u>Section 8.02</u>, in which event the Purchaser Indemnified Party shall have the sole right to assume the defense of and to settle any such Third Party Claim and may retain counsel reasonably satisfactory to it (and any necessary local counsel), at the cost and expense of the Indemnifying

85

Party.  The Indemnifying Party shall be liable for the reasonable fees, costs and expenses of counsel employed by the Purchaser Indemnified Party for any period during which the Representative has failed to assume the defense of any Third Party Claim.  If the Representative does not expressly elect to assume the defense of such Third Party Claim within the time period and otherwise in accordance with the first sentence of this Section 8.03(b), the Purchaser Indemnified Party shall have the sole right to assume the defense of and to settle such Third Party Claim at the sole cost and expense of the Indemnifying Party.  If the Representative is entitled to assume and elects to assume the defense of such Third Party Claim, the Purchaser Indemnified Party shall have the right to employ separate counsel and to participate in the defense thereof, but the fees, costs and expenses of such counsel shall be at the sole cost and expense of the Purchaser Indemnified Party, unless (i) the employment of such counsel shall have been specifically authorized in writing by the Representative or (ii) the named parties to the Third Party Claim (including any impleaded parties) include both the Purchaser Indemnified Party and the Indemnifying Party, and the Purchaser Indemnified Party reasonably determines in good faith that representation by counsel to the Indemnifying Party of both the Indemnifying Party and such Purchaser Indemnified Party may present such counsel with a conflict of interest.  If the Representative is entitled to assume and elects to assume the defense of any Third Party Claim, the Purchaser Indemnified Party shall, but at the Indemnifying Party's cost and expense, use its commercially reasonable efforts to cooperate with the Representative in such defense.  If the Representative is entitled to assume and elects to assume the defense of any Third Party Claim, the Representative shall not, without the prior written consent of the Purchaser Indemnified Party, enter into any settlement or compromise or consent to the entry of any judgment (or offer to do any of the foregoing) with respect to such Third Party Claim if such settlement, compromise or judgment (i) involves a finding or admission of wrongdoing, (ii) does not include an express, irrevocable and unconditional written release by the claimant or plaintiff of the Purchaser Indemnified Party and its Affiliates from all Liability in respect of such Third Party Claim or (iii) imposes or results in equitable remedies or any Liability on the Purchaser Indemnified Party or any of its Affiliates, other than solely the payment of money damages for which the Purchaser Indemnified Party and any such Affiliates will be fully indemnified hereunder (subject in each case to the limitation set forth in Sections 8.04(a), (d), (h) and (i)).

       (c)     If a Purchaser Indemnified Party is seeking indemnification in respect of, arising out of or involving a Loss or a claim or demand hereunder that does not involve a Third Party Claim being asserted against or sought to be collected from such Purchaser Indemnified Party (a "Direct Claim"), then such Purchaser Indemnified Party shall deliver a Claim Notice in respect thereof to the Representative with reasonable promptness after becoming aware of any facts that the Purchaser Indemnified Party determines supports such Direct Claim, and shall reasonably promptly provide the Representative with all information, documents and materials with respect thereto as the Representative may reasonably request, to the extent reasonably practicable and known by the Purchaser Indemnified Party.  The failure to deliver (or to timely deliver) a Claim Notice, however, shall not release the Indemnifying Party from any of his, her or its obligations under this Article VIII, unless (and then solely to the extent that) the Indemnifying Party is actually and materially prejudiced by such failure or delay, and any such failure or delay shall not relieve the Indemnifying Party from any other Liability that he, she or it may have to any Purchaser Indemnified Party pursuant to this Article VIII.  If the Representative does not notify the Purchaser Indemnified Party in writing within twenty (20) days following its receipt of a Claim Notice in respect of a Direct Claim that the Representative disputes the Indemnifying Party's

liability to the Purchaser Indemnified Party hereunder, then (i) such Direct Claim specified by the Purchaser Indemnified Party in such Claim Notice shall be conclusively deemed a liability of the Indemnifying Party hereunder and (ii) the Indemnifying Party shall pay the amount of such liability to the Purchaser Indemnified Party promptly upon written demand. If the Representative agrees, in writing within twenty (20) days following its receipt of a Claim Notice in respect of a Direct Claim, that the Indemnifying Party has an indemnification obligation but asserts that he, she or it is obligated to pay a lesser amount than that claimed by the Purchaser Indemnified Party in the Claim Notice, then the Indemnifying Party shall pay such lesser amount promptly to the Purchaser Indemnified Party, without prejudice to or waiver of the Purchaser Indemnified Party's claim for the difference.

SECTION 8.04    <u>Limits on Indemnification</u>.

(a)    Notwithstanding anything to the contrary contained in this Agreement, Sellers shall not be liable for any indemnifiable Losses under <u>Section 8.02(a)(i)(A)</u> or <u>Section 8.02(b)(i)(A)</u> unless and until the aggregate amount of such indemnifiable Losses for which Sellers would otherwise be required to provide indemnification equals or exceeds, on a cumulative basis, ███████

(b)    Notwithstanding anything to the contrary contained in this Agreement, Sellers shall not be liable for any indemnifiable Losses under <u>Section 8.02(a)(i)(A)</u> or <u>Section 8.02(b)(i)(A)</u> to the extent the aggregate amount of indemnifiable Losses thereunder for which Sellers would otherwise be required to provide indemnification exceeds, on a cumulative basis, an amount equal to (i) the Holdback Consideration <u>plus</u> (ii) ███████ of the aggregate amount of any Earnout Payments (without giving effect to amounts that may be deducted from or set-off against any such Earnout Payments) otherwise payable to Sellers and Optionholders following the Holdback Release Date, if any (the "<u>Cap</u>").

(c)    Notwithstanding anything to the contrary in this Agreement, (i) each Seller shall be liable for its Pro Rata Indemnification Portion of the full amount of any indemnifiable Losses under <u>clauses (a)(i)(B)</u> or <u>(a)(ii)</u> – <u>(a)(v)</u> of <u>Section 8.02</u> and (ii) each Seller shall be liable for the full amount of any indemnifiable Loss under <u>clauses (b)(i)(B)</u> or <u>(b)(ii)</u> of <u>Section 8.02</u>; <u>provided</u>, <u>however</u>, that in no event shall any Seller's cumulative liability for Losses pursuant to <u>Section 8.02</u> exceed such Seller's Pro Rata Indemnification Portion of (A) an amount equal to the Purchase Price, <u>plus</u> (B) the aggregate amount of Earnout Payments paid or otherwise payable to Sellers and Optionholders, if any.

(d)    For all purposes of this <u>Article VIII</u>, the amount of any Losses payable by Sellers shall be reduced by any amounts actually recovered as compensation for such Losses by a Purchaser Indemnified Party under any insurance policies or third-party indemnification obligations, net of any (i) expenses incurred, (ii) deductibles associated with the collection of such amounts and (iii) any increases in insurance premium or other costs associated with collecting such amounts (<u>clauses (i)</u> through <u>(iii)</u>, the "<u>Collection Costs</u>"), by the Purchaser Indemnified Parties; <u>provided</u> that the Purchaser Indemnified Parties shall have no obligation to seek any such recovery. If, following a final court order awarding an indemnification payment for Losses hereunder and following actual payment by Sellers of such Losses, the Purchaser Indemnified Party actually receives any amounts as compensation for such Losses under any insurance policies or third party

indemnification claims, then the Purchaser Indemnified Party shall promptly reimburse Sellers up to any such amounts so recovered for which Sellers were responsible, net of any Collection Costs and the amount of any Losses not recovered from Sellers.

(e)     For all purposes of this Article VIII when determining the amount of Losses attributable to any breach of representation or warranty (but not for purposes of determining whether there has been a breach), such representations and warranties shall be interpreted without giving effect to any limitations or qualifications as to materiality, "Material Adverse Effect" or words of like meaning set forth therein.

(f)     Notwithstanding anything to the contrary contained herein, the indemnification provided for herein shall not cover, and in no event shall any Party be liable for, any special or punitive damages in respect of any indemnification obligations hereunder (except to the extent necessary to reimburse a Purchaser Indemnified Party for judgments actually awarded to third parties in respect of such types of damages and reasonable costs and expenses).

(g)     Any Losses for which any Purchaser Indemnified Party is entitled to indemnification under this Agreement shall be determined without duplication of recovery by reason of the state of facts giving rise to such Losses constituting a breach of more than one representation, warranty, covenant or agreement in respect of which indemnification in accordance with this Article VIII has otherwise been provided to such Purchaser Indemnified Party.

(h)     Sellers shall not have any liability for Losses under Section 8.02(a) to the extent such Losses were expressly taken into account in the calculation of the Deferred Consideration in accordance with Section 2.07.

(i)     For all purposes of this Article VIII, "Losses" shall be net of any Tax benefit or relief arising in connection with the incurrence of such Loss that is actually recognized by Purchaser or the Company (or any of their Affiliates) in the taxable year in which such Loss is incurred.

(j)     Notwithstanding anything to the contrary contained herein, the indemnification provided for herein by any Seller in respect of Excluded Taxes shall not apply to or cover any Taxes:

(i)     arising from Purchaser (i) filing an amended return of the Company with respect to a Pre-Closing Tax Period or Pre-Closing Straddle Period or (ii) entering into a voluntary disclosure Tax program that relates to Taxes of the Company for a Pre-Closing Tax Period or Pre-Closing Straddle Period, except, in each case, to the extent required by applicable Law; or

(ii)     to the extent that any Tax relief, credit, deduction, exemption or set-off for the Company relating to any Pre-Closing Tax Period or Pre-Closing Straddle Period (except to the extent reflected as an asset in the final calculation of Net Working Capital) is available to the Company to offset or otherwise mitigate the Taxes in question.

SECTION 8.05     Exclusive Remedy.  The Parties acknowledge and agree that, except (a) for the right to specifically enforce the provisions of this Agreement as provided in

Case 1:23-cv-02245-RA   Document 1-2   Filed 03/15/23   Page 112 of 185

<u>Section 9.12</u>, (b) with respect to the matters covered by <u>Section 2.06</u> or <u>Section 2.08</u>, which shall be governed by such Sections, (c) with respect to Fraud and (d) as set forth in <u>Section 9.01(b)</u>, following the Closing, the provisions of this <u>Article VIII</u> shall be the sole and exclusive remedies of the Purchaser Indemnified Parties against Sellers for any Loss.  Notwithstanding anything to the contrary set forth in this Agreement, following the Holdback Release Date, in the event that Purchaser makes a claim for indemnification related to a breach of <u>Section 3.15(b)</u> or <u>Section 4.08</u>, Disruptional may satisfy such claim without further monetary liability to Disruptional or Sellers by promptly transferring, conveying or otherwise assigning to Purchaser the applicable Hive-Down Assets in accordance with <u>Section 9.13</u>.

SECTION 8.06    <u>Order of Recovery by the Purchaser Indemnified Parties</u>. Following the application of, in each case, the limitations set forth in <u>Section 8.04</u>:

(a)    Any indemnification for Losses to which the Purchaser Indemnified Parties are entitled pursuant to <u>Section 8.02(a)(i)(A)</u> or <u>Section 8.02(b)(i)(A)</u> shall be recoverable solely by Purchaser withholding and deducting an amount equal to such Losses from (i) the Holdback Consideration and (ii) ███████████ of each Earnout Payment otherwise payable to Sellers and Optionholders (without giving effect to amounts that may be deducted from or set-off against any such Earnout Payments), from Sellers as such Earnout Payments become payable to Sellers pursuant to <u>Section 2.08</u>, if any.

(b)    Any indemnification for Losses to which the Purchaser Indemnified Parties are entitled pursuant to <u>clauses (a)</u> (other than <u>(a)(i)(A)</u>) or <u>(b)</u> (other than <u>(b)(i)(A)</u>) of <u>Section 8.02</u> shall be recoverable as follows:

(i)    prior to the date that all Earnout Payments, if any, are finally determined and, to the extent payable, paid pursuant to <u>Section 2.08</u>, all claims shall be recoverable by Purchaser withholding and deducting an amount equal to such Losses from (A) the Holdback Consideration and (B) any Earnout Payments that would otherwise become payable to Sellers pursuant to <u>Section 2.08</u>, if any; and

(ii)    thereafter or to the extent such Losses exceed all Earnout Payments that would otherwise become payable pursuant to <u>Section 2.08</u>, if any, all claims shall be recoverable directly from Sellers, as applicable.

SECTION 8.07    <u>Holdback Consideration</u>.

(a)    For purposes of this Agreement, the value of each Purchaser Share that constitutes Holdback Consideration or that is deducted from any Earnout Payment pursuant to this <u>Article VIII</u> shall be deemed to be the Issuance Price as of the date such Purchaser Share would have otherwise been issued to Sellers pursuant to this Agreement.

(b)    Any portion of the Holdback Consideration that has not been withheld and deducted by Purchaser to satisfy claims pursuant to this <u>Article VIII</u> as of the Holdback Release Date (<u>minus</u> the aggregate amount claimed by Purchaser Indemnified Parties pursuant to claims made and not fully resolved prior to such date) shall be released to Sellers in accordance with their respective Pro Rata Indemnification Portions.  At any time following the Holdback Release Date, to the extent the remaining Holdback Consideration exceeds the aggregate amount claimed by

89

Purchaser Indemnified Parties pursuant to claims made prior to such date and not fully resolved prior to the time of determination, the excess amount shall be promptly released to Sellers in accordance with their respective Pro Rata Indemnification Portions.

SECTION 8.08    No Right of Contribution.  After the Closing, no Seller shall have any right of contribution against the Company or any other Purchaser Indemnified Party for any indemnifiable Loss related to a breach of representation, warranty, covenant or agreement of the Company or any Seller under this Agreement or any Ancillary Document.

SECTION 8.09    Claims Unaffected by Investigation.    The rights of the Purchaser Indemnified Parties to indemnification, reimbursement and any other remedy available to any Purchaser Indemnified Party hereunder shall not be impacted or limited by any investigation conducted or knowledge obtained by or on behalf of Purchaser or its Affiliates. Sellers hereby acknowledge that, regardless of any such investigation or diligence or knowledge, Purchaser has entered into this transaction in express reliance upon the representations, warranties, covenants or agreements of the Company and Sellers in this Agreement.

# ARTICLE IX

## GENERAL PROVISIONS

SECTION 9.01    Expenses.  Except as otherwise specified in this Agreement (including with respect to Transaction Expenses and as otherwise provided in Sections 2.06(d)(vi) or 2.08(c)), (a) all costs and expenses, including fees and disbursements of counsel, financial advisors and accountants, incurred in connection with this Agreement and the transactions contemplated by this Agreement shall be borne by the Party incurring such costs and expenses, whether or not the Closing shall have occurred and (b) notwithstanding the preceding clause (a), but subject to Section 2.06, Section 2.08 and Section 7.08, with respect to any dispute under any of such sections, if any Party brings an Action in connection with any controversy, disagreement or dispute arising under this Agreement (other than under Section 2.06, Section 2.08 or Section 7.08), the prevailing Party shall be entitled, in addition to any other rights or remedies available to it, to collect from the nonprevailing Party or Parties the reasonable, out-of-pocket costs and expenses incurred by such prevailing Party in pursuing such Action, including reasonable attorney's fees and court costs.

SECTION 9.02    Notices.  All notices, requests, claims, demands and other communications hereunder shall be in writing and shall be given or made (and shall be deemed to have been duly given or made upon receipt) by delivery in Person, by an internationally recognized overnight courier service or by e-mail to the respective Parties at the following addresses (or at such other address for a Party as shall be specified in a notice given in accordance with this Section 9.02):

(a)     if to Purchaser:

Amyris, Inc.
5885 Hollis Street, Suite 100
Emeryville, CA 94608
United States of America
Attention:  General Counsel
E mail:  generalcounsel@amyris.com

with a copy (which shall not constitute notice) to:

Shearman & Sterling LLP
535 Mission Street, 25th Floor
San Francisco, CA 94105
United States of America
Attention:  Michael S. Dorf
E-mail:  mdorf@shearman.com

(b)     if to Sellers or Optionholders:

Disruptional Ltd.
Vitrum Building
St Johns Innovation Park, Cowley Road,
Cambridge CB4 0WS
United Kingdom
Attention:  Riaan Hodgson
E-mail:  riaan@beautylabs.com

and

AndVest Beauty Labs LP
147 West 79th Street
Apt 2B
New York, NY 10024
United States of America
Attention:  Doug Jacob
E-mail:  dj@andvest.co

with a copy (which shall not constitute notice) to:

Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166
United States of America
Attention:  Stefan G. dePozsgay
E-mail:  SdePozsgay@gibsondunn.com

91

Case 1:23-cv-02245-RA    Document 1-2    Filed 03/15/23    Page 115 of 185

SECTION 9.03    Severability.  If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any Law or public policy, all other terms and provisions of this Agreement shall nevertheless remain in full force and effect for so long as the economic or legal substance of the transactions contemplated by this Agreement is not affected in any manner materially adverse to any Party.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, Purchaser and Sellers shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated by this Agreement are consummated as originally contemplated to the greatest extent possible.

SECTION 9.04    Entire Agreement.    This Agreement, the Non-Disclosure Agreement and the Ancillary Documents constitute the entire agreement of the Parties with respect to the subject matter hereof and thereof and supersede all prior agreements and undertakings, both written and oral, between any of the Parties with respect to the subject matter hereof and thereof.

SECTION 9.05    Assignment.    This Agreement may not be assigned by operation of Law or otherwise without the express written consent of the Representative and Purchaser (which consent may be granted or withheld in the sole discretion of the Representative, on the one hand, or Purchaser, on the other hand, as applicable), and any purported assignment without such consent shall be null and void *ab initio*, except that Purchaser may assign its rights and obligations under this Agreement to any Affiliate of Purchaser without the consent of any other Party; provided, however, that no such assignment shall relieve Purchaser of any of its obligations hereunder.  The provisions of this Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.

SECTION 9.06    Amendment.    This Agreement may not be amended or modified except (a) by an instrument in writing signed by Sellers and Purchaser or (b) by a waiver in accordance with Section 9.07.

SECTION 9.07    Waiver.  Purchaser, on the one hand, and the Representative, on the other hand, may:

(a)    extend the time for the performance of any of the obligations or other acts of (in the case of Sellers or the Representative) Purchaser, and (in the case of Purchaser) the Representative;

(b)    waive any inaccuracy in the representations and warranties contained herein or in any document delivered pursuant hereto of (in the case of Sellers or the Representative) Purchaser, and (in the case of Purchaser) the Representative; and

(c)    waive compliance with any of the agreements or conditions to performance contained herein of (in the case of Sellers or the Representative) Purchaser, and (in the case of Purchaser) the Representative.

Any such extension or waiver shall be valid if set forth in an instrument in writing signed by the Party or Parties to be bound thereby.  Any waiver of any term or condition shall not be construed as a waiver of any subsequent breach or a subsequent waiver of the same term or condition, or a

92

Case 1:23-cv-02245-RA   Document 1-2   Filed 03/15/23   Page 116 of 185

waiver of any other term or condition of this Agreement.  Any failure or delay by a Party in exercising any right under this Agreement shall not constitute a waiver of such right.

SECTION 9.08   No Third Party Beneficiaries.  Except for the provisions of Section 6.08, Article VIII relating to any Purchaser Indemnified Party and Section 9.17, this Agreement shall be binding upon and inure solely to the benefit of the Parties and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever, including any rights of employment for any specified period, under or by reason of this Agreement.

SECTION 9.09   Currency.  Unless otherwise specified in this Agreement, all references to currency, monetary values and dollars set forth herein shall mean United States (U.S.) dollars and all payments hereunder shall be made in U.S. dollars.  If any amount referred to herein is calculated in any currency other than U.S. dollars, then, for purposes of this Agreement, such non-U.S. currency amount shall be converted into U.S. dollars based on the exchange rate of the applicable non-U.S. currency as quoted by WM/Refinitiv FX Benchmark on the close of business in New York on the Business Day immediately preceding the Closing Date; provided, however, that for purposes of determining the amount of any Amyris Brands Revenue, Average Monthly Revenue Per User, Beauty Labs Revenue, First Earnout Amyris Brands Revenue, First Earnout Beauty Labs Revenue, Second Earnout Amyris Brands Revenue, Second Earnout Beauty Labs Revenue, Synthetic Beauty Labs Revenue or Third Party Beauty Labs Revenue, any non-U.S. currency amount shall be converted into U.S. dollars based on Purchaser's generally applicable revenue recognition or pricing policies applied by Purchaser to all of its other Subsidiaries and business units.

SECTION 9.10   Governing Law; Venue.

(a)     This Agreement shall be governed by, and construed in accordance with, the Laws of the State of New York, without regard to the conflicts of Law rules of such state.  The Parties agree that any Action seeking to enforce any provision of, or based on any matter arising out of or in connection with this Agreement shall be brought and determined exclusively in any New York federal court sitting in the Borough of Manhattan of The City of New York (or any appellate court thereof); provided, however, that if such federal court does not have jurisdiction over such Action, such Action shall be heard and determined exclusively in any New York state court sitting in the Borough of Manhattan of The City of New York.  The Parties hereby (i) irrevocably submit to the exclusive personal jurisdiction of such courts for the purpose of any Action arising out of or relating to this Agreement brought by any Party, (ii) agree that all claims in respect of such Action or proceeding shall be heard and determined exclusively in such courts and (iii) irrevocably waive, and agree not to assert by way of motion, defense or otherwise, in any such Action, any claim that it is not subject to the personal jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution, that the Action is brought in an inconvenient forum, that the venue of the Action is improper or that this Agreement may not be enforced in or by any of the above-named courts.

93

(b)     Each of the Parties agrees to waive any bond, surety or other security that might be required of any other Party with respect to any Action or proceeding, including any appeal thereof.

(c)     Each of the Parties irrevocably consents to the service of any summons and complaint and any other process in any other Action relating to this Agreement, on behalf of itself or its property, by the personal delivery of copies of such process to such Party or by sending or delivering a copy of the process to the Party to be served at the address and in the manner provided for the giving of notices in <u>Section 9.02</u>.  Nothing in this <u>Section 9.10(c)</u> shall affect the right of any Party to serve legal process in any other manner permitted by Law.

SECTION 9.11     <u>Waiver of Jury Trial</u>.  EACH OF THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY LITIGATION AMONG THE PARTIES DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT.  EACH OF THE PARTIES HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THAT FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 9.11</u>.

SECTION 9.12     <u>Specific Performance</u>.  The Parties agree that they would be irreparably damaged if any provision of this Agreement was not performed in accordance with its specific terms or was otherwise breached and that any non-performance or breach of this Agreement by any Party could not be adequately compensated by monetary damages alone and that the Parties would not have any adequate remedy at Law.  Accordingly, the Parties shall be entitled to seek an injunction or injunctions to prevent breaches of this Agreement and to seek to enforce specifically the performance of the terms of this Agreement to prevent breaches or threatened breaches of any of the provisions of this Agreement without posting any bond or other undertaking, in addition to any other remedy at Law or in equity.

SECTION 9.13     <u>Further Assurances</u>.  Each Party shall do and perform, or cause to be done and performed, all such further acts, and shall execute and deliver all such other agreements, certificates, instruments and documents, as the other Parties may reasonably request, as may be reasonably required in order to carry out the provisions of this Agreement and the Ancillary Documents and give effect to the transactions contemplated hereby or thereby and the consummation of the transactions contemplated hereby and thereby (including executing any additional instruments of transfer, conveyance or other similar actions required to transfer title to any and all Hive-Down Assets held by Disruptional to Purchaser or one of its Affiliates from and after the date hereof).

SECTION 9.14     <u>Non-Recourse</u>.  Notwithstanding anything to the contrary contained herein, other than in respect of Fraud, this Agreement may only be enforced against,

Case 1:23-cv-02245-RA   Document 1-2   Filed 03/15/23   Page 118 of 185

and any claims or causes of action that may be based upon, arise out of or relate to this Agreement, or the negotiation, execution or performance of this Agreement, the Ancillary Documents or the transactions contemplated hereby or thereby, may only be made against the Persons that are expressly identified as parties to this Agreement or such Ancillary Document, as applicable, in their capacities as such and, except to the extent named as a party to this Agreement or any Ancillary Document and then only to the extent of the specific obligations of such parties set forth in this Agreement or such Ancillary Document, no former, current or future stockholders, equity holders, controlling Persons, directors, officers, employees, general or limited partners, members, managers, agents or Affiliates of any party hereto or thereto, or any former, current or future direct or indirect stockholder, equity holder, controlling Person, director, officer, employee, general or limited partner, member, manager, agent or Affiliate of any of the foregoing (each, a "<u>Non-Recourse Party</u>") shall have any liability for any obligations or liabilities of the parties to this Agreement or such Ancillary Document or for any claim (whether in tort, contract or otherwise) based on, in respect of, or by reason of, the transactions contemplated by this Agreement or such Ancillary Document or in respect of any representations made or alleged to be made in this Agreement or such Ancillary Document.  Without limiting the rights of any party to this Agreement or any Ancillary Document against the other parties hereto or thereto, other than in respect of Fraud, in no event shall any party to this Agreement or any Ancillary Document or any of its Affiliates seek to enforce this Agreement or such Ancillary Document against, make any claims for breach of this Agreement or such Ancillary Document against, or seek to recover monetary damages related to or arising out of a breach of this Agreement or such Ancillary Document from, any Non-Recourse Party.  For the avoidance of doubt, nothing set forth in this Agreement shall limit any claims or causes of action that may be based upon, arise out of or relate to any Ancillary Document.

SECTION 9.15    <u>Disclosure Schedule</u>.  No reference to or disclosure of any information in the Disclosure Schedule shall be construed as an admission or indication that such information is material or that such information is required to be referred to or disclosed in the Disclosure Schedule nor shall such information be deemed to establish a level or standard of materiality for purposes of this Agreement.  The schedules and exhibits attached to this Agreement (including their respective attachments, if any) form an integral part of this Agreement and are incorporated herein by reference.

SECTION 9.16    <u>Mutual Drafting</u>.  The Parties are each represented by legal counsel and have participated jointly in the negotiation and drafting of this Agreement and the Ancillary Documents, and, in the event an ambiguity or question of intent or interpretation arises, this Agreement and the Ancillary Documents shall be construed as if drafted jointly by the Parties, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement or any Ancillary Document.

SECTION 9.17    <u>Attorney-Client Privilege and Waiver of Conflicts</u>.

(a)    Purchaser hereby waives and agrees to not assert, and agrees to cause the Company to waive and not assert, any actual or potential conflict of interest arising out of or relating to the representation, after the Closing Date, of Sellers in any dispute with Purchaser or the Company or any other matter involving the transactions contemplated by this Agreement (each, a "<u>Post-Closing Representation</u>"), by Gibson, Dunn & Crutcher LLP ("<u>Prior Company Counsel</u>")

in connection with the transactions contemplated by this Agreement prior to the Closing ("Pre-Closing Representation"); provided that Prior Company Counsel is not then representing, and has not following the Closing represented, any of Purchaser and its Affiliates (including the Company). Purchaser further waives and agrees to not assert, and agrees to cause the Company to waive and not assert, in connection with any Post-Closing Representation, any attorney-client privilege with respect to any communication between Prior Company Counsel and Sellers, the Company or any officer, employee or manager of the Company that relates solely to the Pre-Closing Representation (it being understood the intention of the Parties that all rights to such attorney-client privilege, including, subject to the other terms and conditions of this Section 9.17, the right to control such attorney-client privilege shall be held by each Seller). In addition, all communications between direct and indirect holders of Equity Securities, the Company and their respective Affiliates, on the one hand, and Prior Company Counsel, on the other hand, solely to the extent related to the sale of Seller Shares constituting a majority of the outstanding voting power of the Company or to the cancellation of Other Seller Securities shall be deemed to be attorney-client confidences that belong solely to the direct and indirect holders of Seller Shares and their respective Affiliates (and not the Company or any holder of the rights in respect of such Other Seller Securities) (the "Seller Pre-Closing Communications"). Accordingly, the Company shall not have access to any such Seller Pre-Closing Communications or to any portion of the files of Prior Company Counsel solely relating to the Pre-Closing Representation from and after the Closing, and all records of the Company in any medium (including electronic copies) solely to the extent containing or reflecting any of Seller Pre-Closing Communications or the work product of legal counsel with respect thereto, including any related summaries, drafts or analyses, and all rights with respect to any of the foregoing, are hereby assigned and transferred to Sellers effective as of the Closing. Such material and information shall be excluded from the transfer contemplated by this Agreement and shall be distributed to Sellers immediately prior to Closing with no copies thereof retained by the Company, Purchaser or any of its Subsidiaries or their respective representatives and all costs and expenses related thereto shall be deemed Transaction Expenses. To the extent Purchaser or any of its Affiliates should discover in its possession after the Closing any such materials or information that contain Seller Pre-Closing Communications that are not delivered to Sellers prior to the Closing, (i) Purchaser will take reasonable steps to (A) hold such materials or information for the benefit of Sellers and (B) maintain the confidentiality of all such material and information, (ii) none of Purchaser, the Company and their respective Affiliates, representatives and, as applicable, Subsidiaries shall intentionally use or rely upon any such materials or information in any action related to this Agreement against or involving any Seller or Prior Company Counsel after the Closing, (iii) Purchaser, the Company and, as applicable, their respective Subsidiaries will take reasonable steps to deliver all such material and information to the Representative, at Sellers' sole cost and expense, reasonably promptly upon discovery thereof, without retaining copies thereof, and (iv) the retention of any such materials or information by Purchaser or the Company shall not be deemed a waiver of any privilege or other protection applicable to such materials or information. Without limiting the generality of the foregoing, from and after the Closing, (a) the direct and indirect holders of Seller Shares prior to the Closing and their respective Affiliates (and not the Company or any holder of the rights in respect of such Other Seller Securities) shall be the sole holders of the attorney-client privilege with respect to Seller Pre-Closing Communications, and the Company shall not be a holder thereof and (b) to the extent that files of Prior Company Counsel in respect of such engagement constitute property of the client, only the direct and indirect holders of Shares and their respective Affiliates (and not the Company or any holder of the rights in respect

of such Other Seller Securities) shall hold such property rights.  Notwithstanding the foregoing provisions of this <u>Section 9.17</u> to the contrary, in the event of any dispute between Purchaser or any of its Affiliates, including (after the Closing) the Company, on the one hand, and any other Person (other than Sellers, solely in their capacity as equityholders of the Company), on the other hand, Sellers agree that Purchaser or its Affiliates may assert the attorney-client privilege to prevent disclosure of any Seller Pre-Closing Communications and if requested by Purchaser, Sellers shall assert such privilege.  This <u>Section 9.17</u> is for the benefit of Sellers and Prior Company Counsel, and Sellers and Prior Company Counsel are intended third party beneficiaries of this <u>Section 9.17</u>.  This <u>Section 9.17</u> shall be irrevocable, and no term of this <u>Section 9.17</u> may be amended, waived or modified, without the prior written consent of the Representative.

(b)     Notwithstanding anything contained in this <u>Section 9.17</u> to the contrary, if Purchaser or any of its Affiliates, including (after the Closing) the Company, are required, by applicable Law or Governmental Order to disclose or otherwise make available any materials or information (including any Seller Pre-Closing Communications), then such Person may do so without any Liability hereunder.

(c)     For the avoidance of doubt, Sellers and Optionholders acknowledge and agree that, except as otherwise set forth above relating to the Seller Pre-Closing Communications, all other confidential and privileged information relating to the Company, including the attorney-client privilege, attorney work product protection and expectation of client confidence involving general business matters of the Company, whether arising prior to or after the Closing, belongs to the Company, and, following the Closing, Purchaser and its Affiliates, including the Company, shall have full rights with respect thereto.

SECTION 9.18     <u>Counterparts</u>.  This Agreement may be executed and delivered (including by e-mail in "pdf" form or other means of electronic transmission, such as by DocuSign) in one or more counterparts, and by the different Parties in separate counterparts, each of which when executed shall be deemed to be an original, but all of which taken together shall constitute one and the same agreement.

[Remainder of page intentionally left blank]

97

IN WITNESS WHEREOF, the Parties herein have executed or, in the case of any Party that is not a natural Person, caused their duly authorized officer to execute this Agreement as of the date first written above.

**COMPANY:**

**BEAUTY LABS INTERNATIONAL LIMITED**

By: _Riaan Hodgson_
      Name: Riaan Hodgson
      Title: Director

**SELLERS:**

**ANDVEST BEAUTY LABS LP**
**By: &vest Fund GP LLC**
**Its: General Partner**

By: _____
      Name: Doug Jacob
      Title: Authorized Signatory

**DISRUPTIONAL LTD**

By: _____
      Name: Mark Gerhard
      Title: Director

[Signature Page to Share Purchase Agreement]

IN WITNESS WHEREOF, the Parties herein have executed or, in the case of any Party that is not a natural Person, caused their duly authorized officer to execute this Agreement as of the date first written above.

**COMPANY:**

**BEAUTY LABS INTERNATIONAL LIMITED**

By: _____
      Name: Riaan Hodgson
      Title: Director

**SELLERS:**

**ANDVEST BEAUTY LABS LP**
**By: &vest Fund GP LLC**
**Its: General Partner**

By: _____
      Name: Doug Jacob
      Title: Authorized Signatory

**DISRUPTIONAL LTD**

By: _____
      Name: Mark Gerhard
      Title: Director

[Signature Page to Share Purchase Agreement]

IN WITNESS WHEREOF, the Parties herein have executed or, in the case of any Party that is not a natural Person, caused their duly authorized officer to execute this Agreement as of the date first written above.

**COMPANY:**

**BEAUTY LABS INTERNATIONAL LIMITED**

By: _____

      Name: Riaan Hodgson
      Title: Director

**SELLERS:**

**ANDVEST BEAUTY LABS LP**
**By: &vest Fund GP LLC**
**Its: General Partner**

By: _____

      Name: Doug Jacob
      Title: Authorized Signatory

**DISRUPTIONAL LTD**

By: _____

      Name: Mark Gerhard
      Title: Director

[Signature Page to Share Purchase Agreement]

**PURCHASER:**

**AMYRIS, INC.**

By: _____
Name: John Melo
Title: Chief Executive Officer

[Signature Page to Share Purchase Agreement]

Case 1:23-cv-02245-RA   Document 1-2   Filed 03/15/23   Page 125 of 185









INDEX NO. 650928/2023
RECEIVED NYSCEF: 03/09/2023

Case 1:23-cv-02245-RA   Document 1-2   Filed 03/15/23   Page 131 of 185

NYSCEF DOC. NO. 19

INDEX NO. 650928/2023

Case 1:23-cv-02245-RA   Document 1-2   Filed 03/15/23   Page 132 of 185

RECEIVED NYSCEF: 03/09/2023

NYSCEF DOC. NO. 19

Case 1:23-cv-02245-RA   Document 1-2   Filed 03/15/23   Page 134 of 185



| | | |
|---|---|---|
| ▮▮▮▮▮▮ | ▮▮▮▮▮▮ | ▮▮ |
| ▮▮▮▮ | ▮▮▮ | ▮▮▮▮▮ |
| ▮▮▮▮ | ▮▮ | ▮▮▮▮▮▮ |
| ▮▮▮▮ | ▮▮▮ | ▮▮▮▮▮▮ |
| ▮▮▮▮▮ | ▮▮▮ | ▮▮▮▮▮▮ |
| | ▮▮ | ▮▮▮ |
| | ▮▮ | ▮▮▮▮ |
| | ▮▮ | ▮▮▮ |
| | ▮▮ | ▮▮▮ |
| | ▮▮ | ▮▮▮ |
| | ▮▮ | ▮▮▮ |
| | ▮▮ | ▮▮▮▮ |
| | ▮▮ | ▮▮▮▮▮ |
| | ▮▮ | ▮▮▮ |
| | ▮▮ | ▮▮▮▮ |
| | ▮▮ | ▮▮▮▮ |
| | ▮▮ | ▮▮▮ |
| | ▮▮ | ▮▮▮ |
| | ▮▮ | ▮▮ |

Case 1:23-cv-02245-RA   Document 1-2   Filed 03/15/23   Page 135 of 185

Case 1:23-cv-02245-RA   Document 1-2   Filed 03/15/23   Page 136 of 185

Case 1:23-cv-02245-RA   Document 1-2   Filed 03/15/23   Page 137 of 185

Case 1:23-cv-02245-RA   Document 1-2   Filed 03/15/23   Page 138 of 185









INDEX NO. 650928/2023
RECEIVED NYSCEF: 03/09/2023



Case 1:23-cv-02245-RA Document 1-2 Filed 03/15/23 Page 144 of 185



INDEX NO. 650928/2023
RECEIVED NYSCEF: 03/09/2023







Case 1:23-cv-02245-RA   Document 1-2   Filed 03/15/23   Page 151 of 185





Case 1:23-cv-02245-RA   Document 1-2   Filed 03/15/23   Page 153 of 185



INDEX NO. 650928/2023
RECEIVED NYSCEF: 03/09/2023



Case 1:23-cv-02245-RA Document 1-2 Filed 03/15/23 Page 156 of 185



Case 1:23-cv-02245-RA   Document 1-2   Filed 03/15/23   Page 157 of 185

INDEX NO. 650928/2023

RECEIVED NYSCEF: 03/09/2023









2

INDEX NO. 650928/2023
Case 1:23-cv-02245-RA   Document 1-2   Filed 03/15/23   Page 163 of 185
RECEIVED NYSCEF: 03/09/2023



3



4

Case 1:23-cv-02245-RA Document 1-2 Filed 03/15/23 Page 165 of 185



5

Case 1:23-cv-02245-RA   Document 1-2   Filed 03/15/23   Page 166 of 185



Case 1:23-cv-02245-RA Document 1-2 Filed 03/15/23 Page 167 of 185



7

Case 1:23-cv-02245-RA   Document 1-2   Filed 03/15/23   Page 168 of 185



[            ]

8





Case 1:23-cv-02245-RA   Document 1-2   Filed 03/15/23   Page 172 of 185



[Signature Page to Guarantee, Release and Restrictive Covenant Agreement]

Case 1:23-cv-02245-RA   Document 1-2   Filed 03/15/23   Page 174 of 185



Case 1:23-cv-02245-RA Document 1-2 Filed 03/15/23 Page 175 of 185



2



3



4





| ███████████ | ████████████ | ████████████ | ████████ | █████████ |
|---|---|---|---|---|
| ██ | ██ | ███ | ████████ | |
| ██ | ██ | ███ | ████████ | |

---

██ ██████████████████████████████

6

Case 1:23-cv-02245-RA   Document 1-2   Filed 03/15/23   Page 180 of 185





| ███████████ | ██████ | ████████████ |
|---|---|---|
| ██████ | | |
| ████████████ | | |
| ████████████ | ███████████ | ██████████ |
| ███████████ | ██████████ | ██████████ |
| █████████████ | ████████████ | ██████████ |
| ████████████ | ███████████ | ███████████ |
| ████████████ | ███████████ | ███████████ |
| ███████████ | ███████████ | ██████████ |
| ████████████ | ███████████ | ██████████ |
| ██████████ | ███████████ | ██████████ |

8



9

Case 1:23-cv-02245-RA   Document 1-2   Filed 03/15/23   Page 183 of 185



# EXHIBIT B



January 27, 2023


Disruptional Ltd.
Vitrum Building
St Johns Innovation Park, Cowley Road,
Cambridge CB4 0WS
United Kingdom
Attention: Riaan Hodgson
E-mail: riaan@beautylabs.com


AndVest Beauty Labs LP
147 West 79th Street
Apt 2B
New York, NY 10024
United States of America
Attention: Doug Jacob
E-mail: dj@andvest.co


Dear Riaan Hodgson:


Pursuant to the Share Purchase Agreement ("the Purchase Agreement"), dated as of August 31, 2021, by and among Beauty Labs International Limited ("Beauty Labs" or "Seller") and Amyris, Inc. ("the Company" or "Amyris" or "Purchaser"), Seller and each Optionholder is entitled to Earnout payments in the form of Purchaser Shares, as stipulated within the Purchase Agreement, upon achievement of a certain revenue milestone. The outcome of the fiscal 2022 earnout achievement is as follows:

Fiscal 2022 Revenue Milestone (per Purchase Agreement): ▮▮▮▮▮

Fiscal 2022 Revenue Achieved (actual): ▮▮▮▮▮, comprised of the following:

- ▪ Beauty Labs Revenue & Third Party Beauty Labs Revenue: ▮▮▮▮▮
- ▪ Synthetic Beauty Labs Revenue: ▮▮▮▮▮

Milestone achieved: No

As Beauty Labs did not achieve the revenue milestone per the Purchase Agreement in fiscal 2022, no earnout payment is awarded for 2022 performance.


Respectfully,


Amyris, Inc.

5885 Hollis Street Suite 100, Emeryville, California 94608
P: 510 450 0761 F: 510 225 2648